1  James A. Bruen (State Bar No. 43880)
   Charles M. Sink (State Bar No. 078168)
2  Thomas B. Mayhew (State Bar No. 183539)
   Carl E. Switzer (State Bar No. 211858)
3  Arjun Agarwal (State Bar No. 233576)
   Farella Braun + Martel LLP
4  235 Montgomery Street, 17th Floor
   San Francisco, CA  94104
5  Telephone:  (415) 954-4400
   Facsimile:  (415) 954-4480
6  E-mail: jbruen@fbm.com
   E-mail: csink@fbm.com
7  E-mail: tmayhew@fbm.com
   E-mail: cswitzer@fbm.com
8  E-mail: aagarwal@fbm.com

9  Ned N. Isokawa (State Bar No. 66287)
   Paul, Hastings, Janofsky & Walker LLP
10 55 Second Street
   Twenty-Fourth Floor
11 San Francisco, CA 94105
   Telephone:  (415) 856-7000
12 Facsimile:  (415) 856-7100
   E-mail: nedisokawa@paulhastings.com
13

14 Attorneys for Defendant and Counterclaimant
   GE TRANSPORTATION SYSTEMS GLOBAL
15 SIGNALING, LLC

16                UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18

19 SAN FRANCISCO BAY AREA RAPID          Case No. C-06-03749 JSW
   TRANSIT DISTRICT,
20                                       **GE TRANSPORTATION SYSTEMS**
                  Plaintiff,             **GLOBAL SIGNALING, LLC'S**
21                                       **OPPOSITION TO BART'S MOTION FOR**
            vs.                          **PARTIAL SUMMARY JUDGMENT**
22
   GE TRANSPORTATION SYSTEMS             Date:    May 14, 2010
23 GLOBAL SIGNALING, LLC,                Time:    9:00 a.m.
                                         Courtroom: 11, 19th floor
24                Defendant.             Judge: Hon. Jeffrey S. White

25                                       Complaint Filed:   June 13, 2006
                                         Trial Date:        August 30, 2010
26

27 ─────────────────────────────
   AND RELATED COUNTER-CLAIM.
28

GETS' OPPOSITION TO BART MOTION FOR PARTIAL                    18972\2189333.3
SUMMARY JUDGMENT
 - Case No. C-06-03749 JSW

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

STATEMENT OF FACTS ........................................................................................................ 2

    A.    BART And Its Earlier Partners Designed A Flawed System.................................. 2

    B.    GETS Learned Of Problems And Complained ...................................................... 5

    C.    The Parties Talked For Years About GETS' Claims, And Potential Change
          Orders To Address The Issues, Before The Lawsuit Was Filed. ........................... 7

    D.    In The Contract's Final Days, GETS Re-Confirmed Its Contention To
          Pursue A Claim Against BART If The Contract Did Not Go Forward. ............... 10

ARGUMENT ........................................................................................................................... 12

I.      GETS GAVE PROPER NOTICE OF ITS REQUESTS FOR COMPENSATION ......... 12

    A.    Standards Governing Evaluation Of Claims Notice Provisions ........................... 12

         1.    The Purpose Of The Claims-Notice Process Is To Initiate
               Investigation And Negotiation, So Precise Pleading Is Not
               Required; Even "Unspecified Damages" Will Satisfy The Rule ............. 13

         2.    A Condition That Leads To Forfeiture Of Contract Rights Must Be
               Construed To Avoid Forfeiture ............................................................... 14

    B.    GETS Complied With The Contractual Provisions Governing Claims ................ 16

II.    THE CLAIMS NOTICE PROVISION DOES NOT APPLY IN ANY EVENT
      BECAUSE THE ISSUES WERE RAISED IN THE CHANGE ORDER
      CONTEXT .............................................................................................................. 18

III.   THE CLAIMS NOTICE PROVISION DOES NOT APPLY BECAUSE BART
      SUED FIRST. ......................................................................................................... 21

IV.   A REASONABLE FACT-FINDER COULD CONCLUDE THAT THE CLAIMS-
      NOTICE PROVISIONS WERE WAIVED, OR THAT BART IS ESTOPPED TO
      ASSERT THOSE PROVISIONS AS A BAR. ....................................................... 23

CONCLUSION ....................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................ 12

*Brinderson Corp. v. Hampton Roads Sanitation District*,
   825 F.2d 41 (4th Cir. 1987) .................................................................................... 16

*Calfon Constr., Inc. v. United States*,
   18 Cl. Ct. 426, 439 (1989) ...................................................................................... 16

*Delaware Steel Co. v. Calmar Steamship Corp.*,
   378 F.2d 386 (3d Cir. 1967) .................................................................................... 16

*Frank Briscoe Co. v. Clark County*,
   857 F.2d 606 (9th Cir. 1988) .................................................................................. 21

*Frederick v. United States*,
   386 F.2d 481 (5th Cir. 1967) .................................................................................. 22

*Hoel-Steffen Construction Co. v. United States*,
   456 F.2d 760 (Ct. Cl. 1972) .................................................................................... 16

*Nortel Networks, Inc. v. Gold & Appel Transfer S.A.*,
   298 F. Supp. 2d 81 (D.D.C. 2004) .......................................................................... 15

*Pacific Gas & Electric Co. v. City of Union City*,
   220 F. Supp. 2d 1070 (N.D.Cal. 2002) ................................................................... 21

**STATE CASES**

*Arntz Builders v. City of Berkeley*,
   166 Cal. App. 4th 276 (2008) .................................................................................. 22

*Boas v. County of San Diego*,
   113 Cal. App. 3d 355 (1980) ................................................................................... 24

*City of Stockton v. Superior Court*,
   42 Cal. 4th 730 (2007) ...................................................................................... 13, 21

*Connelly v. County of Fresno*,
   146 Cal. App. 4th 29 (2006) ........................................................................ 13, 14, 17

*Cory v. City of Huntington Beach*,
   43 Cal. App. 3d 131 (1974) ..................................................................................... 22

*Cruise v. City & County of San Francisco*,
   101 Cal. App. 2d 558 (1951) ................................................................................... 25

*Galdjie v. Darwish*,
   113 Cal. App. 4th 1331 (2003) ...................................................................... 23, 24, 25

*Krainock v. Superior Court,*
    216 Cal. App. 3d 1473 (1990)........................................................................ 21

*Lauderdale Associate v. Department of Health Services,*
    67 Cal. App. 4th 117 (1998) ........................................................................ 15

*M.F. Kemper Construction v. City of Los Angeles,*
    37 Cal. 2d 696 (1951) ................................................................................. 15

*Milovich v. City of Los Angeles,*
    42 Cal. App. 2d 364 (1941)......................................................................... 14

*Ocean Services Corp. v. Ventura Port District,*
    15 Cal. App. 4th 1762 (1993) ......................................................... 14, 24, 25

*Outboard Marine Corp. v. Superior Court,*
    52 Cal. App. 3d 30 (1975).......................................................................... 25

*People ex rel. Department of Parks and Recreation v. West-A-Rama, Inc.,*
    35 Cal. App. 3d 786 (1973)........................................................................ 21

*Rand v. Andreatta,*
    60 Cal. 2d 846 (1964) ................................................................................ 23

*Southern Cal. Edison Co. v. Superior Court,*
    37 Cal. App. 4th 839 (1995) ....................................................................... 20

*Stevenson v. San Francisco Housing Authority,*
    24 Cal. App. 4th 269 (1994) ....................................................................... 14

*Stockett v. Association of Cal. Water Agencies Joint Powers Insurance Authority,*
    34 Cal. 4th 441 (2004) ............................................................................... 13

*Universal Sales Corp. v. California Press Manufacturing Co.,*
    20 Cal. 2d 751 (1942) ......................................................................... 14, 20

*Valley View Home of Belmont v. Department of Health Services,*
    146 Cal. App. 3d 161 (1983)....................................................................... 15

**FEDERAL STATUTES**

28 U.S.C.
    § 2406.......................................................................................................... 22

**STATE STATUTES**

Cal. Civ. Code
  § 1442 ................................................................................................... 14
  § 1635 ................................................................................................... 14
  § 1641 ................................................................................................... 20
  § 1643 ................................................................................................... 22
  § 1692 ................................................................................................... 23
  § 3275 ............................................................................................. 14, 15

Cal. Welf. Inst. Code § 14018.5 ........................................................... 15

**SECONDARY AUTHORITIES**

Rest. 2d Contracts § 229 ................................................................. 15, 16

Witkin, Summary of Cal. Law, Contracts § 991 (10th ed., 2009) ................................. 14

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

2

GETS agreed to a fixed price contract to complete the AATC system using the

3 specifications that BART had developed during Phase 1 with Hughes and Morrison Knudsen.

