1  John W. Crowley - SB# 039041
   Robert B. Stringer - SB# 056148
2  Mark D. Fenske - SB #160640
   Crowley, Stringer & Fenske LLP
3  456 Montgomery Street - 17th Floor
   San Francisco, California 94104-1250
4  Telephone: (415) 989-1100
   Facsimile:  (415) 421-6651
5  E-mail: jcrowley@crowleysf.com
   Attorneys for Plaintiff San Francisco
6  Bay Area Rapid Transit District

7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11  SAN FRANCISCO BAY AREA RAPID          )  CASE NO. CV-06-03749 JSW
    TRANSIT DISTRICT,                     )
12                                        )  PLAINTIFF'S MEMORANDUM OF
                              Plaintiff,  )  POINTS AND AUTHORITIES IN
13                                        )  OPPOSITION TO DEFENDANT'S
    vs.                                   )  MOTION FOR SUMMARY JUDGMENT
14                                        )
                                          )
15  GE TRANSPORTATION SYSTEMS             )  Date:       May 14, 2010
    GLOBAL SIGNALING, LLC                 )  Time:       9:00 am
16                                        )  Courtroom:  11
                             Defendant.   )
17  _____  )  Complaint Filed:   June 13, 2006
                                          )  Trial Date:        August 30, 2010
18  AND RELATED COUNTERCLAIM              )
    _____  )
19

20

21

22

23

24

25

26

27

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17ᵗʰ Floor
San Francisco, CA 94104
(415) 989-1100

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1

**TABLE OF CONTENTS**

2

Page

3   INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5      A. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6      B. CONTRACT WITH HARMON INDUSTRIES, INC. ("HARMON") . . . . . . . . . . . . . . 2

7      C. CONTRACT PERFORMANCE FEBRUARY 1998 - AUGUST 2002 . . . . . . . . . . . . . 4

8      D. THE DISPUTE: AUGUST 2002 - JANUARY 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9      E. GETS' AATC DESIGN DOCUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10     F. COMMUNICATIONS BASED TRAIN CONTROL ("CBTC") SYSTEMS . . . . . . . . 8

11     G. COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12     H. THE PARTIES' OPTIONS IN 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

13        1. BART . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

14        2. GETS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

16     A. BART's Remedies for Breach of Contract are Not Limited by the Contract . . . . . . . . . 12

17        1. Article P.8.3 Doesn't Set Forth an Exclusive Remedy . . . . . . . . . . . . . . . . . . . . . 12

18        2. There Was No "Termination" of Phase 2 within the Meaning of Article P8.3 . . . . . 15

19        3. Even if P8.3 Sets Forth an Exclusive Remedy, GETS Is Barred from Asserting
            it under the Doctrines of Failure of Essential Purpose, Estoppel and Bad Faith . . . . 17

20

21     B. BART's Claim for Benefit of the Bargain Damages Is Proper . . . . . . . . . . . . . . . . . . . 18

22     C. Article P8.4 Does not Limit BART's Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

23  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

24

25

26

27

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

<u>Page</u>

4

*American-Hawaiian Engineering v. Butler*
    165 Cal. 497 (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5

*Anchor Savings Bank v. U.S.*
    – F.3d –, 2010 WL 786578 (Fed.Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

6

7

*Bachman v. Parkin*
    471 N.E.2d 759 (Mass.App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

8

*Boshes v. Miller*
    119 Cal.App.2d 332 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

9

10

*Brandon & Tibbs v. George Kevorkian Accountancy*
    226 Cal.App.3d 442 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

11

*Bretches v. Kirkland*
    2007 WL 1378021 (N.D.Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

12

13

*Chevrolet Motor Co. v. McCullough Motor Co.*
    6 F.2d 212 (9th Cir. 1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

14

*Chyten v. Lawrence & Howell*
    23 Cal.App.4th 607 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

15

16

*City of Hollister v. Monterey Ins. Co.*
    165 Cal.App.4th 455 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

17

*Coates v. Lake View*
    20 Cal.App.2d 113 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18

19

*County Of Los Angeles v. Baker*
    2005 WL 1661986 (Cal.App. 2005) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

20

*County of Marin v. Assessment Appeals Bd.*
    64 Cal.App.3d 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

21

22

*Davies v. Krasna*
    14 Cal.3d 502 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

23

*Dickson v Delhi*
    760 S.W.2d 382 (Ark.App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

24

25

*Dura-Wood v. Century*
    675 F.2d 745 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

26

27

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17ᵗʰ Floor
San Francisco, CA 94104
(415) 989-1100

1

**TABLE OF AUTHORITIES (Cont'd)**

2

**Cases**

**Page**

3

*Employers Ins. of Wausau v. Granite State Ins. Co.*
   330 F.3d 1214 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4

*EPIS v. Fidelity*
   156 F.Supp.2d 1116 (N.D.Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

5

6

*Freitag v. Bill Swad Datsun*
   443 N.E.2d 988 (Ohio App. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

7

*Glenn v. Carlisle*
   297 F.3d 294 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

8

9

*Hawley v. Orange County Flood Control Dist.*
   211 Cal.App.2d 708 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

10

*Hessler v. Crystal Lake*
   788 N.E.2d 405 (Ill.App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11

*Hollon v. McComb*
   636 P.2d 513 (Wyo. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

12

13

*Hughes Communications v. U.S.*
   271 F.3d 1060 (Fed.Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

14

*Huntington Beach Union H.S. Dist. v. Continental*
   621 F.2d 353 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15

16

*KGM v. Fresh Network*
   36 Cal.App.4th 376 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

17

*Kuffel v. Seaside Oil Co.*
   11 Cal.App.3d 354 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

18

19

*Leininger v. Sola*
   314 N.W.2d 39 (N.D. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

20

*Le Moyne v. Agajanian*
   121 Cal.App. 423 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

21

22

Lifeguard Industries
   42 B.R. 734 (Bankr.S.D. Ohio 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

23

*Los Angeles v. Margulis*
   6 Cal.App.2d 57 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

24

25

*Lunden v. Los Angeles*
   233 Cal.App.2d 813 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26

*Martin v. U-Haul*
   204 Cal.App.3d 396 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

27

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- ii -

CASE NO. CV-06-03749 JSW

1

**TABLE OF AUTHORITIES (Cont'd)**

2

**Cases**

Page

3

*Mayer v. Multistate Legal Studies*
52 Cal.App.4th 1428 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

4

5

*McGuire & Hester*
113 Cal.App.2d 186 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

6

*Mendoyoma v. Mendocino*
8 Cal.App.3d 873 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7

8

*Milenbach v. C.I.R.*
318 F.3d 924 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

9

*Nelson v. Spence*
182 Cal.App.2d 493 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10

*O'Neill v. U.S.*
50 F.3d 677 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

11

12

*Pecarovich v. Becker*
113 Cal.App.2d 309 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

13

*People v. Doolin*
45 Cal.4th 390 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

14

15

*Pollard v. Saxe & Yolles*
12 Cal.3d 374 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

16

*Riess v. Murchison*
503 F.2d 999 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17

18

*Ring Bros. v. Martin Bros.*
438 F.2d 420 (9th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

19

*Rose v. Chrysler Motors*
212 Cal.App.2d 755 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20

21

*RRX Industries v. Lab-Con*
772 F.2d 543 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

22

*Sanborn v. Ballanfonte*
98 Cal.App. 482 (1929) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

23

24

*Smalley v. Bay Dray*
612 So.2d 1182 (Ala. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

25

*Sun Maid v. Victor Packing*
146 Cal.App.3d 787 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

26

27

*Strong v. Theis*
187 Cal.App.3d 913 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- iii -

CASE NO. CV-06-03749 JSW

1

## **TABLE OF AUTHORITIES (Cont'd)**

2

### **Cases**

**Page**

3  *Temple Beth Shalom v. Thyne Construction*
        399 So.2d 525 (Fla.App. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4

5  *Taylor v. Johnston*
        15 Cal.3d 130 (1975)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

6  *Terrace Water Co. v. San Antonio Light*
        1 Cal.App. 511 (1905)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

7

8  *Thorstenson v Mobridge*
        208 N.W.2d 715 (S.D. 1973)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

9  *Valencia v. Shell Oil Co.*
        23 Cal.2d 840 (1944)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10

11  *Whitney v. Westview*
        273 Cal.App.2d 594 (1969)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12  *Zanker v. Cogito*
        215 Cal.App.3d 1377 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

13

### **Statutes and Court Rules**

14

15  67A Am.Jur.2d Sales § 848  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

16  U.C.C. Comment 1 to § 2719  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

17  Witkin, *Summary* (10th ed), Contracts § 925  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18  1 Witkin, *Summary of California Law* (10th ed. 2005)

19      Contracts § 798  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20      Contracts § 852  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

21  1 White & Summers, *Uniform Commercial Code* (5th ed.)