4 Because those specifications were flawed, and because BART didn't cooperate or provide

5 adequate engineering guidance or remedial change orders to solve the problems with the design,

6 GETS lost the value of its investment: $27 million in unreimbursed out-of-pocket costs, and

7 another $9.9 million in return on investment.

8

BART argues that GETS failed to give notice of its claim, and that this results in a

9 complete forfeiture of the claim. BART asserts that simply because it did not receive a document

10 titled "Notice of Claim" containing the precise numbers and words now used in GETS' damages

11 expert's report, the claim is barred because of failure to give notice.

12

BART's position is legally and factually flawed. California law does not impose

13 forfeiture for alleged technical violation of claims procedures. Instead, California courts require

14 only "substantial compliance" with government claims requirements sufficient to "to enable the

15 public entity to make an adequate investigation of the claim's merits and settle it without the

16 expense of litigation." In other words, claims notice provisions, like any contractual

17 provisions, are construed to satisfy their essential purpose: here, to provide notice.

18

There is ample evidence of substantial compliance that meets this standard. As the facts

19 will show at trial, BART was repeatedly and thoroughly notified of GETS' claims arising from

20 BART's defective design of the AATC system. These claims did not arise all at once, but

21 manifested over time and were the subject of numerous discussions and notifications. The claim

22 notices GETS provided BART were sufficiently detailed and more than adequate to enable BART

23 to investigate and assess the merits of these claims. Indeed, BART and GETS negotiated for over

24 three years about how to fix the BART design through a change order in order to avoid GETS'

25 substantial claims, before BART ended negotiations by filing suit.

26

BART's contention that the inevitable refinement of a claimant's damage numbers

27 through litigation and expert reports invalidates the claim is equally misplaced. The law does not

28

GETS' OPP. TO BART'S MOT. FOR PARTIAL SUMMARY
JUDGMENT
 - Case No. C-06-03749 JSW

- 1 -

18972\2189333.3

require that the damage numbers match exactly, or that the pre-litigation claim be made with the precision of a pleading, much less an expert declaration. Here, BART was notified that if it walked away from the contract, GETS' claim would be approximately $35.6 million. Sink Exh. A (GETS March 4, 2003 cost estimate). These numbers are not materially different from what appears in the Lechner report, which places a value of approximately $37 million on GE's counterclaims. The sufficiency of notice, therefore, is at best a contested issue to be resolved by the trier of fact.

Moreover, even if there were no substantial compliance with the contract's claims notice procedure, BART's motion would still fail for several additional reasons:

1.      The contract's claims notice provision provides an express exception for the contract's change order process, because the change order process serves the same effective purpose as a claims notice. Here, the issues raised in GETS' claims were also the subject of a change order and are, therefore, contractually exempted from the "notice of claims" procedure.

2.      Under California law, claims notice provisions do not apply to contract counterclaims, because when the government sues first on a contract, it shows that it has decided that its investigation and negotiation is sufficient, and because it would be unfair for the government to sue on a contract but not be subject to countersuit on the same contract.

3.      Through its conduct of encouraging negotiation over the change orders, and never complaining that GETS' notices of claims were late or insufficiently specific, BART waived, or is estopped from asserting, the claims notice provisions.

For all of these reasons, BART's motion for summary judgment should be denied.

## STATEMENT OF FACTS

### A.      BART And Its Earlier Partners Designed A Flawed System.

The Advanced Automatic Train Control system ("AATC") was the brainchild of now-retired BART employee Eugene Nishinaga. Sink Exh. B (BART 30(b)(6) Nishinaga Depo. 23:18-24:24. He founded the research and development department of BART in 1991. *Id.* at 21:10-22:2. That same year, he contacted various companies to learn what technologies they might have for determining the location of vehicles. *Id.* at 23:25-24:24. He learned of the

Hughes military radio-ranging technology and began discussions with them about using that technology to locate trains.  *Id.*

In April 1993, BART completed the first set of specifications for the AATC system.  *Id.* at 51:20-23.  BART wanted another company to invest, because the project "was perceived by our management at the time [as] a risky venture"; everyone at BART other than Nishinaga and his group thought AATC was "pie in the sky, highly risky . . ."  *Id.* at 61:18-62:20.  Nevertheless, using Defense Department funding to pay for the project, BART entered into an alliance with the joint venture of Hughes Aircraft and Morrison Knudsen.  TAC ¶ 12.

For the next several years, Hughes and Morrison Knudsen worked on the AATC project with BART on the test track in Hayward.  Bruen Exh. A[1] at 1-0151.  By August 1997, when Hughes and Morrison Knudsen had withdrawn and Harmon signed a letter of intent, BART had spent an estimated 40,000 man hours in development (including over 3,000 hours by BART's research and development group on the drafting of the AATC system technical requirements), Hughes and Morrison Knudsen had spent an estimated 314,140 hours, and the parties had used $17 million in grant funds from the Department of Defense.  Sink Exh. C, Exh. B at 191:13-21, 174:3-25, 187:4-189:8.  The project had completed a successful 1996 demonstration on the test track, "proving conceptually you can control vehicles through the air."  *Id.* at 88:22-89:5; 106:22-107:2.  BART incorporated the aspects of the design that were developed on the test track as technical requirements in the 1998 contract with GETS.  *Id.* at 144:17-145:16.  But as Nishinaga now concedes, "At the time we thought they had gotten a lot further than they had gotten . . ."  *Id.* at 107:16-108:6.

The technical requirements specified that the AATC system would rely upon certain elements of BART's existing system.  *See* Bruen Exh. A at pp. 1-0289 to 1-0496 (technical requirements).  In order to understand the kinds of issues that came up in 2002 (which everyone agrees is when the project started to fall apart, and which are the basis of GETS' claims), we identify two examples of how AATC uses elements of BART's existing system here:

---

[1]     Rather than resubmitting the entire contract, we cite here to the Bruen Declaration in support of GETS' motion for partial summary judgment, Exhibit A.

For example, BART required that the AATC system rely upon BART's existing track circuit signals for "silent train" detection.[2] "Silent trains" are trains that don't have AATC radios or have malfunctioning/non-working radios, and therefore cannot be detected by the AATC radio technology. BART's AATC design depended upon BART's existing track circuits to generate occupancy indications in order to locate these trains. Bruen Exh. A TR2.5.2, 2.5.2.1, and 2.5.2.2 at pp. 1-0305 - 306. BART further confirmed the reliability of using its track circuit system – indeed, relying on one track circuit alone to detect silent trains – by issuing a change order that told GETS to do just that. Sink Exh. D pp. 2-0412 - 413 (changes to TR2.5.2.1 and TR2.5.2.2).

BART's required use of the "key switch" on the train operator's console as a safety back-up offers another important example of how the AATC design that BART set out in its specifications depended on the reliability of BART's existing systems. Each BART train has a control car at each end of the train, with a key switch that, when in the "on" position, designates that car as the "lead" control car. Under the AATC design, the control cars at either end of the train were also to be equipped with AATC radios, the location of which could be determined by the wayside AATC equipment to determine the lead and tail ends of the train. A safety issue could arise, however, if one of the two AATC radios failed, in which case the wayside equipment would be unable to determine whether that radio was at the lead end of the train or the tail end. BART specified that in this scenario: "The proper direction of a train shall be determined by determining which end of the train has the key switch turned on." Bruen Exh. A at TR2.11.3.1, p. 1-0329. During the project, BART re-confirmed that the key switch indication sent by its train to the AATC wayside equipment would support safety critical functions (i.e., in industry parlance, that it would be "vital"). *Id.*; Sink Exh. E (BART 30(b)(6) Depo.) at 37:8-16.

---

[2]     BART's existing train control system uses "track circuits" to, among other things, determine the location of trains. A wire is attached to each of the two rails (not the electrified third rail), and a second wire is attached to the rails some distance away (for example, 1/4 mile away). Electricity is applied to this circuit and monitored. If a train comes onto that portion of the track, the metal wheels/axles interfere with the circuit, causing the power measurement to fall significantly. This is called "shunting." This information is sent back to the station computer, which then knows that a train is "occupying" that particular portion of the track. The problem with this system comes when trains "fail to shunt," so that no signal is sent even though a train is present.