22      § 6-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

23      § 12-10  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

24

25

26

27

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

1

<u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

2    For discussion of terminology and a document which makes it easier to refer to contract

3 provisions discussed in this memorandum, we respectfully refer the court to the Stringer

4 Declaration ¶¶ 3 through 9, and Exhibits 1 and 2.

5    GETS claims that Article P8.3, regarding termination for cause, is turned into an

6 exclusive remedy by a sub-subarticle within Article P8.4, which states that exclusive termination

7 rights are "set forth *above*." GETS' memorandum never informs the court that Article P8.5, also

8 concerning termination rights, appears immediately *below* P8.4. When all articles are read in

9 context, the sub-subarticle can only refer to the termination rights set forth within P8.4. P8.3, on

10 its face, gives BART "discretion" to exercise an entirely different termination right. GETS'

11 claim also fails because under California's election of remedies laws "termination" has not

12 happened. It also fails under the doctrines of failure of essential purpose, estoppel and bad faith.

13    GETS' claim that BART's common law remedy is limited to the cost to complete AATC

14 is premised on inapplicable building construction cases, and is contrary to the case law.

15    Finally, there is no cap on damages by virtue of the termination for convenience clause

16 because GETS' breach did not "terminate" the contract, as discussed by Ninth Circuit authority.

17

<u>STATEMENT OF FACTS</u>

18

A. <u>BACKGROUND</u>

19    In the early 1990s, BART was at a crossroads. Its original train control system was

20 nearing the end of its forecast 25-year life (Slama ¶ 2), and BART needed to increase the

21 capacity of its transit system (Nishinaga ¶ 1) to meet ever-escalating passenger demand. To meet

22 these challenges, BART decided to search for a new train control system that would be able to

23 run trains faster and closer together than its existing track-circuit based system could, since the

24 only alternative – building a second Transbay tube – was financially and politically impractical,

25 if not impossible (Nishinaga ¶ 2).

26    In pursuit of an enhanced system, BART went to the technical community in 1992 and

27 solicited ideas (Nishinaga ¶ 3). After consideration of other options, BART concluded that

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

1   Hughes Aircraft Co.'s EPLRS technology[1] had the most potential to fulfill BART's needs.

2   Hughes and BART agreed to try to develop a train control system based upon EPLRS, with

3   Hughes' costs being paid by funds from DARPA[2] and BART paying for its effort in supporting

4   Hughes' work through its own funds. After approximately three years of work, in 1996 Hughes

5   demonstrated and proved on BART's Hayward test track the concepts that trains could be

6   located and controlled by radio signals (Nishinaga ¶ 6).  What was just an educated hope in 1991

7   became a reality in 1996.

8       BART simulations demonstrated that up to a 25% increase in performance could be

9   achieved once Hughes' EPLRS technology was engineered and developed (Lehrer ¶ 1). The

10  technology also provided additional benefits: it could be implemented as an overlay to BART's

11  existing system, with modifications it could utilize BART's existing car-borne control

12  equipment, and it could be imbedded within BART's existing train control system without a

13  significant amount of revenue service disruption (Lehrer ¶ 2). For these and other reasons,

14  Hughes' wayside-centric communication based train control system ("WC- CBTC") was ideal

15  not only for BART, but potentially for all existing automatic public transit systems. There was

16  every reason to believe that after it was developed it would significantly impact if not dominate

17  the automatic public transit system world market (Crowley ¶¶ 1 & 37; Lehrer ¶ 3).

18      B. <u>CONTRACT WITH HARMON INDUSTRIES, INC. ("HARMON")</u>

19      Hughes' original partner in BART's Advanced Automatic Train Control ("AATC")

20  project was Morrison Knudsen, but it withdrew during 1996 because of corporate business

21  problems unrelated to the project. After inquiries by Hughes to the train control system supplier

22  industry, Hughes and Harmon made contact in early 1997, and Hughes proposed that Harmon

23  and Hughes continue with the AATC project in a joint venture (Crowley ¶ 2). Harmon had

24

25      [1] EPLRS ("Enhanced Position Location Reporting System") is a radio-ranging
26  technology Hughes invented that was employed during the Persian Gulf War to track the
    movement of military vehicles on the battlefield (Nishinaga ¶ 4).

27      [2] The US Defense Department's Defense Advanced Research Projects Agency
28  ("DARPA") offered grants for the purpose of pursuing commercial applications of military
    technology (Nishinaga ¶ 5).

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 2 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1  wanted to expand its train control system business for some time going back to at least 1992

2  when it considered making a proposal to BART in response to BART's initial request for ideas

3  from the technology community (Crowley ¶ 1), and it agreed to consider Hughes' proposal.

4      Harmon devoted approximately 12 months to due diligence efforts. Those efforts

5  included numerous discussions with Hughes, to include consideration of the respective

6  responsibilities of the two parties in the contemplated Hughes-Harmon joint venture for overall

7  system safety (Crowley ¶ 2),[3] examination and analyses of Hughes' technical work product, and

8  discussions with BART (Nishinaga ¶ 8). In late 1996 Hughes advised BART that for corporate

9  business reasons it had decided to concentrate its business on government military procurement

10  matters and that it would like to withdraw from the commercial AATC project (Nishinaga ¶ 7).

11  Hughes offered to grant Harmon a license to its EPLRS technology and to provide Harmon with

12  EPLRS radios and radio chips as a subcontractor to Harmon if Harmon wished to continue with

13  the project (Crowley ¶ 3).

14      Thereafter, Harmon pursued the project on its own. It entered into a Letter of Intent with

15  BART (Nishinaga ¶ 9), hired three principal Hughes software and radio engineers (Nishinaga

16  ¶ 10), changed the design of Hughes' AATC system (Nishinaga ¶ 11) and, after BART provided

17  it in August 1997 with a draft Contract Book for its consideration and suggestions, requested

18  changes to BART's proposed technical requirements and commercial terms (Crowley ¶ 32).

19      Harmon and BART agreed that Harmon's costs for the development phase of the project

20  ("Phase 2")[4] which the parties anticipated would be approximately $13M would be funded by

21  contributions of $5M from BART, $5M from Harmon, and approximately $3M from the

22  DARPA grants that remained unspent after Hughes' work (Crowley ¶ 5), and that BART's

23

24      [3] This issue became moot when Harmon assumed all of Hughes' duties (Crowley ¶ 23).

25      [4] Phase 2 was defined in the 49GB-110 Contract:

26      Phase 2 – Pilot Demonstration Project
        Phase 2 includes the completion of the development of the system and the
27      implementation of production hardware on the District's revenue track . . . Upon
        completion of this phase the installed system shall be fully safety certified and
28      ready for revenue operation . . . (Crowley ¶ 4)

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

1   support costs would be paid from BART's own funds. The agreement also contained a BART

2   option to purchase the construction component of the project (Phase 3) after Harmon's

3   completion of Phase 2. BART agreed to pay Harmon $40.5M if it exercised the option, and all of

4   the costs that Harmon had incurred in the performance of its Phase 2 work if BART decided that

5   for lack of funding or other reasons it could not proceed with the construction (Crowley ¶ 6).

6          Harmon's primary objective in pursuing the BART project was to obtain ownership of

7   the AATC technology after Harmon developed it at BART (Crowley ¶ 1) . The project schedule

8   agreed by the parties was two years for Harmon to complete the Phase 2 development (Crowley

9   ¶ 7) and, if BART exercised its option, two additional years thereafter for Harmon to complete

10  the implementation of AATC at BART (Crowley ¶ 8). BART granted Harmon all of its

11  ownership interests in the AATC technology (Crowley ¶ 9; Nishinaga ¶ 13), which meant that if

12  Harmon completed its development work within the planned two years, in 2000 it would be the

13  first and only provider of the cutting-edge radio-ranging technology in the world-wide automatic

14  public transit system marketplace (Nishinaga ¶ 12).