### B.      GETS Learned Of Problems And Complained.

In 2002, as Phase 2 appeared near completion, BART began to identify numerous technical issues as result of its misleading and defective technical requirements.  Because GETS had agreed to a fixed price contract in exchange for the right to exclusively license and market the AATC technology in the future, these technical issues put at risk all of GETS' costs to develop the AATC technology and the prospect of any reasonable return on that investment.

In May 2002, BART notified GETS that the keyswitch indication was in fact not "vital." Sink Exh. F (May 22, 2002 e-mail:  "The Keyswitch Indication cannot ever be made a vital indication.").  This was contrary to what BART engineers had previously believed and told GETS, and what BART's own safety consultant, Dr. James Ringland, had thought.  *Id.* Exh. G (BART engineer David Lehrer 12/24/01 e-mail:  "The VATC vitally reports the keyswitch indication."); *Id.* Exh. H (Ringland e-mail:  "It looks like we all thought the keyswitch was vital."); *Id.* Exh. E (BART 30(b)(6) Depo.) at 211:25-213:8 (testifying that Oct. 24, 2001 e-mail was "not factual.  It is not correct."); *Id.* at 203:5-208:24 (Lehrer "mea culpa," "The facts is the facts, yeah.  I considered this a mistake on my part," "my thinking was warped at the time . . ."); *id.* at 222:14-23.

In mid-July 2002, an even more serious problem was identified with the AATC system: its dependence on BART's track circuits.  At a safety meeting on July 10, 2002, BART engineers reported to GETS for the first time that BART had at times observed a train passing through an entire track circuit undetected.  *See* Sink Exh. I ("The statement was made that they [BART] do infrequently see persistent non-occupancy failures, which would prevent a silent train from being detected.").  If true, this meant that a single track circuit could not be relied upon for the safety critical functions as directed by the contract, including "silent train" detection.  BART agreed to further investigate this issue and recognized that a change order may be necessary.  *Id.* ("This discussion may be an expansion of scope, but needs to be added to the list.").  GETS immediately informed BART that this was a significant issue, stating that it would render the system "unbuildable" unless there was a change order to address the issue.  Sink Exh. J at 192:16-194:25; Sink Exh. K at 319:2-320:21.

1    Although discussions over these issues were ongoing and phase 2 could therefore not be

2    completed, the parties were anxious to proceed with a partial victory.  Sink Exh. L (LaBonte

3    Depo.) at 114:1-114:18; 120:21-121:21.  GETS and BART wanted to market AATC to the

4    London Underground, which had put out an invitation to bid on providing a new train control

5    system.  *Id.*  BART also wanted to claim progress for political reasons, and show off the system

6    to others in the industry.  *Id.*  So the parties agreed to declare a partial success:  BART would

7    obtain CPUC permission to operate trains in revenue service (using a highly qualified and limited

8    version of the system, "restricted mixed mode") and exercise its option for Phase 3 of the project.

9    As part of this agreement, BART in late July 2002 signed one change order declaring

10   Phase 2 to be "substantially complete," and a second one giving GETS notice to proceed with

11   Phase 3.  Sink Exh. M (change order 97); Exh. N (change order 86).  Change order 97 expressly

12   indicated that there were "open system issues" and a "punch list" remaining to be resolved, and

13   carved these items out from a release of claims.  *Id.* Exh. M.  Included in these open technical

14   issues that required resolution were the track circuit and keyswitch issues.  *Id.*

15   In addition to BART's amendment of its contract to specify its responsibility to resolve all

16   open system issues from Phase 2, BART's executive manager for transit system development

17   Gary LaBonte also requested that GETS' Phase 3 Project Manager, Lorne Harris, send BART a

18   formal letter detailing the specific Phase 2 technical issues that had been identified.  The parties

19   had consciously pursued a policy of "no letter before its time," which meant that the parties

20   should not send claim documents, but instead should focus on problem solving and follow-up

21   with letters only after the parties reach an understanding of how things will proceed.  Sink Exh. K

22   at 216:4-217:22; Exh. O at 108:6-20 (general manager of BART, describing approach)

23   On August 2, 2002, two days after BART's Notice To Proceed on the remaining Phase 3

24   work, GETS sent the requested letter in the form of a initial notice of potential claim as an

25   additional way of documenting and describing the problems.  Sink Exh. P.  Consistent with the

26   parties discussions and expectations, the letter also formally documented that GETS was

27   "requesting a change order be issued" to address the problems.[3]  *Id.*

28   _____
[3]    That GETS would seek compensation about these issues weren't a surprise to BART; they

C.    **The Parties Talked For Years About GETS' Claims, And Potential Change Orders To Address The Issues, Before The Lawsuit Was Filed.**

The notices had the precise effect that they were supposed to have under the contract: they ensured that BART understood that a claim was possible so that BART could try to resolve the matter out of court.

In October 2002, BART management drafted findings of fact concerning some of GETS' notices of potential claims – and concluded that the potential claims were valid and that the contract should be amended by change orders. Sink Exh. R, S. As to the keyswitch issue, BART noted that GETS believed the keyswitch indication could be used for safety critical functions, confirmed that Change Order 85 had directed GETS to use it that way, and that this was a problem because "[i]t was discovered that the keyswitch on the vehicle is in fact non-vital." Exh. R at B0276189. And on the issue of "silent train detection," BART stated that it was "unable to find a rebuttal to GETS' claim," concluded that GETS was entitled to relief, and proposed to solve the problem by adding a new requirement to the contract. *Id.* ("Entitlement granted."). The BART findings concluded by stating "As entitlement to these four claim items has been established, in accordance with Article GCP4.4.1.2 issue a Change Notice requesting a proposal." *Id.* at B0276190; *see also* Exh. S (e-mail from BART's project manager Morven MacLean: "BART finds there is entitlement on the following issues. Go ahead and submit cost and schedule proposals for these along with the other items . . ."). GETS confirmed: "These items will require change notices, since the [GETS] work scope within the present contract requirements cannot be implemented due to specification deficiencies." Sink Exh. T.

Meanwhile, everyone focused on solving the problems and moving forward. BART issued change orders, modifying the contract to indicate that the issues were unsettled and would

---

had been identified in the safety group's meeting minutes, and expressly carved out from the declaration of phase 2 completion (and a release of claims) by change order 97. *See, e.g.,* Sink Exh. Q (internal BART e-mail in May 2002, attaching safety group meeting minutes, and stating "At some point we also need to determine which proposed changes are due to [GETS] mistakes (i.e. paid for by [GETS]) and which design changes are due to added or modified requirements (i.e. should be paid for by BART via one or more CNs [Change Notices].)"; Exh. M (change order 97, including exception from release, punch list, "open systems issues"); Exh. P (handwritten notes on GETS' August 2 claim document, indicating "yes" to some of them).

1   need further design changes to resolve.  In Change Order 100, BART deleted the text of

2   TR2.5.2.2 (concerning silent trains) so that the contract provision now read only "TBD.  Note:

3   Article TR2.5.2.2 will be revised in its entirety after finalization of the White Paper on Silent

4   Train Detection."  *Id.* Exh. U at 2-0488.[4]  Once BART heard that the issues might result in a

5   change order for over $8 million, it asked for additional paperwork to be submitted:  a "thick file

6   to justify $8 million."  *Id.* Exh. W (BART employee DuPont Depo.) at 259:8-263:11; *cf.* Exh. K

7   at 309:16-311:9 (BART's LaBonte asked for a "very big stack of paper" he could take to the

8   board to justify expenditure as part of change order).

9        GETS then submitted an extensive submittal describing how BART's faulty design

10   specifications had led to wasted work.  Sink Exh. X.  The document clearly indicated that GETS

11   would seek millions in compensation for BART's bad specifications:

12        The contract specification is defective and the AATC system cannot be built as
         specified.

13

14        It is [GETS'] position that BART was negligent by creating a design within the
         TR's [technical requirements] of the contract book that was dependent on, but not

15        supported by, the safety characteristics of the underlying existing ATC system
         and compounded that error by continuing to approve the design and

16        implementation of an AATC system that was derived from the TR's and that
         continued to be dependent on features of the underlying ATC system that did not

17        support the required level of safety.  The dependencies were clearly identified in
         documents that were approved by BART at numerous points within the 4 years of

18        the Phase 2 program.  The errant specification and subsequent approvals that
         perpetuated the flawed design caused [GETS] to expend millions of dollars in

19        work that is now worthless and must be replaced.