15         The Contract was executed on February 26, 1998 (Crowley ¶ 10).

16         C. <u>CONTRACT PERFORMANCE FEBRUARY 1998 - AUGUST 2002</u>

17         BART objected to Harmon's decision to try to develop a new computer platform to

18  process the AATC system radio communications to locate and control BART's trains (Nishinaga

19  ¶ 11; Crowley ¶ 1).  Harmon believed that its HNAC would enhance its ability to market the

20  AATC system after Harmon implemented the AATC system at BART, and as AATC system

21  designer and owner of the AATC technology it had the right to decide which style of computer

22  system was best for its future commercial ventures (Nishinaga ¶ 13). After approximately two

23  years of effort to develop the HNAC, Harmon concluded it was not feasible, it dropped the

24  project, and it reverted back to the Hughes' checked-redundant computer platform concept

25  (Nishinaga ¶ 14). As a result of the failed HNAC effort, the Phase 2 schedule was extended from

26  two years to over four (Miller ¶ 1), with corresponding increases in the development and support

27  costs of the two parties.

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 4 -

On June 13, 2002, the General Electric Transportation Company - Global Signaling ("GETS")[5] certified to BART that GETS was not aware of any hazards that could render either BART's trains or trackway to be unsafe in passenger carrying revenue service while the AATC system was being operated in Mixed Mode (Crowley ¶ 11; Lehrer ¶ 4).  Based on this certification on June 28, 2002, BART obtained permission from the California Public Utilities Commission to operate the AATC system in Mixed Mode (Crowley ¶ 12).

During late 2001 and the first half of 2002, GETS repeatedly represented to BART that its Phase 2 development work was almost if not completely finished (Dupont ¶ 1; Crowley ¶ 13). Relying on those representations, on July 2, 2002 BART declared Phase 2 a "technical success" and "substantially complete." BART incorporated those findings in a proposed Contract Change Order ("CO"), CO 097, and submitted it to GETS for concurrence and  approval. GETS approved CO 097 on July 24, 2002, and on July 26, 2002 BART exercised its option for the Phase 3 construction work (CO 086) (Miller ¶ 1). The latter act entitled GETS to approximately $24M, and GETS invoiced BART approximately $7.9M of that amount before the end of 2002 (Dupont ¶ 2). As terms of those COs, the schedule for the completion of Phase 2 was extended until December 2, 2002 and the schedule for the completion of Phase 3 was extended to July 30, 2004 (Miller ¶ 1).

D. <u>THE DISPUTE:  AUGUST 2002 - JANUARY 2006</u>

On August 2, 2002 GETS served BART with a Notice of Potential Claim in which GETS contended that most of its remaining Phase 2 development work was "out of the scope of the Contract" and at BART's expense (Crowley ¶ 14). On October 18, 2002, GETS quantified its claim at approximately $7M (Crowley ¶ 15; Dupont ¶ 3).

The nature and size of the claim surprised BART, and BART reacted by proposing modification to the Contract in an attempt to settle the claim commercially by decreasing the scope of GETS's work (Lehrer ¶ 5). BART also proposed modifying at its expense the Keyswitch, Master Control Selection Switch and track circuit hardware in its existing system in

---

[5] GETS purchased Harmon during mid-2000.

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

1    order to accommodate GETS' then existing AATC design (Crowley ¶ 16). These overtures went

2    for naught as on April 9, 2003 GETS increased its claim to over $13M (Crowley ¶ 17).

3           The foregoing August 2002 - April 2003 discussions were undertaken in an attempt to

4    resolve the dispute commercially short of direct confrontation on the merits of GETS' claims.

5    However, in March 2003 GETS advised BART that the Board of Directors of the General

6    Electric Co., GETS' parent corporation, had instructed GETS to "Kill the project." (Dupont ¶ 4)

7    This advice, GETS' increase in the size of its claim less than a month later, and other matters

8    prompted BART to conduct a formal detailed analysis of GETS' claims. This effort took three

9    months, after which BART concluded that all of GETS' claims were without merit. On July 9,

10   2003 BART formally rejected GETS April 2003 claims, advised GETS that it should pursue

11   them within the Contract claims procedures, and instructed it, per Contract terms, to continue its

12   Phase 2 work while it was appealing BART's rejection of its claims (Crowley ¶ 18).

13          BART later agreed to renew its efforts to resolve the dispute commercially. Those efforts

14   by BART lasted another two and a half years, and they plus earlier accommodations included

15   BART's performing duties that GETS had under the terms of the Contract (e.g. the performance

16   of a scientific track circuit shunting probability study by BART and the Sandia National

17   Laboratory, the performance of operations scenarios reviews, the analyses of various matters

18   related to the software, hardware and operational interfaces between the AATC system and

19   BART's existing system) (Lehrer ¶ 6) and the dropping of yet more Contract features (e.g.,

20   Mixed Mode operation functionality and decreased AATC scope at BART's Lake Merritt station

21   and at the Oakland Wye) (Lehrer ¶ 7; Crowley ¶ 36). The end result of all of these BART

22   accommodations was not the hoped-for decrease in GETS' price to BART to complete GETS'

23   Phase 2 work – but *increases* in the price to $36M in December 2003 (Crowley ¶ 19) and then to

24   $65M in February 2005. The $65M price was accompanied by advice that it would take a further

25   8.2 years to complete the project if GETS' proposal was accepted (Crowley ¶ 20).

26          From August 2003 to late 2005, GETS repeatedly restated its positions that all of its

27   remaining Phase 2 Work was outside the scope of the Contract, it had finished its Phase 2 Work

28   and all of its remaining Phase 2 Work was at BART's expense (Crowley ¶ 21). And on

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 6 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1   November 29, 2005, GETS formally advised BART that, contrary to train control system

2   industry customs and practices (Ghaly ¶ 6) and the terms of the Contract (Crowley ¶ 22), GETS

3   would not warrant that its control system would control BART's trains in a safe manner (Dupont

4   ¶ 6; Crowley ¶ 38). This position had been stated by GETS' negotiators previously (Dupont ¶ 5),

5   but on the indicated date GETS' General Manager, K. Caponecchi, accented it to BART's

6   executive management.

7          Mr. Caponecchi's pronouncement brought the commercial dispute resolution efforts to a

8   halt because BART as a public transit agency has the paramount duty to ensure the safety of the

9   traveling public (Dupont ¶ 10), and by necessity it, like all public transit agencies, has to rely

10  upon its train control system supplier to provide a safe train control system. To BART, it was the

11  bottom line and a no compromise matter (Crowley ¶ 36).

12                          E. GETS' AATC DESIGN DOCUMENTS

13         The core GETS AATC design documents were, in ascending order of detail, the System

14  Functional Requirements Specifications, the Subsystem Software Requirements Specifications

15  and the ultimate definitive product, the subsystem source codes ("source code"). Supporting

16  subordinate design documents included the Data Item Dictionary, Interface Requirements

17  Specifications, Subsystem Hardware Design Specifications, the  Station Computer Checked

18  Redundant Architecture, and Process and Data Flow Diagrams. Collectively, these documents

19  constituted almost the entire Hughes-Harmon-GETS design work for the 13 year period from

20  1993-2006 (Lehrer ¶ 11).

21         GETS had a license from Hughes to use the EPLRS technology (Crowley ¶ 3), and, per

22  terms of GETS' contract with BART, GETS owned the EPLRS based AATC technology that

23  was developed during the course of the BART project (Crowley ¶ 9). BART had a sub-license

24  from GETS to use GETS' AATC technology for its own operations (Crowley ¶ 26).

25         The contract required GETS to deliver the design documents to BART for review as they

26  were developed. With the notable exception of the source code, GETS did deliver several

27  versions of design documents to BART during the course of the project, but all of them were

28  delivered to BART subject to GETS' intellectual property restrictions:

Crowley, Stringer
& Fenske LLP
456 Montgomery Street
17ᵗʰ Floor
San Francisco, CA 94104
(415) 989-1100

- 7 -

Plaintiff's MPA in Opposition to Defendant's Motion for Summary Judgment
Case No. CV-06-03749 JSW

1
2
3
4
5

> This document is the property of GETS-Global Signaling and may not be copied in any form without the expressed written permission of GETS-Global Signaling. It is entrusted to the customers and subcontractors of GETS-Global Signaling for their information only. The information contained herein is proprietary and confidential and may not be transferred, transported, or transmitted by any means without the expressed written permission of GETS-Global Signaling. GETS-Global Signaling makes no guarantee of the completeness of the information contained in this document and retains the right to make changes at any time, without notice. (Lehrer ¶ 12)

6    The Contract required GETS to deliver the source code to BART during the course of the

7  project (Crowley ¶ 27). But, even though it had delivered the source code to its other licensee,

8  the Nippon Signal Company of Japan ("Nippon") (Nishinaga ¶ 16 and ¶ 19), and despite

9  innumerable requests/demands by BART (Crowley ¶ 28), GETS refused to give BART the

10  source code, and GETS has not provided it to BART to date (Crowley ¶ 29; Stringer ¶¶ 10-12)[6].