20   *Id.* at p. 5.

21        In July 2003 BART sent a pair of letters responding to the "thick file" submittal.  In one

22   letter, BART denied that it was liable for most of the issues raised by GETS; it now insisted that

23   GETS had been wrong about the flawed specifications.  Significantly for purposes of this motion,

24   the denial was on the merits of the claim; no procedural insufficiency (for example, timing, or

25   documentation) was identified as to the key issues like track circuits and keyswitch.  *See* Sink

26   _____

    [4]     BART now tries to run from this language.  BART's executive manager for transit
27   development Gary LaBonte, who signed the document, testified "Shame on Gary.  Gary never
    picked up on that.  I signed it without seeing that, understanding that."  Sink Exh. L (LaBonte
28   Depo.) at 201:16-18; Sink Exh. V (BART 30(b)(6) Depo.) at 558:18-19 ("BART did not realize
    that change order 100 had changed this TR to TBD.").

1   Exh. Y (BART engineer Lehrer Depo.) at 185:18-186:25 (relating to the matters that came up in

2   mid-2002, "BART chose not to deny claims based on [48 hour deadline and cost estimate

3   requirements]."); Exh. LL (BART 30(b)(6) Depo.) at 240:1-8.

4        By separate letter, BART asked for more information about some of the issues, and

5   indicated that if it were provided sufficient information about why the prior work was now

6   "wasted," and more specifics about the fix going forward, it would grant the claim – again, it

7   never raised any alleged procedural insufficiencies with the claim.  Sink Exh. Z.  Then, because

8   both parties wanted to work on a solution instead of just a claims process, BART suspended the

9   claims process while the parties worked on the precise terms of the change orders.  *Id.* Exh. AA.

10       Much of the effort of the parties from 2003-2006 was then spent on what came to be

11  known as Change Order 99, or "the Change Order Grande."  *See id.* Exh. L at 157:25-158:18;

12  Exh. BB at 367:21-368:9; Exh. W at 253:5-23.  An October 2003 "request for change" document

13  identified the sixteen major issues that would be part of the Change Order Grande, and indicated

14  GETS' position that it would cost $16.7 million to resolve them.  GETS and BART drafted

15  extensive "white papers" coming up with proposed technical solutions to BART's design

16  problems, to be included, along with a financial resolution, in the Change Order Grande.  Exh. L

17  at 181:13-183:20.  As BART's executive manager for transit system development testified, "No

18  one was under the impression that we would settle this dispute without a change order –

19  globally."  *Id.* at 184:14-18; *cf. id.* at 8:13-9:1; *see also* Exh. V (BART 30(b)(6) Depo.) at 556:7-

20  18 (concerning silent train specification, "we were anticipating at the time that change orders 100

21  through 102 were filed [in February 2003] that we would come to some mutually satisfactory

22  resolution to the commercial issues and would file change orders that would then fill in those

23  TBDs with something.  Of course, we never got there.  But that's what – that was the intent of the

24  time we filed change orders 100 through 102.").

25       Unfortunately, BART didn't follow through with the promised change orders.  Once

26  BART found out the price tag for the changes, it balked.  *See, e.g.,* Exh. K at 327:5-329:5

27  (describing the history generally).

28       At one point in early 2003, in preparing for a board meeting about the change orders,

1    BART specifically asked GETS "what if we walk away?"  *Id.* at 347:10-350:17.  BART hadn't

2    yet said that it would walk away; everyone was still trying to solve the problems and move

3    forward (in which case, GETS would not have the claims it does now).  GETS answered the

4    question in a letter dated March 4, 2003.  Henderson Decl. ¶ 1; Sink Exh. A.  After first

5    explaining the costs of going forward – around $8 million for a release of any past claims, plus

6    the cost to correct the design – GETS included at BART's request an analysis of "the cost to stop

7    work."  "The cost to stop work" is the precise subject of GETS' counterclaims:  i.e., the damages

8    to GETS because BART caused the project to fail, instead of fixing the design issues that it had

9    embedded in the contract through appropriate change orders.  In the letter, GETS estimated that

10   the uncompensated costs it had incurred on the project to date were $27,188,468, and that with

11   appropriate mark-ups for overhead and profit, GETS' claim if BART abandoned the project

12   would be approximately $35.6 million.  Sink Exh. A.  These numbers are not materially different

13   from what appears in the Lechner report, which checked the numbers and reports that the unpaid

14   contractual value plus costs invested and not reimbursed total $27,119,154 (i.e., $3,683,219 plus

15   $23,435,935), and that adding in a reasonable return on GETS' investment would in his opinion

16   bring the claim up to $37 million.  Stringer Decl. Exh. E (Lechner Report) at p. 15, table III-1.

17   The letter expressly noted that the number was a "quick calculation of rough order of magnitude

18   phase 2 costs" and that "If BART desires a formal determination of costs, please provide a formal

19   request."  BART never provided a formal request.[5]  Henderson Decl. ¶ 2.

20       **D.    In The Contract's Final Days, GETS Re-Confirmed Its Contention To Pursue
             A Claim Against BART If The Contract Did Not Go Forward.**

21

22       In 2006, when BART grew more hardened in its negotiation over potential change orders,

23   GETS let BART know, over and over again, that it regarded BART as in breach and that it would

24   make a claim in litigation.

25       In January 2006, BART lifted the suspension of the claims process, and indicated an

26

27   _____
     [5]      BART was already aware of the rough order of magnitude.  BART had, in a December
     2002 internal meeting a few months earlier, used basically the same estimate internally.  Sink
28   Exh. CC (internal BART meeting minutes:  "Alternatives to AATC ¶ Cost to terminate contract
     with GETS estimated at $40M").

intention to deny the claims, notwithstanding the earlier discussions of entitlement.  GETS

responded by sending a "written objection," which re-detailed the status of the open potential

claims.  In light of BART's indications that it might now walk away from the project, GETS

included language to put BART on notice that it would make a substantial claim (as it had earlier

let BART know).  GETS wrote:

> [GETS] formally objects to BART's rejections of WNPCs 36 and 42, since both of these WNPCs include actual out-of-scope costs already incurred by [GETS].
>
> WNPC 36 included 3 categories of cost:
>
> 1)      Phase 2 costs incurred by [GETS] on work performed in reliance on the defective provisions contained within the Contract issued by BART,
>
> 2)      Costs incurred by [GETS] supporting BART's efforts to redefine the technical and commercial project to resolve the identified BART interface issues within BART's stated budget constraints, and
>
> 3)      Estimated cost for completion of the work specified by the draft technical scope change language indicated by BART for future inclusion in Change Order 99, the Change Order allocated and planned by BART for this purpose.
>
> Regarding the WNPC 36 category 1 costs, [GETS] objects to BART's rejection since [GETS'] Phase 2 work was performed in reliance on the defective provisions contained within the Contract issued by BART.  [GETS] is continuing its efforts to finalize all of the costs incurred to date in this category.

Sink Exh. DD.

    In early 2006, BART also sent a letter that it called a "request for adequate assurances,"

insisting that GETS agree to BART's interpretation of disputed terms of the contract.  Sink Exh.

EE.  The request was improper and unreasonable; the proper procedure under the contract would

have been to ask GETS to proceed to perform the work according to BART's interpretation, and

then have GETS claim for a "constructive change" decided later.  Bruen Exh. A P4.4.3, 4.4.6 at

1-0039-40.  But BART didn't want to risk being stuck with the bill for completing AATC if its

interpretation was wrong, so BART framed its letter as a "request for adequate assurances."

GETS responded by letting BART know that it was wrong and that it stood ready to perform the

contract.  Sink Exh. FF at B0009974 ("GETS . . . is prepared and willing to carry out the

remainder of its work, as specified by BART's contract.").  BART tried again.  *Id.* Exh. GG.  And

GETS again let BART know that it was wrong; wrong about how the contract was to be

1   interpreted, wrong about the history, and potentially liable for damages if the project didn't go

2   forward. *Id.* Exh. HH.