11  By denying BART the source code and restricting BART's use of the intermediate design

12  documents, GETS foreclosed BART from any consideration of picking up the Hughes-Harmon-

13  GETS 1993-2006 work from where GETS left it in 2006 (Nishinaga ¶ 15; Lehrer ¶ 13). BART

14  was even precluded from going back to 1998 when Harmon assumed responsibility for the

15  AATC development and starting anew because GETS also had control of the Hughes EPLRS

16  technology through its license agreement with Hughes (Nishinaga ¶ 15; Lehrer ¶ 13).

17  F. COMMUNICATIONS BASED TRAIN CONTROL ("CBTC") SYSTEMS

18    There are two styles of communications based train control systems: wayside centric

19  ("WC-CBTC") and vehicle centric ("VC-CBTC"). The distinguishing feature of the two styles of

20  CBTC systems is that most of the intelligence (brain) for VC-CBTC systems is contained within

21  the cabs of the control cars in a train while it is contained in stations spread along the trackways

22  in WC-CBTC systems. Radio signals are used to communicate between trains and wayside in

23  both styles of CBTC systems and they also can be used for train location detection purposes in

24  both systems. RF tags and tag readers (and other devices) can be used by themselves or in

25
26
27
28

---

[6] In 2004 GETS advised BART it would be willing to give BART the source code after the completion of the construction phase of the project (Phase 3). But even then GETS was only willing to provide BART the source code through an escrow arrangement pursuant to the terms of which BART would not have direct access to the code until and if GETS ceased doing AATC business (Crowley ¶ 30).

CROWLEY, STRINGER & FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 8 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1   combination with radio signals to locate trains in both systems if the system designer deems

2   complementary location detection systems to be prudent for one or more functions (Lehrer ¶ 8).

3          WC-CBTC and VC-CBTC systems can provide the same performance on a given transit

4   agency trackway (Lehrer ¶ 9), and they also have several features in common. But WC-CBTC

5   has several advantages over VC-CBTC (e.g., it provides multiple train coordination and is less

6   expensive and less disruptive to revenue service operations to install) along with a disadvantage

7   (i.e., VC-CBTC is more suitable for long-haul railroads because it only needs a sparse wayside

8   radio network.) (Lehrer ¶ 10). There are several VC-CBTC systems in the marketplace today and

9   one WC-CBTC system: Nippon's (Nishinaga ¶ 16, ¶ 17).

10         Harmon granted two licenses of its AATC technology: one to  BART and the second to

11  Nippon (Crowley ¶ 24). GETS provided Nippon with the AATC source code (Crowley ¶ 25;

12  (Nishinaga ¶ 16), and Nippon used that code to develop its CBTC system (Nishinaga ¶ 16).

13  Nippon has recently sold two systems, one in China (Beijing) and another in Korea. The latter is

14  scheduled to begin revenue service shortly (Nishinaga ¶ 17).

15         VC-CBTC systems have been in the marketplace since the 1980s when the Toronto and

16  Vancouver transit agencies implemented Alcatel's VC-CBTC system (Nishinaga ¶ 19) so VC-

17  CBTC is the oldest CBTC technology. It remains to be seen whether Nippon's recently

18  introduced new technology will have more appeal to the public transit agency marketplace.

19                                          G. COSTS

20         GETS' 2005 price to BART to complete a then much diminished AATC system (Lehrer

21  ¶ 14) was $65M, and its estimate of the time it would take to complete the project was an

22  additional 8.2 years (Crowley ¶ 20). BART's estimated cost to support GETS' efforts is $85M.

23  (Dupont ¶ 9) for a total BART cost if GETS finishes the project today of approximately $150M.

24  Given the history of GETS' estimates, its 2005 estimates have to be considered low, short and

25  soft at best.

26         During 2008-2010, BART received budgetary cost estimates from three suppliers and an

27  independent expert for the costs of alternative VC-CBTC systems. Three of the estimators

28  forecast it would take five years to implement a VC-CBTC system and the fourth asserted it

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 9 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

could be done in four years. Including BART support costs the total cost (present value) to

BART for an alternative system varies from $241M to $383M (Crowley ¶ 31).

H. <u>THE PARTIES' OPTIONS IN 2006</u>

1. <u>BART</u>

BART had only four theoretical options in January 2006:

1. Finish the work itself;

2. Engage another train control supplier to take over the AATC project from GETS and finish it;

3. Give up on the AATC project and purchase a different train control system from another supplier; or

4. Send GETS a Notice to Proceed with and Finish its Phase 2 Work.

BART is a public transit agency, not a train control system designer. BART believed it was not prudent or in the public interest for a public transit agency itself to assume the responsibilities and liabilities for the safety and functionality of the system that controls its trains (Dupont ¶ 10). On the assumptions that GETS would reconsider and provide BART with the project source code, remove its restrictions on the intermediate design documents, and allow its CBTC system competitors to use its design documents to finish the AATC project, BART approached three other train control system suppliers during 2005 and 2007 to determine if any of them would be interested in finishing the project.[7] At that time all of them had their own CBTC systems, and they advised BART that although they would be interested in providing BART their own systems they were not interested in committing resources to a one-time effort to try to perfect a competitor's technology (Miller ¶ 2; Dupont ¶ 7, ).

GETS' refusal to provide BART with the cumulative 1993-2006 AATC source code, its restrictions on the use of the subordinate AATC system design documents and its license with Hughes for the EPLRS radio-ranging technology meant that not only could BART not pick up the project where GETS had left off, it couldn't even go back to 1998 and start again. BART

---

[7] Nippon was not available as an alternative supplier for many reasons, the most determinative of which was its license with GETS restricted its operations to certain countries in Asia (Crowley ¶ 24).

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

finishing the AATC project itself (or by having another train control system supplier try to do it) was not only impractical, it was not even theoretically possible (Nishinaga ¶ 15; Lehrer ¶ 13).

The abandonment of the AATC project and the purchase of an alterative CBTC train control system option presented significant cost considerations. Initially, it would have meant a write-off of approximately $70M in public funds that BART had invested in GETS' AATC project between 1998 and 2006 (Crowley ¶ 31). Then there were the suppliers' prices for alternative systems and BART's costs in supporting a supplier during the course of its implementation of its system (Crowley ¶ 31). For loss, cost and schedule reasons, the option of the purchase of an alternative system, though necessary for public transportation reasons if GETS would not complete its AATC work, was problematic.

Because of the barriers and difficulties presented by the three other options, BART decided that it would be prudent to give GETS one more opportunity to acknowledge its responsibility to warrant that BART's trains would be controlled in a safe manner by GETS' AATC system and to finish the project. So on January 30, 2006, BART sent GETS a formal Notice to Proceed with its Phase 2 Work per Contract terms, accompanied by an instruction that GETS process BART's rejection of its claims through the Contract claims procedures (Crowley ¶ 33). At the same time (and once again later) it sent GETS a Request for Assurances that, among other things, asked GETS to acknowledge that it was required by the Contract to warrant that its AATC system would control BART's trains in a safe way (Crowley ¶ 33). In the resulting correspondence, GETS refused to any assurance, did not resume its Phase 2 work, yet stated that it stood ready to perform under the contract. (Stringer ¶ 16 .)

2. <u>GETS</u>

There were two legitimate courses of action available to GETS in February 2006 after it received BART's Notice to Proceed with the Phase 2 Work and Requests for Assurances.

1. It could exercise its right to terminate the Contract for its convenience; or

2. It could provide BART with the requested assurances, proceed with its Phase 2 Work and finish the project and prosecute its claims through the Contract claims procedures.

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 11 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1    If GETS had terminated the Contract for convenience it would have been required by

2    Contract terms to pay BART approximately $70 million (Crowley ¶ 31 and ¶ 34), to give up its

3    ownership interests in the source code and other components of the AATC technology, and to

4    deliver the source code and all other AATC design documents to BART (Crowley ¶ 35). GETS

5    did not terminate the Contract for convenience. Nor did GETS provide BART with the requested

6    safety responsibility assurance and return to work.

7    If GETS had really expected BART to finish the project as it now claims, it would have

8    provided BART with the source code and removed its intellectual property restrictions on

9    BART's use of the intermediate design documents. Instead, it continued to rebuff BART's pleas

10   for the source code and it did not remove the restrictions, foreclosing BART from even

11   considering trying to finish the AATC project.