3       Finally, GETS sent BART written notice of potential claim # 101.  Sink Exh. II.  The

4   notice told BART that GETS regarded BART's conduct as preventing the continuation of Phase 3

5   as contemplated by the contract, and reiterated GETS' intent to seek reimbursement for the

6   substantial amounts of money it had expended on the project, all now potentially wasted because

7   of BART's breach. *Id.*  GETS remained hopeful that BART would relent – and because BART

8   might have, it was "impossible for GETS to quantify the damages" "until the actual state of Phase

9   3 is clarified."  But whether it was needed or not, written notice of potential claim # 101 gave one

10  last notice to BART that if it wanted to negotiate about GETS' claims, the time was now.

11      Less than two weeks later, on June 13, 2006, BART sued GETS.

12                                **ARGUMENT**

13      Summary judgment should be denied if the nonmoving party shows evidence "such that a

14  reasonable jury could return a verdict" in its favor, "guided by the substantive evidentiary

15  standards that apply to the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

16  Here that standard is readily met, and the motion should be denied.

17  I.   **GETS GAVE PROPER NOTICE OF ITS REQUESTS FOR COMPENSATION.**

18       A.   **Standards Governing Evaluation Of Claims Notice Provisions.**

19      BART points to no case where a government contractor has been barred from bringing a

20  claim in court based on failure to comply with a contract provision requiring notice of claims.

21  Instead, it points only to the general legal structure:  that government claims can be subject to a

22  statutory bar, and that where a contract exists, the contract governs to the exclusion of the

23  government claims statutory process.  But as will be shown, GETS' written correspondence with

24  BART throughout the 2002 to 2006 time period satisfies both the statutory government claims

25  procedures (which are nowhere as stringent as BART suggests) and the requirements of contract

26  law (which are nowhere as stringent as BART suggests).  Under California law, the test is one of

27  "substantial compliance" only, and claims against government entities are to be liberally

28  construed where the statutory and contractual purpose – to give the government adequate notice

1    that it should investigate and negotiate – is satisfied.  This is because courts in California seek to

2    avoid forfeiture of claims from alleged technical violations of notice requirements where notice

3    has been given, and in the absence of grossly negligent or willful failure by the defaulting party or

4    prejudice to the entity seeking enforcement, neither of which exists here.

5                    1.      The Purpose Of The Claims-Notice Process Is To Initiate Investigation
                             And Negotiation, So Precise Pleading Is Not Required; Even "Unspecified
6                            Damages" Will Satisfy The Rule.

7              As BART acknowledges, the purpose of requiring notice to the government of a potential

8    claim is to enable the public entity "to adequately investigate claims and to settle them, if

9    appropriate, without the expense of litigation."  *City of Stockton v. Superior Court*, 42 Cal. 4th

10   730, 738 (2007).  Because the purpose is to initiate investigation and evaluation, the requirement

11   is not onerous.  "[A] claim need not contain the detail and specificity required of a pleading, but

12   need only 'fairly describe what [the] entity is alleged to have done.'"  *Connelly v. County of*

13   *Fresno*, 146 Cal. App. 4th 29, 38 (2006) (quoting *Stockett v. Association of Cal. Water Agencies*

14   *Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 446 (2004).  California courts apply a doctrine of

15   "substantial compliance" with the claims notice requirement; the test is "whether the face of the

16   filed claim discloses sufficient information to enable the public entity to make an adequate

17   investigation of the claim's merits and settle it without the expense of litigation."  *Id*.

18             BART tries to make much of the fact that GETS' claim notices do not contain the exact

19   dollar amounts that appear, after four years of litigation, in GETS' damages expert's report.

20   Precision in the allegation of damages is not required for a valid claim.  In *Connelly*, 146 Cal.

21   App. 4th 29 (2006), an auto accident victim filed a claim indicating that a county employee had

22   run a stop sign and hit her truck, and in response to the question "What injuries or damages did

23   you suffer?" stated "Damage to my '96 Chevy S-10 pickup – car rental until my truck is replaced.

24   *Unspecified Medical, Lost Income, future Medical*."  *Id.* at 41 (emphasis added).  The county

25   argued that the claimant should have at least specified that the injury was to her neck, but the

26   argument was rejected.  "Even if we were to agree her failure to describe whatever symptoms she

27   was suffering from when she filed her claim rendered it technically deficient, we do not agree she

28   failed to satisfy the test of substantial compliance.  This is because she stated adequate

1    information on the form to advise the County that she suffered personal injuries in the accident."

2    *Id.* at 42.  The use of the term "unspecified" in her form did not render it "hopelessly vague";

3    instead, it alerted the County that they should investigate the claim and settle it if it chose to do

4    so.  *Id.*  Summary judgment in favor of the County was therefore reversed.  *Id.* at 43.  *See also*

5    *Ocean Services Corp. v. Ventura Port Dist.*, 15 Cal. App. 4th 1762, 1777-1778 (1993) (rejecting

6    defendant's argument that judgment should be reduced from $31 million to $1 million set forth in

7    notice of claims).

8         Nor is the precise legal theory required to be spelled out.  In *Ocean Services Corp.*, 15

9    Cal. App. 4th 1762 (1993), the court held that a claim alleging breach of a commercial lease was

10   sufficient to satisfy the requirement for a later lawsuit based on breach of the implied covenant of

11   good faith and fair dealing.  *Id.* at 1777; c*f. Stevenson v. San Francisco Hous. Auth.*, 24 Cal. App.

12   4th 269 (1994) (tenant's claim against housing authority for premises liability and breach of

13   contract supported later complaint for negligent failure to disclose latent defects, negligence, and

14   breach of statutory duty to inspect building for safety before earthquake).

15        2.     A Condition That Leads To Forfeiture Of Contract Rights Must Be
              Construed To Avoid Forfeiture.
16

17        "A condition involving a forfeiture must be strictly interpreted against the party for whose

18   benefit is created."  Cal. Civ. Code § 1442; *Universal Sales Corp. v. California Press Mfg. Co.*,

19   20 Cal.2d 751, 771 (1942) ("Forfeitures are not favored by the courts, and if an agreement can be

20   reasonably interpreted so as to avoid a forfeiture, it is the duty of the court to avoid it.").  This

21   rule of construction applies to public entities as well as private ones.  *Milovich v. City of Los*

22   *Angeles*, 42 Cal. App. 2d 364, 372-375 (1941); Cal. Civ. Code § 1635; Witkin, 1 *Summary of*

23   *Cal. Law*, Contracts § 991 (10th ed. 2009) ("Contracts of the state or its agencies and other

24   governmental bodies are interpreted in the same manner and under the same rules of construction

25   as private contracts.").  It has been applied to avoid the effect of claims-notice requirements in

26   public construction contracts in the absence of prejudice.  *Milovich*, 42 Cal. App. 2d at 372-375.

27        Even where a contractual forfeiture condition cannot be avoided through interpretation,

28   California Civil Code section 3275 provides that enforcement may be refused in the absence of

1  gross negligence, willfulness, or fraudulent conduct – instead, the remedy for breach of the

2  condition is limited to the actual damages that resulted from the breach:

3
> Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a
> loss in the nature of a forfeiture, by reason of his failure to comply with its

4
> provisions, he may be relieved therefrom, upon making full compensation to the
> other party, except in case of a grossly negligent, willful, or fraudulent breach of

5
> duty.

6  Cal. Civil Code § 3275; Witkin, 1 *Summary of California Law*, Contracts § 827 ("Where the

7  provision requiring a forfeiture is express and cannot be avoided by construction, the court may,

8  in a proper case, excuse the condition or give equitable relief against its enforcement.") (citing

9  Civil Code § 3275 and cases); *see also Lauderdale Assoc. v. Dept. of Health Servs.*, 67 Cal. App.

10  4th 117 (1998) (awarding reimbursement for skilled nursing services despite failure to comply

11  with pre-approval process in the Medi-Cal regulations, based on the anti-forfeiture rule of Civil

12  Code § 3275) (abrogated as to Medi-Cal cases by Cal. Welf. & Inst. Code § 14018.5); *Valley*

13  *View Home of Belmont v. Dept. of Health Servs.*, 146 Cal. App. 3d 161, 168 (1983) ("Relief from

14  forfeiture when the facts and equities militate in favor thereof may be granted even when the

15  party seeking it has violated an express condition precedent, such as where time is made of the

16  essence.") (also abrogated as to Medi-Cal cases by Welf. & Inst. Code § 14018.5).  This policy

17  against enforcement of forfeiture clauses applies to government contracts with the same force as

18  it applies to private ones.  *M.F. Kemper Constr. v. City of Los Angeles*, 37 Cal.2d 696, 704-05

19  (1951) ("California cases uniformly refuse to apply special rules of law simply because a

20  governmental body is a party to a contract"; refusing to enforce city charter providing for city's

21  retention of 10% of contract price if successful bidder refused to enter contract as forfeiture where

22  bidder made good faith mistake justifying rescission).