12                                    ARGUMENT

13        A. BART's Remedies for Breach of Contract are Not Limited by the Contract

14             1. Article P.8.3 Doesn't Set Forth an Exclusive Remedy

15   Article P8.3 of the contract expressly states that BART has discretion to terminate the

16   contract for cause if GETS fails to cure a breach of contract within five days after being given

17   notice of default. P8.3 doesn't say this is an exclusive remedy, but notwithstanding the word

18   "discretion," GETS asserts that P8.3 does state an exclusive remedy by virtue of P8.4.1.3, even

19   though P8.4.1.3 is a sub-sub-article of a different provision, Article P8.4, which sets forth rights

20   only in the event of termination for convenience. (Stringer ¶¶ 7 to 9.) The question is whether

21   P8.4.1.3 applies only to termination under Article P8.4 or implicates P8.3 as well.

22   GETS' approach is facile. It quotes P.8.3 and P8.4.1.3 in succession, then observes that a

23   "clear and unambiguous" provision for an exclusive remedy will be enforced. (Motion p. 9:7-

24   16.) GETS doesn't consider other legal principles; juxtaposition of P.8.3 and P8.4.1.3 apparently

25   makes the result "clear." That might work if P8.3 and P8.4 were the only articles on

26   "termination," but they aren't. P8.5 – never mentioned in the motion – addresses termination for

27   reasons beyond GETS' control and appears immediately *below* P8.4.1.3.

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 12 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1    Merely reading the three articles in succession forces one to conclude that GETS' view

2    injects an irreconcilable conflict into the contract. *Id.*, Exhibit 2. Although P8.5 is below

3    P8.4.1.3, it defines GETS' rights in the event of a *certain kind* of termination. P8.5 therefore has

4    to be stricken from the contract in order for the exclusive rights of each party in the event of *any*

5    *kind* of termination of the Phase 2 Work to be "set forth above" P8.4.1.3. But GETS provides no

6    reason for striking P8.5, and it foregoes any argument that the presence of P8.5 creates an

7    ambiguity. GETS' solution is simply to pretend that P8.5 doesn't exist.

8    California law requires contracts to be construed as a whole, with the individual

9    provisions interpreted together to give effect to all of them. An interpretation that renders a

10   clause inoperative must be avoided. *People v. Doolin*, 45 Cal.4th 390, 413 n.17 (2009). This

11   mandates an over-all interpretation that gives meaning to all three articles that address the

12   subject of termination. The logical way to do that is to limit the exclusivity language of P8.4.1.3

13   to a certain *kind* of "termination" – termination for convenience, since that's the only kind of

14   termination for which rights are set forth in Article P8.4. That leaves P8.3 and P8.5 to stand on

15   their own terms. P8.3 thus gives BART discretion to terminate for GETS default, but does not

16   limit BART's remedy, and P8.5 sets forth GETS' rights upon a termination beyond its control.

17   Cf. *Whitney v. Westview*, 273 Cal.App.2d 594, 600 (1969) (where an exclusivity provision was

18   inconsistent with another provision, the other provision governed).

19   Another basic principle of contract interpretation is that where a contract expressly

20   provides a remedy for breach, the remedy is not exclusive unless it "clearly indicate[s] an intent

21   to make the remedy exclusive." *Nelson v. Spence*, 182 Cal.App.2d 493, 497 (1960). Additional

22   fundamental rules are that the court must avoid an interpretation that makes a contract

23   "extraordinary, harsh, unjust, or inequitable," or that leads to an absurd result. *Strong v. Theis*,

24   187 Cal.App.3d 913, 920 (1986); *Lunden v. Los Angeles*, 233 Cal.App.2d 813, 818 (1965).

25   *County of Marin v. Assessment Appeals Bd.*, 64 Cal.App.3d 319 (1976), applied these

26   principles to termination clauses. The broad issue was whether lands subject to contracts

27   executed under the California Land Conservation Act were entitled to preferential tax treatment

28   as open land. The plaintiff tried to terminate the agreements after the landowners rejected a

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 13 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1    contractual amendment to account for a recent amendment to the Act. This required the court to

2    interpret contradictory termination clauses. Each contract incorporated by reference a provision

3    in the Act which stated that in the event of condemnation, the contract would be "null and void

4    as to the land actually being condemned." Another provision, in the contract itself, stated that in

5    the event of condemnation of "any land herein" the contract "shall be null and void." 64

6    Cal.App.3d at 326-327. The court construed the disputed provisions so that condemnation caused

7    termination of the contracts only as to the land actually condemned, because it was "quite

8    obvious" that a contrary interpretation led to a harsh result. 64 Cal.App.3d at 327-329.

9           The common law distinction between "total" and "partial" breaches provides important

10   background to whether construing Article P8.3 to state an exclusive remedy similarly leads to an

11   unreasonable or absurd result. Either type of breach gives rise to a claim for damages. A total

12   breach is significant enough to always be "material," thereby also giving the promisee the option

13   of terminating the contract. A partial breach may justify termination, depending upon its

14   seriousness and effect on the likelihood that the promisee will receive substantial performance.

15   1 Witkin, *Summary of California Law* (10th ed. 2005) Contracts § 852, pp. 938-939. However,

16   termination of only a portion of the contract is not an available remedy for any type of breach,

17   unless the parties provide for it by contract, as they did here in P8.3. *American-Hawaiian*

18   *Engineering v. Butler*, 165 Cal. 497, 512 (1913). P8.3 thus is designed to give BART a

19   *supplemental* remedy.

20          Consider the result if P8.3 is interpreted to state an exclusive remedy instead. Even a

21   trivial breach can be remedied only by BART's threatening GETS with termination if the breach

22   isn't cured within five days. Given both parties' investments of tens of millions of dollars in this

23   project, that is an irrational, foolish way to handle most damages claims.

24          Turning P8.3 into an exclusive remedy also has an inequitable, disfavored consequence.

25   The parties executed change orders almost eight years ago, declaring the Phase 2 Work

26   substantially complete and exercising BART's option to proceed with the Phase 3 work. BART

27   has now paid GETS over $34 million for the latter, yet according to GETS, BART can't even get

28   the $34 million back; the money is forfeited because BART's only remedy is to complete the

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 14 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1    project (and without the source code at that). That violates yet another fundamental principle: "if

2    an agreement can be reasonably interpreted so as to avoid a forfeiture, it is the duty of the court

3    to avoid it. The burden is upon the party claiming a forfeiture to show that such was the

4    unmistakable intention of the instrument." *Hawley v. Orange County Flood Control Dist.*,

5    211 Cal.App.2d 708, 712-713, 717 (1963); accord, *Milenbach v. C.I.R.*, 318 F.3d 924, 936 (9th

6    Cir. 2003). Thus in *Hawley* a contractor was entitled to a trial on its claim for damages caused by

7    unreasonable delay, despite a provision that the exclusive remedy was "an extension of time ...

8    but [contractor] shall not be entitled to any damages for such delay." The court noted that such

9    clauses are construed "rather strictly," and that a nonsuit was improper because "the nature of the

10   default, and the various other circumstances of the particular case" were factual issues. 211

11   Cal.App.2d 708, 716-717. See *McGuire & Hester*, 113 Cal.App.2d 186, 190 (1952), affirming

12   judgment for the plaintiff in similar circumstances.

13          Even more so than in *Hawley* or *McGuire & Hester*, this case presents circumstances not

14   contemplated by the purported exclusive remedy. Again, substantial completion of the Phase 2

15   work was declared by change order eight years ago. BART has paid $34 million for Phase 3

16   work. BART claims that GETS breached the *entire* contract. P8.4.1.3, the sub-subarticle on

17   which GETS relies, is expressly limited to "the event of termination of the Phase 2 Work." Thus,

18   even assuming P8.3 states an exclusive remedy, it doesn't apply.

19          2. <u>There Was No "Termination" of Phase 2 within the Meaning of Article P8.3</u>

20          GETS asserts that BART is "playing games" by claiming that it did not exercise what

21   Article P8.3 calls a *discretionary* remedy, by "terminating" the contract and completing the

22   Phase 2 Work without GETS' help or the use of GETS' intellectual property. But the law is clear

23   that "terminate" means different things, in different contexts, for different purposes. BART

24   exercised its common law right to sue for breach of contract, only a by-product of which was to

25   "terminate" the contract – the entire contract, not just Phase 2. *Taylor v. Johnston*, 15 Cal.3d 130,

26   137 (1975). Further, the complaint includes claims for both partial specific performance, and

27   partial and complete rescission, as well as for damages. (Stringer ¶ 13 & Exhibit 5 ¶¶ 66-77, 85-

28   93.) Specific performance and rescission don't implicate or result in or from "termination."