23       California law is, on this point, substantially similar to the law elsewhere in the United

24  States.  In the Restatement of Contracts, Second, the American Law Institute states the rule as:

25  "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a

26  court may excuse the non-occurrence of that condition unless its occurrence was a material part of

27  the agreed exchange."  Rest. 2d Contracts § 229; *Nortel Networks, Inc. v. Gold & Appel Transfer*

28  *S.A.*, 298 F.Supp.2d 81, 86 (D.D.C. 2004) ("Typical of conditions that may be immaterial are

'those which may be thought of as procedural or technical, or . . . conditions which merely relate

to the time or manner of the return performance or provide for the giving of notice or the

supplying of proofs.'") (quoting Rest. 2d Contracts § 84 cmt. d).  The illustrative example used in

the Restatement is instructive here:

> 2.  A, an ocean carrier, carries B's goods under a contract providing that it is a
> condition of A's liability for damage to cargo that "written notice of claim for loss
> or damage must be given within 10 days after removal of goods."  B's cargo is
> damaged during carriage and A knows of this.  On removal of the goods, B notes
> in writing on the delivery record that the cargo is damaged, and five days later
> informs A over the telephone of a claim for that damage and invites A to
> participate in an inspection within the ten day period .  A inspects the goods
> within the period, but B does not give written notice of its claim until 25 days
> after removal of the goods.  Since the purpose of requiring the condition of
> written notice is to alert the carrier and enable it to make a prompt investigation,
> and since this purpose had been served by the written notice of damage and the
> oral notice of claim, the court may excuse the non-occurrence of the condition to
> the extent required to allow recovery by B.

Rest. 2d Contracts § 229 ill. 2, at p. 186 (1981); *see Delaware Steel Co. v. Calmar Steamship*

*Corp.*, 378 F.2d 386 (3d Cir. 1967) (on which this illustration is based).[6]

## B.   GETS Complied With The Contractual Provisions Governing Claims.

Under the legal standards set forth above, there is ample evidence that GETS adequately

complied with its obligation to give notice to BART before bringing suit.

As discussed above, GETS' claim for its lost investment developed over time and did not

completely materialize until BART abandoned the parties' multi-year effort to develop design

fixes.  But throughout the parties' efforts to address the defects in the design specifications, GETS

gave repeated notice to BART both in formal "notices of potential claim" and other contract

correspondence (1) of its claim that the contract had contained defective specifications and the

---

[6]     The rule is the same under federal claims law.  *Brinderson Corp. v. Hampton Roads
Sanitation Dist.*, 825 F.2d 41, 44 (4th Cir. 1987) ("[I]n the Court of Claims and in several boards
of contract appeals . . . the notice provision has not been given a literal construction. A more
liberal approach, focusing on the purpose of the clause, has been adopted. Generally, when the
owner has actual or constructive notice of the conditions underlying the claim and an opportunity
to investigate, that is sufficient.")*Calfon Constr., Inc. v. United States*, 18 Cl. Ct. 426, 439 (1989)
("If the contracting officials have knowledge of the facts or problems that form the basis of a
claim and are able to perform necessary fact-finding and decision making, the Government is not
prejudiced by the contractor's failure to submit a precise claim at the time a constructive change
occurs."); *Hoel-Steffen Constr. Co. v. United States*, 456 F.2d 760, 768 (Ct. Cl. 1972) ("notice
provisions in contract-adjustment clauses [should] not be applied too technically and illiberally
where the Government is quite aware of the operative facts.").

1    specific defects on which the claim is based, (2) that GETS' damage claim would be based on the

2    value of its "wasted work," with a mark-up to account for overhead and profit that would have

3    been earned had GETS spent its resources elsewhere, and (3) that if the project was not completed

4    the claim amount would be in the range of $27 million for the unreimbursed out-of-pocket costs,

5    and over $35 million when overhead and profit were considered.  *See* Statement of Facts, *supra*,

6    sections B and C.  This more than satisfied the contract's core claims notice requirement that

7    GETS provide "sufficient detail to enable the Engineer to ascertain the basis and amount of said

8    potential claim."  P.9.6.1(c).  And it certainly provides ample proof of "substantial compliance"

9    sufficient "to enable the public entity to make an adequate investigation of the claim's merits and

10   settle it without the expense of litigation."  *Connelly*, 146 Cal. App. 4th at 38.

11       Indeed, BART was well aware that GETS had indicated it had potential claims against

12   BART, and BART investigated the claims, considered them meritorious, and only decided not to

13   pay to change the contract when they found out how expensive the fix would be.  While some of

14   the correspondence indicated that the exact amount of damages remained to be determined –

15   which made sense, since the contract was still ongoing, and the parties were discussing various

16   fixes – BART was also given a "rough order" of magnitude of the claim indicating that if the

17   project ended, GETS intended to claim for $27,188,486 in unreimbursed out-of-pocket costs, plus

18   an additional amount for return on investment, and was told that it could have additional

19   specificity if it wanted.  Sink Exh. A (March 4, 2003 letter); *see also* Sink Exh. DD (BART

20   internnal meeting minutes, estimating cost to terminate GETS at "$40M").  These preliminary

21   damage numbers are not materially different from what appears in the Lechner's opinion, which

22   reports that the unpaid contractual value plus costs invested and not reimbursed total

23   $27,119,154, and that adding in a reasonable return on GETS' investment would in his opinion

24   bring the claim up to $37 million.  Stringer Exh. E (Lechner Report) at p. 15, table III-1.

25       Moreover, any differences in the damage estimates prepared by GETS during this process

26   did not discourage BART from investigating GETS' claims and negotiating a potential resolution

27   through the change order process.  BART literally spent years negotiating potential changes to

28   remedy the design defects that formed the basis of GETS' claims, knowing full well the

1    magnitude of these issues.  And when BART did indicate its intention to abandon the project,

2    GETS also gave additional written notices in 2006 (the written objection to BART's denial of

3    claims, and written notice of potential claims # 101) letting BART know that it would hold BART

4    liable for the value of its wasted work, though the amount had not been calculated with precision.

5             There is simply no doubt that a trier of fact could, and quite likely would, find substantial

6    compliance based on this evidence.  Summary judgment should not be granted.

7             Finally, to the extent that there is any deficiency in the claims notices given – and GETS

8    contends there is none – the minor deficiencies should not be used to bar a potentially meritorious

9    $37 million claim.  That would be using the notice provision as a forfeiture, which California

10   courts repeatedly refuse to do and the Civil Code expressly discourages.  There is no undisputed

11   evidence or argument establishing that GETS was grossly negligent or willful, or that it acted

12   fraudulently in presenting its claims to BART.  Quite the contrary, GETS attempted to put BART

13   on notice of its concerns and claims while abiding by the "no letter before its time" policy that the

14   parties had mutually adopted.  Nor has BART pointed to any conceivable prejudice resulting from

15   any alleged technical deficiencies in the claims notices:  BART had every opportunity to

16   investigate and negotiate these claims in advance of litigation, and spent years doing so.[7]  But the

17   decision of whether to grant relief from forfeiture is for another day.  The court can wait until the

18   full factual record is developed.  In the meantime, it is enough to say that there are material issues

19   of disputed fact that prevent summary judgment based on BART's claims-notice argument.

20   **II.      THE CLAIMS NOTICE PROVISION DOES NOT APPLY IN ANY EVENT**
         **BECAUSE THE ISSUES WERE RAISED IN THE CHANGE ORDER CONTEXT.**
21

22            Section P.9.6 of the contract provides:

23            The Supplier shall not be entitled to any additional compensation or damages
              otherwise payable or to extension of time for completion as a result of any act or
24            failure to act by the Engineer or the District, the happening of any event or
              occurrence, or any other cause, unless the Supplier shall have given the Engineer
25            a written Notice of Potential Claim therefor as hereinafter specified and shall have
              complied with the other requirements specified in this Article P9.6; **provided,**
26            **however, that a Notice of Potential Claim will not be required for protests**

27   _____
     [7]       Indeed, a jury could readily infer lack of prejudice to BART from the fact that BART
28   never complained about problems with the process, as opposed to the content, of the claim.  Exh.
     LL (BART 30(b)(6) Depo. at 240:1-9.