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

1    Specific performance is an action to *enforce* the contract. *Boshes v. Miller*, 119 Cal.App.2d 332,

2    337 (1953). Rescission does away with the contract, rather than "terminate" it. *Sanborn v.*

3    *Ballanfonte*, 98 Cal.App. 482, 488 (1929) ("termination" means "to abrogate so much of [the

4    contract] as remains unperformed"; "rescission" means to restore the parties to their former

5    position). Since sub-subarticle P8.4.1.3 solely concerns "exclusive rights ... *in the event* of

6    termination" (emphasis supplied). Since BART has alleged alternative remedies, some of which

7    exclude the possibility of "termination," Article P8.3 cannot have been triggered.

8           GETS affects amused surprise that there can be a distinction between a termination based

9    on the provisions of a contract and a termination that results from the filing of an action for

10   breach. But in an earlier motion GETS stated the following to this Court:

11          'Termination' of a contract simply refers to the circumstances that arise where a
            contract is ended *for reasons other than for breach*, and that all future obligations
12          between the parties are abrogated. (Stringer ¶ 15 & Exhibit 7 p. 6:24-26)
            (emphasis supplied).
13

     Witkin, which GETS paraphrased, states the distinction this way:
14

15          'Termination' occurs when either party pursuant to a power created by agreement
            or law puts an end to the contract otherwise than for its breach....
16
            'Cancellation' occurs when either party puts an end to the contract for breach by
17          the other and its effect is the same as that of 'termination' except that the
            canceling party also retains any remedy for breach of the whole contract or any
            unperformed balance. Witkin, *Summary* (10th ed), Contracts § 925.
18

19   The courts are not always consistent in how they employ these terms. For example, in *Taylor,*

20   *supra*, 15 Cal.3d at 137, the Supreme Court used "termination" in the sense that Witkin uses

21   "cancellation." But the important point is not semantics; it's that there is a *substantive* distinction

22   between terminating a contract on a basis set forth in a contract and suing for breach of contract.

23   The distinction is not one BART invented; GETS acknowledged it in its earlier motion.

24          The distinction is relevant because under California election of remedies law, BART is

25   not required to choose among the claims that it has pleaded until at least the entry of judgment.

26   *Riess v. Murchison*, 503 F.2d 999, 1008 (9th Cir. 1974). As discussed above, some of BART's

27   claims do not involve "termination" at all. Thus, while filing the complaint "terminated" the

28   contract in the sense of "cancellation" – putting GETS on notice that BART had concluded that

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 16 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1   GETS was in material breach of contract – that was not the same thing as a "termination" under

2   Article P8.3, as GETS once recognized when it suited its purpose.

3          3. Even if P8.3 Sets Forth an Exclusive Remedy, GETS Is Barred from Asserting it
              under the Doctrines of Failure of Essential Purpose, Estoppel and Bad Faith

4          The California Supreme Court looks to the U.C.C. for guidance in deciding issues to

5   which the Code is not strictly applicable. *Pollard v. Saxe & Yolles*, 12 Cal.3d 374, 380 (1974).

6   So do the Ninth Circuit and the Federal Circuit Courts of Appeals. *O'Neill v. U.S.*, 50 F.3d 677,

7   684 (9th Cir. 1995); *Hughes Communications v. U.S.*, 271 F.3d 1060, 1066 (Fed.Cir. 2001). One

8   useful U.C.C. principle, especially relevant here, is found in U.C.C. § 2719, which permits a

9   plaintiff to "pursue all of the remedies available for breach of contract if its exclusive or limited

10  remedy fails of its essential purpose." *RRX Industries v. Lab-Con*, 772 F.2d 543, 547 (9th Cir.

11  1985) (California law). U.C.C. Comment 1 to § 2719 states that the doctrine applies to "an

12  apparently fair and reasonable clause," which "because of circumstances fails in its purpose or

13  operates to deprive either party of the substantial value of the bargain ..." The most common

14  application of the doctrine occurs when, under a limited "repair and replacement" remedy, the

15  seller does not repair defective goods within a reasonable period of time. 1 White & Summers,

16  Uniform Commercial Code § 12-10 (5th ed.).

17         The Ninth Circuit has adopted this doctrine for the purpose of federal law (*O'Neill*,

18  *supra*, 50 F.3d at 687), and GETS' motion invites the court look to the U.C.C. for guidance on

19  the issue of cover. We join in GETS' request, and ask the Court to look to the U.C.C. for the

20  purpose of the present issue as well. Doing so for the present issue is especially apt, because the

21  case law employed a similar principle even before California adopted the Commercial Code.

22  *Rose v. Chrysler Motors*, 212 Cal.App.2d 755, 763 (1963) (by virtue of seller's failure to repair a

23  vehicle after numerous attempts, plaintiff's recovery not limited by the contract).

24         Whether an exclusive remedy has failed of its essential purpose is a question of fact. 67A

25  Am.Jur.2d Sales § 848. It is undisputed that GETS has stonewalled numerous requests by BART

26  for the source code so BART can determine whether it can complete AATC without GETS' help.

27  Therefore, if P8.3 states an exclusive remedy, whether it failed in its essential purpose presents

28  an issue of fact.

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 17 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1    The doctrines of estoppel and bad faith also apply. *Terrace Water Co. v. San Antonio*

2 *Light*, 1 Cal.App. 511, 514 (1905) (party who prevents the other party from performing the

3 contract is estopped from denying that the injured party has been damaged to the extent of it

4 loss); 1 Witkin, Summary 10th (2005) Contracts , § 798, p. 892 (where the defendant's

5 cooperation is necessary for successful performance of an obligation, a promise to give that

6 cooperation and not to do anything that prevents realization of the fruits of performance often is

7 implied; the implied covenant imposes a duty on defendant *actively* to do what the contract

8 presupposes that it will do to accomplish its purpose); *City of Hollister v. Monterey Ins. Co.*, 165

9 Cal.App.4th 455, 490-500 (2008) (both estoppel and bad faith based, in part, on insurer's

10 "withholding information ... that would 'enable [the plaintiff] to take action to secure rights

11 afforded by the [contract]; plaintiff not required to show reliance; see *Id.* at 496, 513).

12                **B. BART's Claim for Benefit of the Bargain Damages Is Proper**

13    The second basis for GETS' motion is that there is a universal, inflexible rule governing

14 the measure of contract damages: that when a "project" (apparently meaning a "contract") is

15 unfinished because of a breach of contract, the proper remedy always is "to finish the project

16 according to the plans and specifications of the contract." But no case says such a thing, and the

17 two lines of cases that GETS relies on do not support its contention.

18    As the motion states, the line of California cases that GETS directly relies on concerns

19 "defective or incomplete construction" – all cases in which, if one contractor can't do the job,

20 then another one can. That is not the situation here, where completion of the AATC system

21 requires the use of intellectual property that GETS won't allow BART to use or share.[8]

22    For the second line of cases, GETS cherry-picks out-of-state U.C.C. cases – cases not

23 even consistent with one another[9] – which, on their specific facts, limit the rights of buyers who

24 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25    [8] For this reason. the failure of essential purpose, estoppel and bad faith principles
discussed in the first section of this brief apply equally to GETS claim that "cost of completion"

26 of AATC itself is BART's only remedy at common law.

27    [9] The following cases that GETS cites hold, contrary to GETS' argument, that a buyer
who covers with a superior product recovers what it *would have* cost to purchase goods of the

28 same quality: *Bachman v. Parkin*, 471 N.E.2d 759, 760 (Mass.App. 1984); *Freitag v. Bill Swad*

(continued...)

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 18 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

"cover" by purchasing substitute good that are "better" than the ones contracted for. Not one

case concerns a situation like the present one, where cover with an identical train control system

is impossible, because, among other reasons, GETS owns the intellectual property and refuses to

allow BART to make use of it. As White and Summers states:

> What of the buyer who covers by purchasing goods of superior quality for use as a commercial substitute? ...

> If the [superior goods] were the only available substitute, then what? One can argue that the buyer should recover the full difference between the price of the superior [product] and the contract price.... [H]ere the buyer has not elected to increase his damage recovery. If the added quality of the cover item will not benefit the buyer in any way, then he should be allowed to claim the full differential from the breaching seller. However, if because of the added quality the seller can prove that the buyer stands to make a greater profit on resale, then the buyer's damage recovery under 2- 712 should be reduced sufficiently to put him in the same position as performance would have. 1 White & Summers, *Uniform Commercial Code* § 6-3 (5th ed.). See also *KGM v. Fresh Network*, 36 Cal.App.4th 376, 380-381 (1995) ("any reasonable purchase of goods in substitution for those due from the seller" is proper, because it gives the buyer the benefit of the bargain; indeed, plaintiff received a "windfall," because it was awarded full recovery even though it passed the extra cost on to its customer).