1   **made in accordance with the change procedures of Article P.4.4 until the
    completion of the procedures set forth in such Article**.

2

3   Bruen Exh. A, P.9.6, p. 1-0056 (emphasis added).  In short, there's a "change order exception" to

4   the claims notice requirement.

5         Article P4.4 and the sections that follow it describe the change order process:  they

6   provide that the District can make changes to the contract documents, and to require changes to

7   be made in the extent or manner of performance of the Work.  Among these sections are

8   provisions that state that if the District issues a change order and the Supplier disagrees with any

9   of its terms, the Supplier should indicate "protested" on the change order and return it; the parties

10  then enter into a process for resolving the terms of compensation.  *Id.* P4.4.4 and P4.4.4.1, p. 1-

11  0039.  The intent of the P9.6 change order exception, therefore, is to indicate that the change

12  order process provides another avenue for potential claims and disputes to be addressed.

13        The particular issues that resulted in GETS's counterclaims were all issues raised in a

14  change order process.  *See* pp. 7-10 above; Sink Exh. K at 312:19-314:12 ("And the initial

15  expectation, based our discussions with BART, was that this was going to be a quick process, and

16  that it was going to be resolved through a change order.").  The record demonstrates that the

17  parties spent years negotiating potential change orders and terms of compensation for the design

18  flaws in the AATC specifications (most significantly, Change Order 99 aka "Change Order

19  Grande").  The "protest" mechanism per se was never triggered formally because the parties

20  chose to work collaboratively to develop design fixes and an agreed change order, rather than

21  BART unilaterally issuing a change order without GETS' agreement, and because BART

22  ultimately refused to issue any change order once the design fixes were identified and priced, but

23  the net effect was the same.  BART certainly understood that GETS "protested" further work on

24  the project without remedial change orders and compensation, and the primary process that the

25  parties chose to address this impasse was the change order process.

26        The effect of the "change order exception" is to take most disputes about the contract

27  itself, or disputes about the best approach to finishing the project, out of the claims process.

28  Other kinds of claims – for example, if a BART employee accidentally destroyed some GETS

1  equipment – would more appropriately be addressed through the P9.6 claims process.  *See* Bruen

2  Exh. A at P9.6.3, P9.7, P.9.7.3, p. 1-0058 (providing for claims to be deferred and paid in

3  conjunction with final invoice); *see, e.g.,* Sink Exh. JJ (negotiation regarding track access claims).

4  Those claims are based on events, and thus the contract's provision for bringing a claim within 48

5  hours "following the occurrence of the event on which the potential claim is based," with "as

6  much information concerning the event and its impact on cost or schedule," make perfect sense.

7  Bruen Exh. A at P.9.6.1.  But when the problem is not an event occurring during the contract, but

8  instead deficiencies in  the contract specifications themselves – that BART's technical

9  requirements were flawed – then the language of P9.6.1 is ill-fitting (because it could otherwise

10  be read to require that a notice of claim be filed within 48 hours of the signing of the contract; the

11  "occurrence of the event on which the potential claim is based" is arguably the bad contract

12  specification itself).  The contract is better read to require that the parties should raise and

13  confront design issues in the change order process.  BART is then given notice and an

14  opportunity to investigate and negotiate, and consider making a change to the contract to mitigate

15  the impact, GETS is encouraged to focus on a workable solution instead of a potential litigation

16  claim, and the success of the project is encouraged.  An interpretation of the contract that pushes

17  design flaw issues into the change order process instead of the notice-of-claims process is

18  therefore consistent with the contract's language and with the parties' conduct.  Cal. Civ. Code §

19  1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if

20  reasonably practicable, each clause helping to interpret the other."); *Southern Cal. Edison Co. v.*

21  *Superior Court*, 37 Cal. App. 4th 839, 851 (1995) ("how the parties performed can show that the

22  contract is reasonably susceptible to the interpretation that is consistent with their actions");

23  *Universal Sales Corp.,* 20 Cal. 2d at 761 ("a construction given to it by the acts and conduct of

24  the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is

25  entitled to great weight, and will, when reasonable, be adopted and enforced by the court.").

26          In short, while GETS issued notices of potential claim in an abundance of caution, the

27  parties recognized that the primary avenue for resolving the design flaws was the change order

28  process and that remained their focus until the end.  In so doing, they effectively removed the

1    dispute from the claims notice provisions.

2    **III.    THE CLAIMS NOTICE PROVISION DOES NOT APPLY BECAUSE BART**
3    **SUED FIRST.**

4            Alternatively, the motion should be denied because claims notice rules do not apply when

5    the government agency sues first.  As held in *People ex rel. Dept. of Parks and Recreation v.*

6    *West-A-Rama, Inc.*, 35 Cal. App. 3d 786, 794 (1973), when the public entity brings suit on a

7    contract and the other party to the contract responds by filing affirmative claims for damages

8    regarding the same contract, the claims notice rules do not apply.

9            In *West-A-Rama*, the State sued first on a contract.  *Id.* at 788.  West-A-Rama filed a

10   cross-complaint, making an affirmative claim back against the State for damages.  *Id.* at 789.  The

11   trial court granted a demurrer to West-A-Rama's cross-claim because it had never filed a claim

12   under the Government Code.  *Id.*  The Court of Appeal reversed.  It held that the purpose of the

13   claims statutes is to permit the government to investigate and have an opportunity to settle

14   without litigation.  *Id.* at 794.  When the government initiates the lawsuit, then the government

15   "presumably made a full investigation of the respective rights and duties of the parties before

16   initiating suit," and "already made the decision that the claim should not be settled."  *Id.*

17           Since sovereign immunity is not involved [because it does not apply to contract
18           cases] and the purposes of the claims statutes have been satisfied, there is no
             reason to insist upon compliance with the claims statutes as a prerequisite to
             West-A-Rama's cross-complaint for monetary damages on the contract. On the
19           contrary, it is manifestly unjust to allow [the government agency] to bring suit
             upon a contract and then to use what amounts to a notice statute to shield itself
20           from a cross-complaint asserted by the defendant in the same suit and arising
             from that very contract.
21

22   *Id.*[8]; *see also Frank Briscoe Co. v. Clark County*, 857 F.2d 606, 609-611 (9th Cir. 1988) (under

23   Nevada law, compulsory counterclaims may be brought against the government without

24   compliance with Nevada's notice-of-claim statute, because statutory purpose of avoiding surprise

25   _____

26   [8]    The *West-A-Rama* case was later expanded beyond the contract context to cross-claims for
     indemnity in tort cases, *see Krainock v. Superior Court*, 216 Cal. App. 3d 1473 (1990).  But the
27   exception does not extend to affirmative "cross-claims" filed by the person who initiated the
     lawsuit.  *See City of Stockton v. Superior Court*, 42 Cal. 4th 730, 745 (2007); *Pacific Gas & Elec.*
     *Co. v. City of Union City*, 220 F.Supp.2d 1070, 1078 (N.D.Cal. 2002) (declining to extend *West-*
28   *A-Rama* to claims in a complaint, as opposed to a counterclaim).

1    is satisfied when government sues, and it would be unjust to bar compulsory counterclaims based

2    on notice-of-claim requirement); *cf. Frederick v. United States*, 386 F.2d 481 (5th Cir. 1967)

3    (where government filed suit, claims-notice requirement of 28 U.S.C. § 2406 does not apply

4    because government cannot claim surprise, but federal sovereign immunity law limits

5    counterclaim to amount of government's claim and prevents affirmative relief).

6          The same reasoning applies here.  The purpose of the notice provision in the contract was

7    no different from the notice provision in the Government Claims Act; indeed, the whole point of

8    the claims notice provisions in the contract is to set up a scheme that will accomplish the same

9    purposes as the statutory claims notice requirements – one that will provide the public entity the

10   opportunity to investigate the facts, and in appropriate cases, settle before litigation.  *Arntz*

11   *Builders v. City of Berkeley*, 166 Cal. App. 4th 276, 289 (2008) ("A contractual claims procedure

12   will amply serve those purposes because the public entity can include in the contract any

13   reasonable requirements it deems necessary to accomplish them."); *Cory v. City of Huntington*

14   *Beach*, 43 Cal. App. 3d 131, 136 (1974) ("Similarly, where the statutory purpose has been

15   realized by other means, strict compliance [with the Government Claims Act] has not been

16   required."; citing *West-A-Rama*).  Because the purpose of the claims provision in the contract is

17   satisfied when BART brings suit first – BART has had the opportunity to investigate and settle to

18   avoid litigation over the parties' respective rights on this contract, and indeed, spent over three

19   years trying to do just that – the counterclaims are properly brought even if there was no

20   compliance at all with the claims provisions (and there was, as discussed above).