White & Summers' view of the issue is consistent with California law outside the Commercial

Code – additional case law that the motion ignores.[10]

> The California Court of Appeal has explained:

> The basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the

---

[9] (...continued)
*Datsun*, 443 N.E.2d 988, 991 (Ohio App. 1981); *Hollon v. McComb*, 636 P.2d 513, 515-516 (Wyo. 1981); *Temple Beth Shalom v. Thyne Construction*, 399 So.2d 525, 526 (Fla.App. 1981).

[10] It is consistent with out-of-state U.C.C. cases as well: *Dickson v Delhi*, 760 S.W.2d 382, 388 (Ark.App. 1988) (processed oats in substitution for unprocessed oats proper where plaintiff unable to find unprocessed oats); *Lifeguard Industries*, 42 B.R. 734, 738 (Bankr.S.D. Ohio 1983) (purchase of higher grade aluminum siding from only other manufacturer of Tedlar-coated aluminum was proper); *Dura-Wood v. Century*, 675 F.2d 745, 753-754 (5th Cir. 1982) (developing own manufacturing process was proper); *Leininger v. Sola*, 314 N.W.2d 39, 48-49 (N.D. 1981) (proper to purchase a bull to impregnate cows that were supposed to already be pregnant); *Hessler v. Crystal Lake*, 788 N.E.2d 405, 418 (Ill.App. 2003) (proper to pay 62% more than the contract price for a limited supply vehicle); *Thorstenson v Mobridge*, 208 N.W.2d 715, 717 (S.D. 1973) (jury question whether replacement tractor was "entirely different" or "similar" to the one contracted for). In short, recovery of the cost of a "better" substitute is proper if the plaintiff has acted reasonably and in good faith – an issue which presents an issue of fact.

CROWLEY, STRINGER & FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

equivalent of the benefits of performance. [Citations.] The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised. This aim can never be exactly attained yet that is the problem the trial court is required to resolve. [Citation.]

'The rules of law governing the recovery of damages for breach of contract are very flexible. Their application in the infinite number of situations that arise is beyond question variable and uncertain. Even more than in the case of other rules of law, they must be regarded merely as guides to the court, leaving much to the individual feeling of the court created by the special circumstances of the particular case.' [Citation.] *Brandon & Tibbs v. George Kevorkian Accountancy*, 226 Cal.App.3d 442, 455 (1990).

In *Brandon* the plaintiff purchased the defendant's accounting firm, for it was cheaper and quicker to take over an existing firm than to create a new one. When the defendant breached, the plaintiff mitigated its damages by starting up a new office, at much greater expense. Judgement awarding the cost of opening the new office plus compensation for net losses was proper because "starting a new business was ... reasonable under the circumstances." 226 Cal.App.3d at 461. *Coates v. Lake View*, 20 Cal.App.2d 113 (1937), concerned a contract for the sale of low quality motor fuel. The court stated:

[W]here a seller agrees to sell to a buyer an article which has no established market value and the seller breaches his contract to sell and deliver, the buyer may go into the open market and purchase a similar article of merchandise, or if a similar article is not available and purchasable the buyer may purchase a reasonable substitute. If he does so the difference between the contract price and the reasonable market value of the substitute purchased is of value in furnishing a measure of his damage. 20 Cal.App.2d at 117.

In *Le Moyne v. Agajanian*, 121 Cal.App. 423, 427 (1932), defendant breached a contract for the sale of garbage to be fed to hogs. As a matter of law plaintiff had a remedy for damages measured by the difference between the contract price and the cost of barley, corn, wheat, or other good hog feed. See also two California Commercial Code cases GETS doesn't cite: *Sun Maid v. Victor Packing*, 146 Cal App 3d 787, 792 (1983) (damaged raisins that had to be reconditioned at substantial cost a proper substitute for undamaged raisins); *Huntington Beach Union H.S. Dist. v. Continental*, 621 F.2d 353, 357 (9th Cir. 1980) (buyer can cover through "any reasonable purchase"; "failure to mitigate reduces recoverable damages only when the course of action chosen is affirmatively unreasonable or in bad faith").

GETS' motion emphasizes how backward AATC supposedly is – apparently akin to "garbage" as compared to other CBTC systems. But even if all other CBTC systems were better,

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

1    case law strips that purported fact of legal significance. Even if AATC is now "garbage" by

2    comparison, BART may obtain an alternative CBTC system as a reasonable substitute:

3            The substitute goods or services involved in cover need not be identical to those
             involved in the contract, but they must be 'commercially usable as reasonable
4            substitutes under the circumstances.' [Citation.] Whether cover provides a
             reasonable substitute under the circumstances is a question of fact. *Hughes v.*
5            *U.S.*, 271 F.3d 1060, 1066 (Fed.Cir. 2001). Accord, *Anchor Savings Bank v. U.S.*,
             – F.3d –, 2010 WL 786578 (Fed.Cir. 2010).
6

7    BART's evidence is that a vehicle-centric CBTC system is in fact commercially usable as a

8    substitute for AATC under the circumstances. (Ghaly ¶ 5; Lehrer ¶ _.)

9            In *Hughes* NASA contracted to launch HS-393 satellites from space shuttles. It

10   repudiated the contract after the *Challenger* explosion. To cover the loss of shuttle service,

11   Hughes launched three of its HS-393s and six of its newer HS-601s by using expensive,

12   expendable launch vehicles ("ELVs"). The HS-601s were more powerful than HS-393s, but

13   better suited to the use of ELVs. The court held that HS-601s were proper substitutes for HS-

14   393s. As the victim of the breach, Hughes was entitled to obtain commercially reasonable

15   substitute launch services. 271 F.3d at 1066-1067. See also *Anchor, supra*, 2010 WL 786578 at

16   14, observing that "cover" is a mitigation of damages concept; therefore, a new mortgage

17   brokerage firm plaintiff purchased to replace one it had to sell off seven years earlier was a

18   "reasonable commercial substitute" although the firms "may not have served identical markets or

19   used identical strategies."

20           The equivalence of "cover" with the doctrine of mitigation of damages is significant, for

21   "[t]he burden of proving that losses could have been avoided by reasonable effort and expense

22   must always be borne by the party who has broken the contract." *Brandon, supra*, 226

23   Cal.App.3d at 460 (defendant's burden to prove plaintiff acted unreasonably in opening a new

24   firm); *Glenn v. Carlisle*, 297 F.3d 294, 302 (3d Cir. 2002) (under U.C.C. burden on

25   seller to prove that buyer's cost of cover is unreasonable); *Mendoyoma v. Mendocino*, 8

26   Cal.App.3d 873, 879 (1970) (once plaintiff establishes amount he was induced to expend,

27

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

1    defendant's burden to show such expenses are "extravagant and unnecessary for the purpose of

2    carrying out the contract").[11]

3           This burden imposes two requirements on which the motion is silent. First, GETS must

4    show that the course of action that it claims BART should have taken (completing AATC

5    without GETS' help) was reasonably possible. *Chyten v. Lawrence & Howell*, 23 Cal.App.4th

6    607, 616-617 (1993). Second, it must show the amount by which the BART's damages would

7    have been reduced had BART properly mitigated its damages. *Mayer v. Multistate Legal Studies*,

8    52 Cal.App.4th 1428, 1436-1437 (1997). Ignoring these requirements, GETS offers no evidence

9    that BART could have completed AATC by itself, and no evidence of what it would have cost

10   BART to complete the AATC project.[12] BART claims and offers evidence that without GETS'

11   help, completion was not possible. Nevertheless, the court may consider GETS' assertions,

12   before the lawsuit was filed, that the completion of AATC at would have cost an additional $65

13   million for work by GETS alone, for a period of 8.2 years, which results in a total cost to

14   complete AATC of $150 million.[13] Page 9, *ante*. Summary judgment therefore cannot be granted,

15   because there is evidence of damages under any standard.

16   _____

17        [11] Three additional mitigation principles merit brief mention. (1) The duty to mitigate
18   does not require a plaintiff to pursue legal action (*Davies v. Krasna*, 14 Cal.3d 502, 515 (1975)),
     disposing of the silly argument that BART acted unreasonably in not trying to obtain a
19   preliminary injunction forcing GETS to produce the source code. (2) Although the motion
     asserts that BART had funding issues, "when expenditures are necessary for minimization of
20   damages, the duty does not run to a person who is financially unable to make such
     expenditures." *Valencia v. Shell Oil Co.*, 23 Cal.2d 840, 846 (1944). The fact that a new system
21   has not yet been implemented does not bar recovery, since all that matters is that BART *intends*
     to proceed. *Los Angeles v. Margulis*, 6 Cal.App.2d 57, 59-60 (1935). (3) Even had GETS been
22   willing, BART was not required to continue working with it, even if doing so would have
23   diminished BART's damages. *Zanker v. Cogito*, 215 Cal.App.3d 1377, 1382 (1989).