21         Moreover, as held in *West-A-Rama*, it would be "manifestly unjust" to allow BART to sue

22   on the contract but be able to use its notice provisions to avoid an affirmative counterclaim

23   arising out of the same contract.  "A contract must be given such an interpretation as will make it

24   . . . reasonable . . . if it can be done without violating the intention of the parties." Cal. Civ. Code

25   § 1643.  Because the intention of the parties is to give notice and an opportunity for investigation

26   and avoidance of litigation, by creating a claims notice system to supplant the Government

27   Claims Act, the claims notice provision should be interpreted not to apply to contract-based

28   counterclaims, just as the Government Claims Act does not so apply.  BART offers no rationale

1   for why it should be immune from liability on the counterclaims, when all of the legitimate

2   purposes of a notice-of-claim requirement have already been satisfied.

3        Finally, BART's argument that the claims cannot be offered on a "set-off" theory is

4   baseless.  If BART pursues its claims for rescission (counts 1 and 3) to judgment, trying to put the

5   parties back into the position they had before the contract began, then the evidence of the amount

6   of GETS' unreimbursed costs in the project are certainly relevant to "adjusting the equities."  Cal.

7   Civ. Code § 1692 ("the court may require the party to whom [rescission] is granted to make any

8   compensation to the other which justice may require and may otherwise in its judgment adjust the

9   equities between the parties.").  As for using the counterclaim to offset damages on BART's

10   count 2 claim for breach of contract, the argument likewise fails.  BART's argument is contrary

11   to *West-A-Rama* and *Krainock*, as BART itself recognizes.  BART's attempt to block a purely

12   defensive claim based on the language of P9.6.4 likewise fails; a purely defensive counterclaim is

13   not a "claim," "right to compensation," "damages," or "any other relief."[9]  It is merely a denial or

14   reduction of BART's (as opposed to GETS') claim for damages, compensation, or relief.

**IV.   A REASONABLE FACT-FINDER COULD CONCLUDE THAT THE CLAIMS-NOTICE PROVISIONS WERE WAIVED, OR THAT BART IS ESTOPPED TO ASSERT THOSE PROVISIONS AS A BAR.**

17        A condition can be waived.  *See, e.g.,* Witkin, 1 Summary of California Law, Contracts §

18   823 p. 912 ("A condition may be waived . . . The waiver may be an express statement, or it may

19   be implied, as where the party entitled to certain performance accepts partial or defective

20   performance."); *Galdjie v. Darwish*, 113 Cal. App. 4th 1331, 1339 (2003) ("Like any other

21   contractual terms, timeliness provisions are subject to waiver by the party for whose benefit they

22   are made."); *cf. Rand v. Andreatta*, 60 Cal. 2d 846 (1964) ("Estoppel may be used in a proper

23   case to excuse the late filing of claims against public entities or the filing of such claims in a

24   defective form. . . . [E]stoppel may likewise be used to excuse no notice.").  Thus, even if the

---

[9]   This reading also reconciles the language with P9.6, which appears to describe the same concept as P9.6.4, but describes the claims-notice forfeiture rule as applying to "additional compensation or damages otherwise payable . . ."  Bruen Exh. A P9.6.4, p. 1-0058.  Moreover, to the extent there is any ambiguity here about whether "any other relief" could encompass the "relief" of denying BART's claim, such ambiguity is construed against forfeiture, as set forth in section I.A.2 above.

1    court finds that it is undisputed that GETS did not timely submit an adequate statement of its

2    claim through the claims process or the change order process (which is disputed, see above), the

3    case should still go to the jury on the question of whether BART waived the condition that GETS

4    submit its claim through a formal written notice. *See, e.g., Engalla v. Permanente Medical*

5    *Group, Inc.*, 15 Cal. 4th 951, 983 (1997) (whether contract right was waived is question of fact).

6           First, BART waived the condition by encouraging GETS not to file claims within 48

7    hours after learning of problems.  The parties agreed to a policy of "no letter before its time," so

8    that people working on the project would stay focused on solutions.  Sink Exh. K at 216:4-

9    217:22; Exh. O (BART General Manager Dugger Depo.) at 108:6-20.  And when BART did want

10   the claim described more formally and thoroughly, it asked for "a very thick stack of papers" –

11   showing that BART did not believe that the claim was late or inadequately documented prior to

12   that, and waiving any issue with the claim's timeliness or lack of compliance with formal

13   requisites.  Sink Exh. L at 177:11-178:5 (BART manager LaBonte:  BART did not believe that

14   the "thick file"/"big black book" claim was untimely, "We didn't want them to work on the

15   formal process.").  Parties can agree to be less formal than the contract requires; frequently this is

16   good business practice.  *Cf.* Sink Exh. KK (May 2002 BART document, concerning earlier

17   claims:  "Supplier did not comply with the Potential Claim process described in P9.6 of the

18   contract . . . Engineer made a business decision to evaluate the claim, even though the claim

19   process was not adhered to.").  But by fostering a process of informality and encouraging GETS

20   to rely on that process to resolve the issues, BART cannot use the lack of formality as a bar to a

21   claim.  *Galdjie*, 113 Cal. App. 4th at 1339 ("tacit approval" of a party's non-compliance with

22   conditions precedent waives those conditions); *Ocean Servs. Corp.*, 15 Cal. App. 4th at 1775-76

23   (exchange of correspondence concerning potential settlement of contract claim both substantially

24   complied with claims statute and estopped public entity; "The claims statute may not be invoked

25   to penalize a plaintiff who at the behest of a public entity has been induced not to take action, but

26   instead to wait until the situation creating a conflict has stabilized."); *Boas v. County of San*

27   *Diego*, 113 Cal. App. 3d 355 (1980) (failure to file timely government claim was excused where

28   plaintiff provided informal notice and was told that county would investigate, and not to take

1   further action until investigative report was completed).

2         Second, BART treated GETS's written submissions as sufficient.  BART addressed

3   GETS' claims on the merits – first finding entitlement, then changing its mind when it saw the

4   price tag – never complaining that the claims were late or insufficiently documented or otherwise

5   not in compliance with the claims provision of the contract.  Exh. O at 170:19-171:1.  Instead the

6   parties worked together on trying to identify solutions and proposed contract changes that would

7   solve the problems and avoid the damage that GETS would otherwise suffer as a result of

8   BART's bad specifications.  By failing to complain about any alleged insufficiency in the claims

9   process, BART waived any conditions that it now alleges were unsatisfied.  *Galdjie*, 113 Cal.

10  App. 4th at 1340 ("staying in communication with respondent and approving and assisting his

11  efforts to locate a willing lender" waived condition of having financing in place); *Ocean Servs.*

12  *Corp.*, 15 Cal. App. 4th at 1777 ("Where, as here, a public entity fails to give notice of defects

13  regarding the content or timeliness of the claim, it 'waives any defenses based on those

14  insufficiencies.'"); *Outboard Marine Corp. v. Superior Court*, 52 Cal. App. 3d 30, 41 (1975)

15  (treating non-compliant notice of claims as sufficient waived procedural non-compliance); *Cruise*

16  *v. City & County of San Francisco*, 101 Cal. App. 2d 558 (1951) (where injured person was in

17  contact with city officials and providing them requested information, and was not told that

18  information provided was insufficient or that more formality was required, city was estopped

19  from asserting claims notice bar).

20                              **<u>CONCLUSION</u>**

21        For the foregoing reasons, the Court should deny BART's motion for partial summary

22  judgment.

23  Dated:  April 9, 2010                    FARELLA BRAUN + MARTEL LLP

24

25                                          By:_____/s/_____
                                               Thomas B. Mayhew
26

27                                          Attorneys for Defendant and Counterclaimant
                                            GE TRANSPORTATION SYSTEMS
28                                          GLOBAL SIGNALING, LLC