24        [12] Given GETS' intellectual property claims that led it to withhold the source code from
25   BART, GETS obviously cannot claim that BART should have hired one of GETS' competitors
     to complete the project.

26        [13] GETS asserts that "new Vehicle-Centric CBTC systems cost a lot more," (GETS' MPA
27   p. 7:8.), but its evidence doesn't support its conclusion. GETS offers two figures: the original
     contract price and BART's claim for "reliance" damages (costs that BART has incurred *to date*
28   for an AATC system that GETS never properly implemented). Neither figure hints at what it
     would cost to *complete* the AATC system for BART.

Crowley, Stringer
& Fenske LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

C. Article P8.4 Does not Limit BART's Damages

The relevant part of Article P8.4.1.2 of the contract provides:

If the Phase 2 Work is terminated by the Supplier, the Supplier shall refund and return to the District all monies previously paid to the Supplier by the District for the performance of the Phase 2 work; ...

As discussed above, the contract provisions on which GETS relies, limited as they are to Phase 2 Work, do not apply to the current situation, where the parties have executed interrelated change orders declaring that the Phase 2 Work is substantially complete and exercising the option to proceed with the Phase 3 Work, and where BART has paid GETS over $34 million for Phase 3 Work that turned out to be useless because GETS didn't perform the Phase 2 Work properly.

Just as Article P8.4.1.2 is inapplicable on its face, so is the principle on which GETS relies. As the motion itself states, the principle is that:

[I]f a person *refuses to perform a contract* which is terminable by him upon certain conditions, the amount of money he would have to pay in exercising his election to terminate becomes the measure of damages for his breach. GETS' MPA at 24:13-16 (original brackets; quoting *Pecarovich v. Becker*, 113 Cal.App.2d 309, 317 (1952) (emphasis supplied).

The clear import of the italicized phrase is that if the defendant breaches the contract in a way that does *not* terminate the contract, the plaintiff's damages are not capped.[14] As will appear, the Ninth Circuit, applying Oregon law, has in fact so held.

In every case GETS cites, the defendant, while failing to give either notice or proper notice of termination, nevertheless breached the contract in such a way as to terminate it entirely. *Pecarovich*, 113 Cal.App.3d at 318 (defendant shut down its business); *Martin v. U-Haul*, 204 Cal.App.3d 396, 410 (1988) (defendant expressly terminated the contract); *EPIS v. Fidelity*, 156 F.Supp.2d 1116, 1119-1120 (N.D.Cal. 2001) (same); *Smalley v. Bay Dray*, 612 So.2d 1182 (Ala. 1992) (same). Not one of the cases that GETS cites remotely touches on the facts presented here, where GETS, after telling BART in February 2002, that GETS' senior management had said to

---

[14] Here, by stipulation and order, the Court dismissed the Termination count of the complaint because GETS did *not* terminate the contract. That now-dismissed count alleged that GETS, through its *conduct*, had *in effect* terminated the Phase 2 Work. **(Stringer, ¶ 14)**

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 23 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1  "kill the project," led BART through more than three years of fruitless "efforts" to "redefine" the

2  project in order to achieve a commercial resolution, but made any resolution impossible by

3  submitting continually escalating cost estimates and claims: starting at $6 million in October

4  2002, $13 million in April 2003, $35 million in December 2003, and $65 million in February

5  2005. And then, to top it off, when, in January 2006 BART instructed GETS to proceed and

6  asked for assurances that GETS would honor its various contractual obligations, GETS simply

7  refused to discuss specifics, while insisting that it stood "ready to perform." (Stringer, ¶ 16.)

8       It is interesting that, dissatisfied with the California cases it cites in support of its

9  position, GETS considers it necessary to look outside California, for an Alabama case (*Smalley,*

10 *supra*) stating what the majority rule is. Yet in its search for out-of-state help, GETS managed

11 not to find the single case nationwide – the Ninth Circuit case alluded to above – that presents

12 facts similar to ours: a defendant breaching the contract, while emphatically *not* terminating it.

13       In *Ring Bros. v. Martin Bros.*, 438 F.2d 420 (9th Cir. 1971), the court held that by

14 shutting down its operations during winter months the defendant breached its contract with the

15 plaintiff. The court rejected the argument that there was a damages cap, by distinguishing an

16 earlier opinion applying Montana law, *Chevrolet Motor Co. v. McCullough Motor Co.*, 6 F.2d

17 212 (9th Cir. 1925). *McCullough* applied the rule limiting damages to the notice period of the

18 termination clause only because the defendant's conduct was "equivalent to actual notice of

19 termination." *Ring Bros.*, 438 F.2d at 422. In *Ring Bros.* damages were not capped because:

20        [Defendant] had the right to terminate the contract on ten days written notice, but
          elected not to exercise that right. Instead, [defendant] allowed the [plaintiff] to
21        continue to commit its equipment and other resources to the project on the
          expectation that it would be allowed to complete performance on the contract.
22        Unlike McCullough, appellant's conduct was not an open and obvious repudiation
          that could be deemed the equivalent of notice of termination which would have
23        alerted the appellee to search for other logging jobs. As a result, the appellee
          maintained its readiness and ability to perform for the appellant during the entire
24        contract period. *Ring Bros., supra*, 438 F.2d at 420.

25       In *Kuffel v. Seaside Oil Co.*, 11 Cal.App.3d 354 (1970), the defendant induced plaintiffs

26 to terminate a contract by falsely promising that it would execute a new contract. 11 Cal.App.3d

27 at 360. The court rejected the defendant's contention that damages for lost profits had to be

28 limited to the 15-day termination period prescribed by the contract. The court explained:

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100

- 24 -

PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW

1
2
3
4

[B]ecause the court found that the termination agreements were fraudulently procured, the Seaside sales contract was still in existence as of that date. Therefore, while arguably Seaside had the contractual right to terminate the sales contract, it simply did not elect to do so by giving the notice required by that contract. It is axiomatic that the express term of a contract is not shortened or affected by a termination clause unless the termination clause is exercised in the manner prescribed by the contract. *Kuffel*, 11 Cal.App.3d at 367-368.

5    It is unnecessary to linger over whether *Pecarovich* and *Marin* are fully consistent with

6  *Kuffel*, for the principles stated in all three cases are in harmony with the Ninth Circuit's analysis

7  in *Ring Bros.* – that in order for a defendant to take advantage of a termination clause as a

8  "damages cap," the defendant must *terminate the contract*, either directly, by giving notice, or

9  indirectly, through conduct that breaches the contract in such a way as to terminate it.

10    The foregoing principle was concisely stated in *County of Los Angeles v. Baker*, 2005

11  WL 1661986 (Cal.App. 2005) (unpublished).[15] Distinguishing *Martin, supra*, the court stated:

12
13
14
15
16
17

The rule of Martin ... applies in cases in which the termination of the contract is itself the breach. In such cases it follows naturally that the time period for damages is limited to the time period that would have applied had the contract been properly terminated: 'Parties who agree that a contract may be terminated for any reason, or no reason, upon the giving of the specified notice could not reasonably anticipate that damages could exceed that notice period.' [Citation.] Here, however, it is not established that the jury found that the County's termination of the contract without following the notice provisions set forth in the contract was (a) a breach of contract or (b) the only breach of contract. Accordingly, this case is unlike Martin and similar cases in which the improper termination of the contract was itself the breach of contract, and the damages here are not limited as a matter of law to 60 days. *Baker*, 2005 WL 1661986 at *17 n.8.

18

19                                      CONCLUSION

20    BART respectfully asks the court to deny the motion in its entirety.

21    Dated: April 9, 2010

22                                      Crowley, Stringer & Fenske LLP

23

24    By: _____

25        Robert B. Stringer, Attorneys for Plaintiff

26    _____

27    [15] As *Baker* is not a published opinion, for the reasons explained in the Stringer Declaration at ¶ 17, we cite it for its persuasive value, not as precedent. *Bretches v. Kirkland*, 2007 WL 1378021, *4 n.2 (N.D.Cal. 2007); *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

28

CROWLEY, STRINGER
& FENSKE LLP
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415) 989-1100
- 25 -
PLAINTIFF'S MPA IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-06-03749 JSW