1   James A. Bruen (State Bar No. 43880)
    Charles M. Sink (State Bar No. 078168)
2   Thomas B. Mayhew (State Bar No. 183539)
    Carl E. Switzer (State Bar No. 211858)
3   Arjun Agarwal (State Bar No. 233576)
    Farella Braun + Martel LLP
4   235 Montgomery Street, 17th Floor
    San Francisco, CA  94104
5   Telephone:  (415) 954-4400
    Facsimile:  (415) 954-4480
6   E-mail: jbruen@fbm.com
    E-mail: csink@fbm.com
7   E-mail: tmayhew@fbm.com
    E-mail: cswitzer@fbm.com
8   E-mail: aagarwal@fbm.com

9   Ned N. Isokawa (State Bar No. 066287)
    Paul, Hastings, Janofsky & Walker LLP
10  55 Second Street
    Twenty-Fourth Floor
11  San Francisco, CA 94105
    Telephone:  (415) 856-7000
12  Facsimile:  (415) 856-7100
    E-mail: nedisokawa@paulhastings.com
13

14  Attorneys for Defendant and Counterclaimant
    GE TRANSPORTATION SYSTEMS GLOBAL
15  SIGNALING, LLC

16              UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18  SAN FRANCISCO BAY AREA RAPID          Case No. C-06-03749 JSW
19  TRANSIT DISTRICT,
                                          **REPLY BRIEF IN SUPPORT OF GETS'**
20              Plaintiff,                **MOTION FOR PARTIAL SUMMARY**
                                          **JUDGMENT AND SUMMARY**
21      vs.                               **ADJUDICATION**

22  GE TRANSPORTATION SYSTEMS             Date:      May 14, 2010
    GLOBAL SIGNALING, LLC,                Time:      9:00 a.m.
23                                        Courtroom: 11, 19th floor
                Defendant.                Judge: Hon. Jeffrey S. White
24

25                                        Complaint Filed:   June 13, 2006
                                          Trial Date:        August 30, 2010
26
    _____
27  AND RELATED COUNTER-CLAIM.

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

REPLY ISO GETS' MOTION FOR PARTIAL SUMMARY
JUDGMENT/SUMMARY ADJUDICATION
 - Case No. C-06-03749 JSW

18972\2231100.1

# TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................. 2

I.    BART'S FIRST AND THIRD COUNTS ARE BARRED BY THE EXCLUSIVE
      REMEDIES PROVISION OF THE CONTRACT. ........................................................ 2

      A.    The Court Should Interpret The Contract As Providing An Exclusive
            Remedy In The Event Of Termination Of Phase 2. ............................................ 2

            1.    There Is No "Irreconcilable Conflict" Between SC8.3 - P8.4.1.3
                  And The Other Provisions Of The Contract .............................................. 2

            2.    Exclusive Remedies Provisions Are Enforced Even If They Are
                  "Harsh"; They Are Enforceable Unless They Were Unconscionable
                  When Drafted .......................................................................................... 6

      B.    The Exclusive Remedy Clause Applies Because There Was A
            "Termination" Of Phase 2. .......................................................................... 11

      C.    BART'S Arguments Concerning The Source Code And IP Rights Fail ............. 13

II.   BART'S "EXPECTATION DAMAGES" ITEM OF DAMAGE, BASED ON
      THE COST OF A NEW VEHICLE-CENTRIC CBTC SYSTEM, SHOULD BE
      SUMMARILY ADJUDICATED. ............................................................................. 16

      A.    BART'S New "Cost To Complete" Estimate Shows That BART Could
            Have Estimated Damages Properly, But Chose Not To. ................................... 16

      B.    BART Does Not Create Disputed Issues Of Material Fact Concerning The
            Vehicle-Centric CBTC Systems. .................................................................. 17

      C.    BART's Legal Discussion Fails To Address The Issues ................................... 18

III.  THE VOLUNTARY TERMINATION CLAUSE CAPS BART'S DAMAGES ............. 21

CONCLUSION .......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<b>Pages</b>

### FEDERAL CASES

*Brobeck, Phleger & Harrison v. Telex Corp.*,
602 F.2d 866 (9th Cir. 1979)......................................................................... 2

*Bunch v. Artec International Corp.*,
559 F. Supp. 961 (S.D.N.Y. 1983).................................................. 5, 6, 11, 13

*Civic Center Drive Apartments Ltd. Partnership v. Southwestern Bell Video Services*,
295 F. Supp. 2d 1091 (N.D. Cal. 2003) ...................................................... 8, 14

*Doe I v. Wal-Mart Stores, Inc.*,
572 F.3d 677 (9th Cir. 2009)......................................................................... 2

*Dow Corning Corp. v. Capitol Aviation, Inc.*,
411 F.2d 622 (7th Cir. 1969) ......................................................................... 7

*Dura-Wood v. Century*,
675 F.2d 745 (5th Cir. 1982)........................................................................ 18

*Employers Insurance of Wausau v. Suwanee River Spa Lines, Inc.*,
866 F.2d 752 (5th Cir. 1989)..................................................................... 7, 10

*Epis, Inc. v. Fidelity and Guaranty Life Ins. Co.*,
156 F.Supp.2d 1116, 1127 (N.D.Cal. 2001) .................................................. 24

*Fosson v. Palace (Waterland) Ltd.*,
78 F.3d 1448 (9th Cir. 1996)......................................................................... 2

*Hart v. Massanari*,
266 F.3d 1155 (9th Cir. 2001)...................................................................... 25

*Hughes Committee Galaxy, Inc. v. United States*,
47 Fed. Cl. 236 (Fed.Cl. 2000) .................................................................... 20

*Hughes v. United States*,
271 F.3d 1060 (Fed. Cir. 2001)................................................................ 19, 20

*IDX Systems v. St. John Health System*,
2003 WL. 25676069 (E.D.Mich. 2003) .................................................... 19, 21

*JOM, Inc. v. Adell Plastics, Inc.*,
151 F.3d 15 (1st Cir. 1998), *opinion vacated on other grounds on reh'g en banc*,
193 F.3d 47 (1st Cir. 1999) ........................................................................... 7

*Leviton Manufacturing Co., Inc. v. Nicor, Inc.*,
245 F.R.D. 524 (D.N.M. 2007) .................................................................... 17

*Linan-Faye Construction Co. v. Housing Authority of City of Camden*,
49 F.3d 915 (3d Cir. 1995)............................................................................ 5

*Logan Equip. Corp. v. Simon Aerials, Inc.*,

736 F. Supp. 1188 (D.Mass. 1990) ......................................................................... 7

*National Rural Telecomm. Cooperative v. DirecTV, Inc. ("NRTC"),*
    319 F. Supp. 2d 1040 (C.D.Cal. 2003) ..................................................... 14, 15

*Price Development Co. v. Redevelopment Agency,*
    852 F.2d 1123 (9th Cir. 1988) ........................................................................... 2

*Ring Brothers v. Martin Brothers,*
    438 F.2d 420 (9th Cir. 1971) ...................................................................... 23, 24

*Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates,*
    583 F.3d 716 (9th  Cir. 2009) ......................................................................... 25

*Wong v. Regents of University of Cal.,*
    410 F.3d 1052 (9th Cir. 2005) ......................................................................... 17

### STATE CASES

*A&M Produce Co. v. FMC Corp.,*
    135 Cal. App. 3d 473 (1985) ...................................................................... 7, 10

*Adams v. Murakami,*
    54 Cal. 3d 105 (1991) ..................................................................................... 21

*Bockman Printing Services v. Baldwin-Gregg, Inc.,*
    572 N.E.2d 1094 (Ill.App. 1991) ................................................................... 19

*Brandon & Tibbs v. George Kevorkian Accountancy,*
    226 Cal. App. 3d 442 (1990) .......................................................................... 21

*Brawley v. J.C. Interiors, Inc.,*
    161 Cal. App. 4th 1126 (2008) ......................................................................... 5

*CDF Firefighters v. Maldonado,*
    158 Cal. App. 4th 1226 (2008) ...................................................................... 21

*Chyten v. Lawrence & Howell Investments,*
    23 Cal. App. 4th 607 (1993) .......................................................................... 21

*Coughlin v. Blair,*
    41 Cal. 2d 587 (1953) .................................................................................... 11

*County of Los Angeles v. Baker,*
    2005 WL.1661986 ......................................................................................... 25

*Delta Airlines v. Douglas Aircraft Co., Inc.,*
    238 Cal. App. 2d 95 (1965) .............................................................................. 8

*Glendale Federal Sav. & Loan Association v. Marina View Heights Development Co.,*
    66 Cal. App. 3d 101 (1977) ........................................................................... 19

*Hawley v. Orange County Flood Control District,*
    211 Cal. App. 2d 708 (1963) ............................................................................ 8

*Hessler v. Crystal Lake*,
   788 N.E.2d 405 (Ill.App. 2003) ................................................................ 10, 19

*Kuffel v. Seaside Oil Co.*,
   11 Cal. App. 3d 354 (1970) ................................................................................ 24

*Lakin v. Watkins Associate Industrial*,
   6 Cal. 4th 644 (1993) ......................................................................................... 21

*Leininger v. Sola*,
   314 N.W.2d 39 (N.D. 1981) ............................................................................. 18

*Markborough Calif., Inc. v. Superior Court*,
   227 Cal. App. 3d 705 (1991) ............................................................... 6, 8, 9, 14

*Martin v. U-Haul Co. of Fresno*,
   204 Cal. App. 3d 396 (1988) ....................................................................... 22, 23

*Mendoyoma v. Mendocino*,
   8 Cal. App. 3d 873 (1970) ................................................................................. 21

*Michel & Pfeffer v. Oceanside Properties, Inc.*,
   61 Cal. App. 3d 433 (1976) ................................................................................. 2

*Nelson v. Spence*,
   182 Cal. App. 2d 493 (1960) ............................................................................... 2

*Pecarovich v. Becker*,
   113 Cal. App. 2d 309 (1952) ....................................................................... 22, 24

*Taylor v. Johnston*,
   15 Cal. 3d 130 (1975) ....................................................................................... 11

*Thorstenson v. Mobridge*,
   208 N.W.2d 715 (S.D. 1973) ........................................................................... 19

*Valley Die Cast v. ACW Inc.*,
   181 N.W.2d 303 (Mich. App. 1970) ................................................................ 19

*Western Camps, Inc. v. Riverway Ranch Enterprises*,
   70 Cal. App. 3d 714 (1977) ......................................................................... 11, 13

*Whitney Investment Co. v. Westview Development Co.*,
   273 Cal. App. 2d 594 (1969) ............................................................................ 11

**FEDERAL STATUTES**

Fed. R. Civ. P. 56(d)(1) ............................................................................................ 17

**STATE STATUTES**

Cal. Civ. Code § 1511(2) ............................................................................................ 3
   § 1651 ............................................................................................................... 4
   § 1670.5(a) ........................................................................................................ 7
   § 3358 ........................................................................................................ 21, 23

REPLY ISO GETS' MOTION FOR PARTIAL
SUMMARY JUDGMENT/SUMMARY ADJUDICATION
 - Case No. C-06-03749 JSW
     - iv -
     18972\2231100.1

1

2

Cal. Comm. Code § 2719 .................................................................................................. 13-14

Cal. Evid. Code § 500 ......................................................................................................... 21

UCC 2-708 .......................................................................................................................... 21

UCC 2-712 .......................................................................................................................... 21

UCC 2-719(2) ..................................................................................................................... 14

3

4

5

6

7

**OTHER AUTHORITIES**

8

N.D. Cal. Civil L. R. 3-4(e) ............................................................................................... 24

Witkin, 1 *Summary of California Law*, § 925 (2005) ....................................................... 13

Witkin, 1 *Summary of California Law*, §§ 828-846.......................................................... 3-4

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BART's opposition is as notable for what is missing as what is present. BART does not dispute the material facts: It has not incurred costs to complete AATC. It does not offer admissible expert opinion testimony to show the estimated cost of finishing AATC. It instead tries to measure its damages by reference to five "Vehicle-Centric CBTC systems" that operate by different principles, and which BART does not dispute cost significantly more, have different features and equipment, and are based on proven 2010 technology as opposed to the unproven, experimental AATC technology. As set forth in the motion, these undisputed facts lead to partial summary judgment or summary adjudication in GETS' favor on significant damage issues.

GETS' motion requires only that the Court apply the contract language as written to these undisputed facts. In the absence of a material factual dispute, BART attempts instead to create unsolvable problems based on language in the contract. Because these problems rise or fall on contract language, they are suitable for resolution by the Court on motion. BART's attempt to create an irreconcilable conflict between the limitation on liability in SC8.3 – P8.4.1.3 and article P8.5 (concerning force majeure terminations) is readily solved, as GETS will explain, by reading the contract from top to bottom. BART's attempt to problematize the word "termination" fails because that term has a plain meaning, and BART presents no evidence that would show an ambiguity here. BART's complaint that it cannot proceed without the source code is defeated by contract language that shows it has the right to the source code if it sends a written notice of termination. And BART's remaining arguments about why it can measure its damages by reference to more expensive, different systems, are based on the purported unavailability of the source code (solved by the contract), issues about IP rights (also provided for in the contract), and problems finding a supplier to take over the project mid-stream (a risk it knew about in 1998 when it signed the contract, since Harmon was the only company that was interested in picking up where Hughes left off). BART's arguments that it can go buy a better system instead of seeking damages limited to the cost to complete AATC fail.

The issues on this motion turn on legal questions about interpretation of the contract and the proper remedies for breach of an uncompleted project. The Court should rule on these issues now and eliminate BART's more extravagant damage claims so that the parties can focus on the

1   more limited case that will actually be contested on the facts at trial.

2   **ARGUMENT**

3   **I.    BART'S FIRST AND THIRD COUNTS ARE BARRED BY THE EXCLUSIVE**
       **REMEDIES PROVISION OF THE CONTRACT.**

4

5   While BART argues about the meaning of the contract, it identifies no facts that would

6   alter or inform the interpretation of P8.4.1.3 as limiting BART's remedies in the event of a

7   termination of Phase 2.  When the facts are undisputed, as here, the interpretation of the contract

8   is a question of law for the court.  *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir.

9   2009); *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871-72 (9th Cir. 1979).  Here,

10  the contract should be interpreted as establishing an exclusive remedy where GETS Phase 2 Work

11  has been terminated.  Because the exclusivity provision applies based on the undisputed facts, and

12  because BART has not availed itself of this remedy, summary judgment should be granted.

13      **A.    The Court Should Interpret The Contract As Providing An Exclusive**
            **Remedy In The Event Of Termination Of Phase 2.**

14

15          1.    There Is No "Irreconcilable Conflict" Between SC8.3 - P8.4.1.3 And The
                  Other Provisions Of The Contract.

16  Under California law, "a clear and unambiguous contractual provision providing for an

17  exclusive remedy for breach will be enforced."  *Fosson v. Palace (Waterland) Ltd.*, 78 F.3d 1448,

18  1455 (9th Cir. 1996); *see also* Opp. at 13:19-21 (quoting *Nelson v. Spence*, 182 Cal. App. 2d 493,

19  497 (1960)).  This contract makes clear the parties' intention to create exclusive remedies by

20  using the words "The sole and exclusive rights . . ." in SC8.3 – P8.4.1.3.  These words are

21  sufficient to clearly indicate the parties' intent that, in the event that the Phase 2 Work is

22  terminated, BART can pursue only the remedies set forth in the contract, not ones outside it such

23  as suing for the cost of an entirely new system.  *See also Price Dev. Co. v. Redevelopment*

24  *Agency*, 852 F.2d 1123 (9th Cir. 1988) (holding that contract provision using words "sole

25  remedy" satisfied the California law requirement of a clear and unambiguous provision for

26  exclusive remedy); *Michel & Pfeffer v. Oceanside Properties, Inc.*, 61 Cal. App. 3d 433, 442

27  (1976) (same:  contract uses words "sole remedy").

28  BART attempts to create ambiguity where none exists by arguing emphatically that

1   interpreting SC8.3 - P8.4.1.3 as limiting BART's remedies for termination of this experimental

2   contract creates an "irreconcilable conflict" with P8.5, because in BART's view P8.5 is "below"

3   and not "above" SC8.3 - P8.4.1.3.  BART contends that SC8.3 - P8.4.1.3 should be read as if it

4   said "termination within Article P8.4" or "termination for convenience," words that the parties

5   easily could have added had they intended such a limitation but did not.  But the Court can avoid

6   any "irreconcilable conflict" without adding any additional words to the contract, by merely

7   reading the word "above" in SC8.3 - P8.4.1.3 as referring to the termination rights that are set

8   forth on earlier pages of the contract.  While BART creates a new document (Stringer exhibit 2)

9   which sequences SC 8.3 - P8.4.1.3 *before* P8.5 – and which would appear to support BART's

10   argument that P8.5 "appears immediately *below* P8.4.1.3" (Opp. at 12:27; *see also id.* at 13:2-3) –

11   BART also acknowledges most forthrightly that this exhibit "is not evidence or offered as such."

12   *See* Stringer Decl. ¶ 8.  In the actual contract, P8.5 is on page 1-0053, in the General Conditions

13   section that is BART's form contract, and SC8.3 - P8.4.1.3 is on page 1-0091, in the Special

14   Conditions that are added to supplement the General Conditions.  Bruen Exh. A.  P8.5 and its

15   remedies are therefore "above" the reference to those remedies that appears in SC8.3 - P8.4.1.3 in

16   the usual, commonplace way that people read contracts:  top to bottom.  Thus there is no fatal

17   inconsistency or problem rendering one clause inoperative.

18       Even if "above" referred only to provisions in P8.3 and P8.4 (as it would if the contract

19   were re-sequenced as BART suggests), there still would be no fatal inconsistency with P8.5.  P8.5

20   is a provision about *force majeure*:  if unforeseen forces outside the control of GETS

21   "irrecoverably disrupt or render impossible [its] performance hereunder," then BART has the

22   option to voluntarily terminate the contract at GETS' request and compensate GETS for the

23   equipment, materials, supplies, and services that it provided.  Bruen Exh. A P8.5 at 1-0053.  This

24   is not inconsistent with SC8.3, because the remedy for a voluntary termination by BART under

25   P8.4.1.1[1] is the same remedy provided in P8.5 – BART pays GETS its costs for services,

_____

26   [1]     If BART elects to terminate because GETS' performance is irrecoverably disrupted by a
    natural disaster like an epidemic or an earthquake (*see* P8.5, cross-referring to P8.2.5 force
27   majeure events), then that termination is not a termination for default by BART under P8.3:  a
    supplier whose performance has been rendered impossible is not in default, because its
28   performance has been excused.  *See, e.g.,* Cal. Civ. Code § 1511(2); Witkin, 1 Summary of

1    materials, and supplies.

2         If SC8.3 - P8.4.1.3 and P8.5 still could not be reconciled, both the Civil Code and the

3    contract itself provide a method to resolve the issue:  to enforce the specially drafted SC8.3 -

4    P8.4.1.3 over any inconsistencies in the form contract P8.5.  P8.5 is in the part of the contract that

5    is BART's form contract "General Conditions for Procurement Contracts" as opposed to specially

6    drafted by the parties.

7         Where a contract is partly written and partly printed, or where part of it is written
         or printed under the special directions of the parties, and with a special view to
8        their intention, and the remainder is copied from a form originally prepared
         without special reference to the particular parties and the particular contract in
9        question, the written parts control the printed parts, and the parts which are purely
         original control those which are copied from a form.  And if the two are
10       absolutely repugnant, the latter must be so far disregarded.

11   Cal. Civ. Code § 1651.  The parties also agreed in their contract that this would be the case in the

12   event of conflict.  *See also* Bruen Exh. A at 1-0075 (SC5.2:  "The Contract Documents shall

13   govern in the following order of precedence:  (a)  Supplementary Conditions; (b) General

14   Conditions . . .").

15        To solve the problem it has artificially created by re-sequencing the contract to place P8.5

16   below SC8.3, BART proposes the "logical" solution of "limit[ing] the exclusivity language of

17   P8.4.1.3 to a certain *kind* of 'termination' – termination for convenience, since that's the only

18   kind of termination for which rights are set forth in Article P8.4."  Opp. at 13:12-14.  But the

19   exclusivity applies to remedies, not specified kinds of termination, and it simply isn't accurate in

20   any event to say that Article P8.4, as amended by SC8.3, deals only with terminations for

21   convenience.  P8.4.1.1 refers to both GETS' and BART's rights to terminate "with or without

22   cause," and says that in such circumstances the parties will cooperate by executing necessary

23   documents.  If the exclusivity provision of P8.4.1.3 is construed as applying only to the remedies

24   set forth in Article P8.4, then BART's "logical" interpretation of P8.4.1.3 would have the effect

25   of limiting BART's remedies in the event of a "with cause" termination to execution of

26   documents under P8.4.1 – creating a conflict with P8.3's right to finish AATC and charge GETS

27

28   California Law, §§ 828-846 (discussing impossibility, impracticability, and frustration of purpose
     as excuses for non-performance of contract).

1   for the expense.  SC8.3 – P8.4.1.3 thus cannot be fairly construed to refer to the remedies

2   applicable to terminations for convenience only.

3   　　　　An argument similar to BART's was made, and rejected, in *Bunch v. Artec Int'l Corp.*,

4   559 F. Supp. 961 (S.D.N.Y. 1983) (applying California law).  The plaintiff argued that the a

5   clause providing for exclusive remedies on termination should be interpreted to refer only to

6   "lawful" terminations.  The court rejected the argument, explaining (1) it wouldn't make sense to

7   apply the limitation of liability only to "lawful" terminations, because the contract already

8   provided specifically what damages would be recoverable if a party lawfully terminated the

9   agreements, and (2) the ordinary meaning of the word "terminate" under California law includes

10  "termination for any reason."  *Id.* at 968.  Similarly, in the AATC contract applying the exclusive

11  remedy clause to only terminations for convenience would serve little purpose:  the termination

12  for convenience provisions already state what the remedy for termination will be, and because a

13  termination for convenience is not a breach of contract, there is no need to separately state that

14  the remedy is exclusive.  *Id.*; *see also Linan-Faye Constr. Co. v. Housing Auth. of City of

15  Camden*, 49 F.3d 915, 923 (3d Cir. 1995) ("Where the government terminates a private contractor

16  pursuant to a termination for convenience clause in a contract, instead of receiving full

17  expectation damages the contractor's recovery is defined by the termination for convenience

18  clause.").  Moreover, as in *Bunch*, the unqualified word "termination" means all kinds of

19  terminations of Phase 2; if the parties intended to limit their usage of "termination" in SC8.3 –

20  P8.4.1.3 to "terminations for convenience," they would have said so.  *Bunch*, 559 F. Supp. at 968.

21  　　　　BART next asserts that the contract's exclusive remedy clause would be "irrational" and

22  "foolish" because it would govern trivial breaches.  *See* Opp. at 14:20-22 (arguing "Even a trivial

23  breach can be remedied only by BART's threatening GETS with termination if the breach isn't

24  cured within five days.").  But no foolish irrationality is actually present here.  If GETS had

25  committed a trivial breach – say, failure to supply a wingnut on one of the radios – BART doesn't

26  have to threaten termination over the wingnut.  It could sue for partial breach while keeping the

27  contract in place, *Brawley v. J.C. Interiors, Inc.*, 161 Cal.App.4th 1126, 1134 (2008), or it could

28  offset the damages for lack of wingnut against the remaining contract price and pay only the

1    undisputed amount, Bruen Exh. A P9.7.3.1, or it could possibly hire someone else and charge the

2    expense to GETS.  *Id.* P.4.7.1.  Or it could agree to give GETS more than five days to remedy the

3    breach.  None of these approaches would require "termination of the Phase 2 Work," or the

4    exclusive remedy clause of P8.4.1.3.  The clause therefore doesn't create the "foolish, irrational"

5    circumstance that BART suggests it would.  The P8.3 cost of completion remedy is exclusive in

6    the event of a termination of Phase 2 Work for cause, but not every trivial breach requires

7    invocation of P8.3 or a termination of Phase 2 Work.

8         Far from creating an "irreconcilable conflict," the interlocking set of termination remedies

9    provided for in P8.3-P8.6 and SC8.3 only highlights the careful attention that the parties paid to

10   addressing *all* of the ways in which the contract might possibly be terminated (by either party, for

11   cause, for convenience, or due to force majeure), and to specifying the remedies that would flow

12   from each.  The parties had no reason to do so if the remedies were not intended to be exclusive

13   as stated in P8.4.1.3, and the Court should not accept BART's invitation to re-write the contract.

14
15            2.       Exclusive Remedies Provisions Are Enforced Even If They Are "Harsh";
                      They Are Enforceable Unless They Were Unconscionable When Drafted.

16        BART next claims that the limitation of liability clause is "unfair" or "harsh" and provides

17   for a "forfeiture" of monies it paid on the contract, including specifically the $34 million it paid to

18   buy radios in Phase 3.  These arguments fail.  In *Markborough Calif., Inc. v. Superior Court*, 227

19   Cal. App. 3d 705, 714 (1991), the Court of Appeal stated that an exclusive remedy clause will be

20   upheld as reasonable and valid unless it is shown to be unconscionable or in violation of public

21   policy.  *Id.* at 714-15; *see also Bunch*, 559 F. Supp. at 968 ("California courts will enforce

22   commercial limitations on liability unless it is established that the limitation is unconscionable.").

23        BART does not attempt to argue that the limitation of remedies is unconscionable, nor

24   could it.  The forty-one pages of special conditions were not unilaterally imposed by GETS in a

25   form contract; they were specifically negotiated to modify BART's form contract, including

26   specifically SC8.3 about termination remedies, and BART is a sophisticated entity capable of

27   protecting itself.  More significantly, especially where an experimental design is involved, it is

28   not unconscionable for the party charged with trying to develop a complex product to restrict its

1  liability if it fails.  *Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F. Supp. 1188, 1196 (D.Mass.

2  1990) (limitation of liability in contract enforced as not unconscionable where defendant did not

3  complete "experimental" boomlift:  "The agreed-upon allocation of commercial risk should not

4  be disturbed . . . where . . . the warranted item is a highly complex, sophisticated, and in some

5  ways experimental piece of equipment."); *Dow Corning Corp. v. Capitol Aviation, Inc.*, 411 F.2d

6  622, 626 (7th Cir. 1969) (remedy of returning $25,000 deposit if experimental plane priced at

7  $260,000 could not be delivered was not unconscionable; "the unconscionability of a clause is to

8  be judged not in the abstract, but rather in its commercial setting.  Here, Aero was constructing

9  what was at least for itself a new type of airplane construction."); *JOM, Inc. v. Adell Plastics,*

10  *Inc.*, 151 F.3d 15, 28-29 (1st Cir. 1998) (neither unconscionability nor "failure of essential

11  purpose" vitiated exclusive remedy clause providing for refund of amount paid; risks in

12  proceeding with "new and untested" resin to save money were known to both sides at time of

13  contracting), *opinion vacated on other grounds on reh'g en banc*, 193 F.3d 47 (1st Cir. 1999).

14      Whether the contract limitation of liability is unconscionable is determined by looking at

15  what the parties expected when the contract was signed, because it is those risks that they

16  intended to deal with by agreement.  *JOM*, 151 F.3d at 29; Cal. Civ. Code § 1670.5(a); *A&M*

17  *Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 487 (1985) ("[S]ubstantive unconscionability

18  must be evaluated as of the time the contract was made.").  If sophisticated parties have decided

19  to allocate the risks in a particular way, the court should not rewrite the contract simply because

20  one of the risks they allocated has materialized.  *Employers Ins. of Wausau v. Suwanee River Spa*

21  *Lines, Inc.*, 866 F.2d 752, 780 (5th Cir. 1989) (parties allocated risks of "relatively novel"

22  catamaran tug barge; plaintiff entitled only to recover "cost of repair" even though barge could

23  not be repaired because it had sunk).  Even a "severe" allocation of risks is not illogical,

24  particularly because where "the subject of the contract [is] complex or innovative the contract

25  may allocate the risks differently than when the contract involved 'standard' goods . . .  We will

26  not disturb the agreed upon allocation of risks simply because the worst of those risks has

27  materialized."  *Id.* at 779-80.[2]  Whether BART can or wants to finish AATC by itself or with

28  _____

[2]  Moreover, unlike the more common exclusive remedy of "repair," which can be found to

1    others, or loses its past investments in AATC – because it no longer wants to be a guinea pig,[3] or

2    for any other reason – does not defeat the application of the exclusive remedy clause, because a

3    limitation on remedies in the event of termination of an experimental commercial development

4    project is not unconscionable as a matter of law.

5          BART cites *Hawley v. Orange County Flood Control Dist.*, 211 Cal. App. 2d 708 (1963)

6    for the proposition that an exclusive remedy clause is a disfavored forfeiture.  As Magistrate

7    Judge Spero of this Court explained in *Civic Center Drive Apartments Ltd. Partnership v.*

8    *Southwestern Bell Video Services*, 295 F. Supp. 2d 1091 (N.D. Cal. 2003), *Hawley* is limited to

9    the "no damages for delay" context in which it arose, and does not apply to other cases involving

10   limitation of liability clauses.  *Id.* at 1106 n.10 (no authority for applying *Hawley* more broadly,

11   especially because it would be inconsistent with *Markborough*).  Instead, the law governing

12   limitation of liability clauses is set forth in *Markborough*, cited in GETS' opening brief, and

13   ignored in BART's.  The fact that plaintiff might lose the right to pursue an otherwise valid claim

14   for more money does not invalidate a limitation of liability clause; indeed, that is the point of all

15   such clauses.  *Markborough*, 227 Cal. App. 3d at 717 (enforcing clause that limited liability for

16   negligent performance of consulting contract to refund of $67,640 fee paid, and denying

17   consequential damages of $5,000,000); *cf. Delta Airlines v. Douglas Aircraft Co., Inc.*, 238 Cal.

18   App. 2d 95, 104-5 (1965) ("In short, all that is herein involved is the question of which of two

19   have failed in its essential purpose where the contractor fails to repair, here the experimental
     design of AATC was such that GETS did not even promise to finish AATC in the event of a
20   termination before the development phase was complete (which distinguishes cases where the
     failure of essential purpose consisted of a party's failure to perform the repair obligation).  GETS
21   had the option to terminate its performance at any time for any reason.  Thus, there was never any
     guarantee of completion by GETS.  Moreover, even where BART opted to terminate for cause,
22   the contract plainly specifies that it is BART's obligation to complete AATC if it chooses, with
     the option of charging GETS for the completion.  This places the burden on BART in the first
23   instance to decide whether it will forge onward without GETS, based on whatever problem has
     led to the termination of the Phase 2 Work.
24   [3]   Reply Exh. FF (BART 30(b)(6) 4/29/09 Depo.) at 492:18-493:9 ("Q  Speaking on behalf
     of the entity, though, does BART -- is BART still interested in completing AATC today?  A:
25   BART today is no longer willing to be -- to offer itself as a guinea pig for a first of its kind like it
     was prior to this.  As a result of the lawsuit and other things I guess that has gone on since the
26   request for adequate assurances of due performance was filed, BART --BART simply is not
     willing to be a first.  ¶  If AATC were to be installed in revenue service in another transit
27   property, BART is willing to be second or third or fourth.  But -- so because primarily of that as I
     understand it, BART isn't willing to go forward with AATC if AATC isn't installed in revenue
28   service somewhere else first.").

1   equal bargainers should bear the risk of economic loss if the product sold proved to be defective.

2   . . . We can see no reason why Delta, having determined, as a matter of business judgment, that

3   the price fixed justified assuming the risk of loss, should now be allowed to shift the risk so

4   assumed to Douglas, which had neither agreed to assume it nor been compensated for such

5   assumption.").

6        Moreover, BART identifies no real unfairness here anyway.  If BART completes the

7   Work, then the radios that were sold to BART for the $34 million will be used in a working

8   system.  Either way, BART has the radios, and it's not inequitable that GETS keep the money

9   that paid for them.  If BART can show that Phase 3 should be rescinded – as it seeks in Count

10  Two – then it can return those radios for a refund.  That claim in the Third Amended Complaint is

11  not implicated by this motion, which addresses only Counts One and Three.  The parties chose

12  their own rules for what would be fair or unfair in the event of a termination during the Phase 2

13  development stage:  they agreed that if GETS was terminated just short of completing Phase 2,

14  BART couldn't sue for a refund for everything that had happened in the past, or the cost of

15  starting over with a completely different system.  It could obtain compensation only for the cost

16  of finishing the project.  Particularly in light of the experimental nature of this fixed-price

17  development contract for a "Pilot Demonstration Program," there's nothing inequitable about

18  limiting BART to the cost of completion, and then only if BART actually goes forward with

19  completion of the project.  *Cf. Markborough*, 227 Cal. App. 3d at 714 ("it has been recognized

20  that limitation of liability provisions are particularly important where the beneficiary of the clause

21  is involved in a 'high-risk, low-compensation service'").[4]

22       Lastly, BART complains that it has "approached" three suppliers and each refused to

23  partner with BART in completing AATC, and therefore BART cannot complete AATC even if it

24

25  _____

[4]   Here "low" is used in a relative sense only.  The compensation wasn't exactly "low," but

26  it was fixed – and fixed at a level far below the cost of other commercially available systems.
    BART's contention is that by failing to finish Phase 2, GETS became liable for up to $400

27  million on a contract that originally provided for only $45 million of compensation – and only
    provided for payments by BART of 50% of GETS' costs in Phase 2 capped at $5 million.  Bruen

28  Exh. A GR1.4, p. 1-0154.  In light of the risk of BART's novel radio-ranging-based design, this is
    exactly the kind of situation where a limitation of liability provision is warranted.

- 9 -

18972\2231100.1

1    wanted to.[5]  It is clear from the record that BART asked potential partners that were all virtually

2    certain to say "no" because they are all major suppliers of their own Vehicle-Centric systems –

3    including Alstom and Siemens, the very same suppliers that BART was asking to provide

4    estimates for an alternative vehicle-centric system at the same time it was purporting to ask them

5    if they would assist in completing AATC.  Asking one of them to assist BART in developing a

6    competing technology based on AATC would be much like asking Google to help one finish a

7    project to create an alternative search engine for the Internet, particularly if one were

8    simultaneously asking Google what it would cost to license Google's technology.  One would

9    know the answer without even bothering to ask the question.  BART offers no evidence that it

10   asked any potential partners who might conceivably have agreed (probably because, as BART's

11   30(b)(6) deponent has stated, BART no longer wants experiment with AATC, *see* footnote 3

12   above).  *Compare Hessler v. Crystal Lake*, 788 N.E.2d 405, 418 (Ill.App. 2003) (proper cover to

13   buy the same kind of car from a different dealership, even though it was more expensive, where

14   the plaintiff had already checked with thirty-eight other dealers).  But in any event, BART's

15   putative problems in finding someone who is willing to take on this hefty project to finish

16   unproven technology midstream are not for the Court to resolve or consider.  This was a risk that

17   BART took on:  it is undisputed that BART knew when it signed the contract that it was going

18   with an experimental approach instead of a proven technology already being implemented by one

19   of the other major train control suppliers, and so it might be hard to find other contractors to

20   finish the project if GETS backed out or was fired.  Reply Exh. BB (BART 30(b)(6) Depo.

21   10/22/09) at 183:10-24 (Harmon, which later became GETS, was the only company interested in

22   finishing AATC in 1997 when Hughes withdrew; "the other companies expressed no interest in

23   finishing the project"); *Suwanee River Spa Lines*, 866 F.2d at 779 ("Although the circumstances

24   which caused the repair remedy to fail had catastrophic results, those circumstances were not

25   beyond the contemplation of the parties."); *A&M Produce*, 135 Cal. App. 3d at 487 (1985)

---

26   [5]        Interestingly, none of the suppliers are claimed to have said that they couldn't finish
27   AATC based on source code or IP rights issues.  Dupont Decl. ¶ 7 ("Each of them advised me
     that they would be willing to provide BART their own CBTC systems, but they were not
     interested in finishing GETS' AATC work.");  Miller Decl. ¶ 2 (same re: earlier approach to
28   Alcatel); *see also* section I.C below.

1 ("unconscionability must be evaluated as of the time the contract was made."). The fact that

2 BART's half-hearted efforts to find someone to finish AATC haven't succeeded does not render

3 the exclusive remedy unconscionable.

### B. The Exclusive Remedy Clause Applies Because There Was A "Termination" Of Phase 2.

6 BART next argues that there was no "termination" of Phase 2. As a matter of law based

7 on the undisputed facts, BART is incorrect.

8 While BART asserts vaguely that "the law is clear that 'terminate' means different things,

9 in different contexts, for different purposes," Opp. at 15:22-23, the task here is simpler than that.

10 In the context of interpreting what the word means *in a contract*, California courts have held "that

11 word generally is used in its ordinary and popular meaning, i.e., 'to end,' 'to put an end to.'"

12 *Western Camps, Inc. v. Riverway Ranch Enterprises*, 70 Cal. App. 3d 714, 723 (1977); *cf.*

13 Webster's New World Dictionary ("termination" means "to put an end to; stop."). BART agrees

14 that if a party sues for total breach it has the option of treating the contract as terminated, Opp. at

15 14:12-13, 15:23-25; *see also Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594 (1969)

16 ("A breach does not terminate a contract as a matter of course but is a ground for termination at

17 the option of the injured party"), and factually concedes that it did just that: "BART's filing of

18 the complaint then terminated the contract as a matter of law." Bruen Exh. S (BART Answers to

19 Fourth Set of Interrogatories, # 83); *see also Coughlin v. Blair*, 41 Cal. 2d 587, 599 (1953) (by

20 bringing suit for value of entire contract, plaintiffs gave notice that they would no longer treat

21 defendants' continued failure to perform as a partial breach, and were excused from further

22 obligation to perform). As BART concedes, this is also how the California Supreme Court uses

23 the word "termination." *See* Opp. at 16:19-20 (citing *Taylor v. Johnston*, 15 Cal. 3d 130, 137

24 (1975)); *see also Bunch,* 559 F. Supp. at 968 ("California courts give the word "terminate," unless

25 otherwise stated, its ordinary meaning when it appears in a contract, that is, termination for any

26 reason") (citing *Western Camps*).

27 BART seeks to make a distinction between "termination" and "cancellation," contending

28 that "while filing the complaint 'terminated' the contract in the sense of 'cancellation,' . . . that

1   was not the same thing as a 'termination' under Article P8.3 . . ."  Opp. at 16:26-17:2.  This

2   semantic argument does not hold water when measured against the ordinary meaning of the word

3   terminate as used in the dictionary, California case-law, and BART's own interrogatory response

4   where BART legally conceded that it "terminated" the contract.  Moreover, the exclusive remedy

5   clause does not depend on whether BART exercised P8.3.  GETS has assumed, for purposes of

6   the motion, that BART could obtain the benefit of P8.3 by invoking it.  *See* Motion at p.9, n.9.

7   Of course, if BART sticks with its position that it has not invoked P8.3, then it is all that much

8   clearer that summary judgment should be granted in light of the exclusivity provision because

9   then there is no contractual basis on which termination damages can be awarded (if it does not

10  invoke P8.3, then BART is not entitled even to the remedy of completing AATC and charging the

11  cost of completion to GETS).

12      BART states that P8.3 is a "discretionary" remedy – that BART doesn't have to terminate

13  anytime GETS defaults, and doesn't have to finish the Work either.  GETS agrees.  But the

14  conclusion that BART draws from this – that BART therefore can choose to sue for damages for

15  the cost of an all-new system, instead of being limited to the "sole and exclusive rights" set forth

16  in the contract – is what does not follow.  The only discretionary aspect of "sole and exclusive

17  rights" is whether to exercise them; there is no option of choosing different rights instead.

18      BART argues that there is no termination because it has not yet elected remedies, and

19  some of its claims for relief are based on the continued existence of the contract.  This is why the

20  motion is only directed at certain claims for relief:  Counts One and Three.  If BART elects

21  remedies based on other counts, then the relief in the action will be unaffected by the motion.

22  Count Two is for rescission of Phase 3.  An award to BART on that count would not be contrary

23  to the exclusive remedy, because BART could have that remedy even without termination of

24  Phase 2 Work.  Count Five, for specific performance, likewise does not involve termination of

25  Phase 2 Work.  But Count One, for rescission of the entire contract, would "put an end to" Phase

26  2 Work, permanently.  Count Three similarly is based on BART having put an end to the Phase 2

27  Work; its express allegations included a claim for damages for "the costs to complete Phase 2

28  . . ." (TAC ¶ 80) and its damages claims are based on the concept that it can buy a complete

1   replacement.  This is because BART treated the material breaches as terminating the contract by

2   filing suit.  Bruen Exh. S.  It is true that "some of BART's claims do not involve 'termination' at

3   all," Opp. at 16:25-26, but the remedy is limited if BART elects to have judgment entered on

4   those that do:  Counts One and Three.  Summary judgment may therefore be entered against those

5   claims, because as a matter of law BART cannot obtain relief other than its actual expenditures in

6   finishing AATC, and it is undisputed that it has "none."  Bruen Exh. S at # 85.

7           BART also chides GETS based on its usage of the word "termination" in a motion to

8   dismiss earlier in the case.  (The motion to dismiss was later withdrawn pursuant to stipulation of

9   the parties; there is no issue of judicial estoppel here).  The context was in discussing BART's

10  Fourth Count:  that GETS had exercised its right to voluntarily terminate the contract under

11  P8.4.1.  The discussion there was to point out that not every termination involves a breach; GETS

12  argued that the complaint lacked sufficient detail because it did not, in Count Four, allege any

13  breach (and that the word "termination" didn't imply a breach).  There is no inconsistency with

14  GETS' argument here, because the usage of "termination" in P8.4.1.3 could encompass either a

15  contractual right of termination without cause *or* what Witkin calls "cancellation":  "put[ting] an

16  end to the contract for breach by the other" with the same effect.  Witkin, 1 *Summary of*

17  *California Law*, § 925 (2005).  Both are "terminations" as that term is used in P8.4.1.3, because

18  both put an end to the Phase 2 work.  *Western Camps*, 70 Cal. App. 3d at 723 ("terminate," as

19  used in contracts, means "put an end to."); *see also Bunch*, 559 F. Supp. at 968 ("terminate" in a

20  contract under California law means termination for any reason).

21          **C.      BART'S Arguments Concerning The Source Code And IP Rights Fail.**

22          BART next complains that it should not be limited in its remedy because GETS still has

23  the source code and certain IP rights.  But that complaint rings hollow because it ignores the

24  contractual provisions that would have allowed BART to obtain the source code had it chosen to

25  follow those provisions, and that already give BART all the IP rights it needs.

26          As an initial matter, BART concedes that California Commercial Code section 2719 (on

27  whether a limited remedy fails of its essential purpose) does not apply.  To the extent section

28  2719 is offered as "guidance" by BART, GETS notes that at least one court has refused to apply

section 2719 to an exclusive remedy clause outside the UCC, noting that the common law rule in California is instead that an exclusive remedy clause will be enforced unless it is unconscionable or violates public policy (and with no other apparent exceptions).  *See Civic Center Drive Apts.*, 295 F. Supp.2d at 1106 n.10 ("With respect to the failure of essential remedy cases, all of these cases appear to be based on specific provisions of the U.C.C. that are not applicable here."); *cf. Markborough*, 227 Cal. App. 3d at 714-15 (exclusive remedy clauses are reasonable and valid, unless unconscionable or shown to violate public policy).  The holding of *Markborough* and other California cases that unconscionability must be shown means that the attempt to incorporate some other lesser standard by looking to the UCC must fail as contrary to the strength of California's common law policy of upholding clauses limiting liability in the commercial context.

But even if the failure of essential purpose rule in UCC 2-719(2) did apply here legally, it does not apply factually.  While BART claims that it cannot proceed without the source code, BART had a means to obtain the source code, but has thus far simply chosen not to exercise it. *National Rural Telecomm. Cooperative v. DirecTV, Inc. ("NRTC")*, 319 F. Supp.2d 1040, 1055 (C.D.Cal. 2003) (where plaintiff did not exercise termination right for default thereby entitling it to limited remedy, it could not claim that limited remedy failed of essential purpose; partial summary judgment enforcing damages limitation granted).  Absent a termination, the source code was not required to be delivered until the end of Phase 3, which is why GETS properly refused BART's request.[6]  But BART also has the right at any time to send GETS a written Notice of Termination.  P8.3, P8.4, SC8.3; *see also* P1.3 (defining Notice of Termination).  Sending a written Notice of Termination would give BART a series of interrelated rights.  First, as has been discussed at length, BART has the right to complete the Work and charge the expense to GETS if

---

[6]     In Change Order 62, a list of data requirements for Phase 2, the entry next to the five source code deliverables (CDRLs # 201, 204, 206, 207, and 210) was "Escrow agreement needs to be finalized."  Reply Exh. CC (Change Order 62) at p. 2-0338 - 0339..  In Change Order 97, the Phase 2 punchlist, these items were left off of the list.  *See* Sink Exh. M (Change Order 97).  The parties later agreed that these items would be provided at the end of Phase 3.  *See* Reply Exh. DD (December 23, 2004 letter of K. Resnick).  By attaching only BART's in-house counsel's uninformed request for the source code, and not GETS' response, BART gives the false impression that GETS was stonewalling.  But in any event, as explained in text, the real point is not whether BART was entitled to the source code before termination; the point is that the contract provides them an undisputed mechanism for obtaining the source code to finish the project:  sending a written Notice of Termination under P8.3 and P.8.6.

1    it terminates for cause.  P8.3, at p. 1-0053.  Second, P8.6 provides that upon BART's delivery of

2    a Notice of Termination, GETS shall:

3        (d) if directed by the Engineer, transfer title and deliver to the District (i) the
         fabricated or unfabricated parts, work in progress, completed work, supplies and

4        other material produced as a part of, or acquired in connection with the
         performance of, the Work terminated by the Notice of Termination, and (ii) the

5        completed or partially completed plans, drawings, information and other property
         which, if the Contract had been completed, would have been required to be

6        furnished to the District . . . .

7    P8.6, p. 1-0054.  Therefore, BART could obtain the source code by invoking the termination

8    provision.  BART has not done this – because if it did so and it turns out BART was wrong to

9    terminate GETS, because the termination was "without cause," then BART would owe GETS up

10   to $10 million for its costs under P8.4.1.1, and because sending a notice of termination would put

11   the last nail in the coffin of BART's argument that it was able to terminate without "termination."

12       The proper contractual route for BART to follow is clear:  if it contends that GETS was in

13   breach, it could and should have issued a Notice of Termination under P8.3, requested and

14   obtained the source code, and completed AATC if it chose to do so.  But BART wants to "have

15   its cake and eat it too" – it wants to avoid the exclusive remedy provision by the artificial means

16   of not issuing a Notice of Termination, then blame GETS for not handing over the source code,

17   and instead seek the cost of a far better, *proven* technological solution rather than the

18   experimental AATC technology that it set out to develop.  BART cannot avoid the application of

19   the remedial provisions of the contract by simply failing to follow them.  *NRTC*, 319 F. Supp.2d

20   at 1055 (granting partial summary judgment based on exclusive remedy clause over plaintiff's

21   objection that remedy failed of essential purpose; plaintiff failed to seek partial refund by sending

22   notice to cure and then terminating).  It certainly cannot fault GETS for refusing to turn over the

23   source code when BART refrained from issuing a Notice of Termination for its own strategic

24   reasons.  BART could obtain the source code by following P8.3 and P8.6, and so the remedy does

25   not "fail of its essential purpose," GETS is not estopped from asserting the limitation of remedy,

26   and GETS did not act in bad faith by refusing to send the source code.

27       Moreover, if BART is correct that GETS should have transferred the source code already,

28   then BART will prevail on its Fifth Count, for specific performance.  TAC ¶¶ 85-93.  Thus if

1   BART is entitled to a remedy against GETS, then it will as part of this suit obtain what it claims it

2   needs to complete the job.  The exclusive remedy provision will then not fail of its essential

3   purpose because BART will have what it claims it needs (unless BART is wrong about GETS'

4   breach, in which case it is entitled to no remedy anyway).

5          BART next complains of a restrictive legend placed on certain documents by GETS,

6   which asserts that GETS has certain IP rights with respect to the documents.  But as BART itself

7   admits, it "had a sub-license from GETS to use GETS' AATC technology for its own operations"

8   (Opp. at 7:23-24), and the source code as well as these other documents fall within SC1.2.9's

9   broad definition of "technology."  Examined in that context, it is evident that whatever restrictive

10  legend GETS put on the documents cannot override the contract's specific grant of a license to

11  BART.  *See* Bruen Exh. A at SC7.0.3 ¶ 2.  Similarly, BART retained the right to use the Hughes

12  technology in the event GETS stopped manufacturing the radios, including by getting the source

13  code.  SC5.1.1.  BART's status as a sub-licensee reinforces its entitlement to obtain the source

14  code and other documents under P8.6 if it terminates the contract under P8.3.

15  **II.     BART'S "EXPECTATION DAMAGES" ITEM OF DAMAGE, BASED ON THE
          COST OF A NEW VEHICLE-CENTRIC CBTC SYSTEM, SHOULD BE
16         SUMMARILY ADJUDICATED.**

17         In the opening brief, GETS explained that the proper measure of damages is based on the

18  system that BART would have gotten under the contract, not based on some other, newer, proven,

19  and different system, even if that other newer, different system would have met the same goals.

20  BART does not dispute the facts here – though it tries to add a new one, about the cost to finish

21  AATC.  This Court should thus summarily adjudicate the issue of BART's expectation damages.

22                 **A.     BART'S New "Cost To Complete" Estimate Shows That BART Could Have
                       Estimated Damages Properly, But Chose Not To.**
23

24         Faced with the argument that the proper measure of damages is the cost-to-complete,

25  BART now states that the cost of completing AATC would be $150 million.  Opp. at 9:22-23,

26  22:11-14 citing Dupont ¶ 9.  The problem for BART is that this testimony, whether reliable or

27  not,[7] is inadmissible.  As set forth in GETS' separately filed Objection to Dupont Declaration,

28  ――――――――――
    [7]    Mr. Dupont refers to an engineer's estimate that he prepared, though he doesn't say when

1    Dupont's expert testimony on this point is barred by Rule 37(c) for the failure to make a timely

2    expert disclosure.  Late disclosed supplemental expert testimony cannot be used to defeat

3    summary judgment, because expert and summary judgment deadlines are no good unless they are

4    enforced.  *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1060, 1067 (9th Cir. 2005) (affirming

5    summary judgment based in part on exclusion of late supplemental expert report by existing

6    expert where expert disclosure deadline was prior to summary judgment deadline and party

7    moving for summary judgment filed after expert deadline, even though trial date was still months

8    away); *Leviton Mfg. Co., Inc. v. Nicor, Inc.*, 245 F.R.D. 524, 530-31 (D.N.M. 2007) (late

9    supplemental expert report in opposition to summary judgment will not be considered).  Adding

10   new opinions to an expert's report after the disclosure deadline, merely to respond to the

11   arguments made in a summary judgment motion, cannot defeat summary judgment.

12          The inadmissible Dupont testimony does show, however, that BART could have

13   attempted to measure damages by the proper method – as its initial disclosures had stated it would

14   – but simply chose not to for tactical reasons.  In any event, the difference between $150 million

15   and $241-383 million is quite significant.  Even if the Court decides that BART can now present

16   evidence on the cost to finish AATC at trial, it should nevertheless summarily adjudicate that the

17   alternative suppliers' proposals – none of which are for the cost to finish AATC – may not be

18   offered as evidence of BART's damages.  *See* Fed. R. Civ. P. 56(d)(1).

19
20          **B.      BART Does Not Create Disputed Issues Of Material Fact Concerning The
                       Vehicle-Centric CBTC Systems.**

21          BART's opposition shows why this issue is ripe for determination as a matter of law:

22   BART never disputes the facts about the five Vehicle-Centric CBTC estimates that it uses as its

23   measure of damages.

24          BART concedes through its silence that GETS is correct that the five Vehicle-Centric

25   and doesn't attach it so that anyone can analyze what it says. From what little he says about it,
     the estimate appears inflated:  he added 20% to GETS' estimate even though that estimate already

26   took contingencies into account, and then performed some kind of "escalation" to account for the
     last five years' passage of time.  The declaration does not say whether Mr. Dupont subtracted out

27   the costs that BART would have incurred had it not claimed that GETS repudiated the contract
     and sued; BART had costs to complete AATC, and can't recover those costs that it would have

28   incurred anyway.

1    CBTC systems that BART points to as a measure of damages operate by materially different

2    principles (the wayside vs. carborne distinction, and the transponder-based vs. radio location

3    methods),[8] and use substantially more equipment.  It concedes, by failing to dispute it, that the

4    newer systems have features that AATC didn't, such as replacing elements of BART's existing

5    system with respect to functions including station stopping and vehicle regulation onboard the

6    train.  *See* Motion at 6:11-12 & n.6.  BART itself proves, by offering the Dupont declaration

7    concerning the cost of finishing AATC, that the other estimates are far more expensive:  $150

8    million now alleged for the cost of finishing AATC (as dubious and inadmissible as that evidence

9    is) vs. $241 million up to $393 million for the cost of the other systems.  And it concedes that the

10   five Vehicle-Centric systems are all proven, state-of-the-art systems, while AATC is an unproven

11   development project based on decades-old technology.  Thus its "substitution" would allow

12   BART to avoid all of the risk and uncertainty that it consciously accepted when it eschewed

13   existing systems and set out to develop its own AATC system based on new technology never

14   before used for train control.

15           The facts are undisputed; the Court should therefore answer the legal question now.

16   **C.     BART's Legal Discussion Fails To Address The Issues.**

17           BART acknowledges the line of cases that establishes that the proper measure for

18   damages is the cost to finish the project pursuant to the contract's terms and specifications.[9]  *See,*

---

19   [8]     On the issue of how trains are located, BART asserts that radio signals "can be used for
20   train location detection systems" in vehicle-centric CBTC systems. Opp. at 8:22-9:2, citing
     Lehrer Decl. ¶ 8.  But what Mr. Lehrer doesn't say is that any of the five systems BART uses for
21   its damages measure actually do.  In fact, none of the five systems that BART uses as its damage
     measure use radio signals in that way.  Instead, as set forth in the motion (including extensive
22   citations to the record), each of the systems that BART bases its damages on use installations of
     transponders to do the work of locating the trains.  See Motion at 5:9-14, incl. esp. record
23   citations at footnote 3.  BART's damages are based on systems that do not use the same operating
     principle, and instead use a lot more equipment to do the job in a different way.  *See also* Reply
24   Exh. EE (Ghaly Depo.) at 484:4-485:4 (by using transponders instead of radios for location,
     vehicle-based CBTC systems solve the problem of lateral track discrimination without reliance on
     BART's track circuits); *compare* Bruen Exh. A at TR2.5.1.3, TR2.5.1.3.1, and TR2.6.3.1.8.
25   [9]     BART cites two UCC cases in which the owner took steps to get a product that complied
     with the contract specifications:  *Leininger v. Sola*, 314 N.W.2d 39, 48-49 (N.D. 1981) (purchase
26   of bull to impregnate cows that were supposed to be pregnant) and *Dura-Wood v. Century*, 675
     F.2d 745, 753-54 (5th Cir. 1982) (cross-tie manufacturer who, after contract to supply
27   creosote/coal-tar treated cross-ties, simply manufactured and treated the ties in-house, was
     entitled to recover cost of doing so, but not profits lost because it was then occupied with making
28   the ties for itself).  But these cases do not help BART because BART's five damage estimates are

1    *e.g., Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.*, 66 Cal. App. 3d 101,

2    123-24 (1977) ("The proper measure of damages for breach of a contract to construct

3    improvements . . . is ordinarily the reasonable cost to the plaintiff of completing the work . . . .").

4    It attempts to distinguish these cases wholesale by simply referring to its source code/IP rights

5    argument. As discussed above, that argument fails.

6          Turning to the UCC analogies, BART's citation to cases about oats, raisins, hog feed,

7    motor oil, or aluminum siding is unpersuasive. In determining the propriety of BART's damages

8    evidence, cases about complex technology and using one system to substitute for another system

9    are far more pertinent. In the opening brief, GETS presented three such cases: *Valley Die Cast v.*

10   *ACW Inc.*, 181 N.W.2d 303, 336-37 (Mich. App. 1970), *Bockman Printing Servs. v. Baldwin-*

11   *Gregg, Inc.*, 572 N.E.2d 1094 (Ill.App. 1991), and *IDX Systems v. St. John Health System*, 2003

12   WL 25676069 (E.D.Mich. 2003). BART does not distinguish or analyze these cases, or contend

13   that the principle explicated from them does not reflect the law; it simply ignores them altogether.

14   Even the cases about automobiles are more pertinent than the commodity cases BART cites;

15   automobiles involve complex machinery (like AATC and Vehicle-Centric CBTC systems). But

16   BART ignores these as well.[10]

17          BART also cites *Hughes v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001). Careful

18   reading of this case shows it does not stand for the proposition for which BART cites it. The

19   contract, as interpreted by the trial court, required launch of five Hughes HS-393 satellites by

20

---

21   all based on the cost of doing something *different* from what the parties agreed to, not finishing
     the job and supplying AATC itself.
     [10]    BART does cite two vehicle cases, but they are both unhelpful to BART. In *Hessler v.*

22   *Crystal Lake*, 788 N.E.2d 405, 418 (Ill.App. 2003), the court held that it was proper to buy the
     *same* kind of car from a different dealership, even though it was more expensive, where the

23   plaintiff had already checked with *thirty-eight* other dealers. In *Thorstenson v. Mobridge*, 208
     N.W.2d 715, 717 (S.D. 1973), whether a replacement tractor was "entirely different' or "similar"

24   to the one contracted for was a question of fact where the contract was for delivery of a Case 730
     tractor mounted with an F-11 Farmhand loader, and plaintiff went out and bought a Case 730

25   tractor mounted with an F-11 Farmhand loader. *Id.* at 716. Because in both cases the plaintiff
     went out and bought the same type of vehicle (down to the model name), those cases do little to

26   elucidate what should happen if a plaintiff tries to buy a very different kind of technology that
     uses very different equipment and operating principles and has different features. At some point,

27   as a matter of law, the technology is not close enough; GETS submits that the cases it cites show
     where the differences become significant enough that the alternative is no longer relevant as a

28   matter of law.

1   NASA.  *Id.* at 1068-69.  Damages were therefore calculated based on the estimated cost of

2   launching five HS-393s, using the actual costs of launching three HS-393s, and then an average

3   cost for the other two.[11]  *Id.* at 1069; *see also Hughes Comm. Galaxy, Inc. v. United States*, 47

4   Fed. Cl. 236, 244, 247 (Fed.Cl. 2000).  The discussion BART points to concerns the

5   Government's argument that Hughes stopped launching HS-393s because it wanted to launch

6   "more powerful" HS-601 satellites instead – i.e., an argument that Hughes had no damages

7   beyond the three launches.  *Id.* at 1067.  The trial court found that Hughes would have kept

8   launching HS-393s, but in any event the Government did not pay more for its breach of contract:

9   "Had Hughes kept using the HS-393s, it would likely have incurred the same damages that the

10  Court of Federal Claims awarded."  *Id.* at 1067.  The trial court did not discuss Hughes' expert's

11  testimony concerning the costs of launching the more powerful HS-601s; it instead calculated

12  damages solely on the cost of doing what the contract provided for:  launching HS-393s.  *See* 47

13  Fed. Cl. at 239 (distinguishing the "Ten 393 Method" from the "Primary Method").  Hughes thus

14  did not get damages based on an upgrade, as BART attempts to do here.

15      Significantly, BART identifies no case in which a party was allowed to upgrade to a

16  proven product from an unfinished experimental design.  BART has not disputed that "the five

17  Vehicle-Centric systems are all proven, state-of-the-art systems, while AATC is an unproven

18  development project based on decade-old technology."  Motion at 16:3-5.  The parties always

19  knew that this project could fail; BART itself alleges this in the complaint.  TAC ¶ 28(3).[12]

20  BART no longer wants to develop a new technology or, in its words, be a "guinea pig."[13]  That's

21  _____
    [11]      No one appears to have argued that expendable rockets were not a proper "cover" for
22  shuttle launches.  The shuttle was no longer available for commercial flights and so expendable
    rockets were the only reasonable substitute.
23  [12]      The Third Amended Complaint alleges:  "The Contract also addresses the risks inherent in
    all research and development projects that seek to expand existing knowledge, such as that the
24  objective might not turn to be technically achievable, that the cost of completing Phase 2 work
    might be greater than expected or commercially acceptable, or that the market value of the
25  technology if and when perfected might be less than originally hoped because of interim
    development of competing technologies or other changes in the marketplace.").  TAC ¶ 28(3).
26  [13]      Reply Exh. FF (BART 30(b)(6) 4/29/09 Depo.) at 492:18-493:9 ("Q  Speaking on behalf
    of the entity, though, does BART -- is BART still interested in completing AATC today?  A:
27  BART today is no longer willing to be -- to offer itself as a guinea pig for a first of its kind like it
    was prior to this.  As a result of the lawsuit and other things I guess that has gone on since the
28  request for adequate assurances of due performance was filed, BART --BART simply is not
    willing to be a first.  ¶  If AATC were to be installed in revenue service in another transit

1   BART's choice.  But BART cannot seek damages based on a non-experimental, proven system

2   when all it contracted for was a "Pilot Demonstration Project."

3         BART also argues that it is GETS' burden to prove that BART could have completed

4   AATC, rather than BART's burden to establish that it could not.  BART is incorrect.  BART has

5   the burden of proof on the elements of its damages, which in this context requires it specifically

6   to show the cost to finish AATC pursuant to the contract specifications (or if BART contends that

7   some other measure applies, the facts that justify applying that alternative measure).[14]  BART's

8   attempt to shift the burden of proving its damages to GETS, by claiming that GETS must show

9   the cost to complete AATC, finds no support in the law.[15]

10        But in any event, the burden of proof does not matter here, because the facts are

11  undisputed and no reasonable jury could properly award damages based on the cost of the

12  Vehicle-Centric CBTC systems.  Summary adjudication should therefore be granted.

13  **III.    THE VOLUNTARY TERMINATION CLAUSE CAPS BART'S DAMAGES.**

14        As set forth in the opening brief, one core principle of contract law is that a party cannot

15  obtain a remedy for breach that is better than what the party would have gotten had the contract

16  been fully performed.  Civ. Code § 3358.  Where there is a voluntary termination provision in the

17  _____

18  property, BART is willing to be second or third or fourth.  But -- so because primarily of that as I
    understand it, BART isn't willing to go forward with AATC if AATC isn't installed in revenue
    service somewhere else first.").

19  [14]   Cal. Evid. Code § 500 ("Except as otherwise provided by law, a party has the burden of

20  proof as to each fact the existence or nonexistence of which is essential to the claim for relief or
    defense that he is asserting."); *CDF Firefighters v. Maldonado*, 158 Cal.App.4th 1226, 1239

21  (2008) (plaintiff has the burden of proof on damages in a contract case, including both the fact
    and the amount of damages); *cf. Adams v. Murakami*, 54 Cal. 3d 105, 119 (1991); *Lakin v.*
    *Watkins Assoc. Indus.*, 6 Cal. 4th 644, 660-61 (1993).

22  [15]   BART's citation to mitigation cases is inapposite.  Mitigation only applies after the

23  plaintiff has first shown their damages pursuant to the proper measure.  In each of BART's cited
    cases, the party had taken some step to remedy the situation, thus fixing their damages with

24  reference to real-world expenses, and it was then the defendant's burden to show the
    unreasonableness of the plaintiff's action.  *See Brandon & Tibbs v. George Kevorkian*

25  *Accountancy*, 226 Cal. App. 3d 442, 455 (1990) (plaintiff started a new accounting office;
    defendant had burden of showing choice was unreasonable); *Mendoyoma v. Mendocino*, 8 Cal.

26  App. 3d 873, 879 (1970) (plaintiff showed amount he spent; defendant had burden to show
    expenses were extravagant and unnecessary); *Chyten v. Lawrence & Howell Investments*, 23 Cal.

27  App. 4th 607, 616 (1993) (plaintiff opened his own law practice; defendant had burden to support
    contention that he should have looked longer and harder for a job as an employee); *compare* UCC

28  2-708 (damages measured by fair market value) with UCC 2-712 (damages measured by cover);
    *IDX* (cover requires an actual purchase).

contract, this principle means that damages are limited to those that would accrue during the

termination notice period.  This principle was first established in California in *Pecarovich v.*

*Becker*, 113 Cal. App. 2d 309 (1952), which traced the principle back to an English law decision

from 1830 (and cited a number of cases from other states), and was more recently discussed in the

California Court of Appeal's thoughtful and reasoned opinion in *Martin v. U-Haul Co. of Fresno*,

204 Cal. App. 3d 396 (1988), which explained that "Parties who agree that a contract may be

terminated for any reason, or no reason, upon the giving of the specified notice could not

reasonably anticipate that damages could exceed the notice period."  *Id.* at 409.

BART attempts to avoid this principle by claiming that it applies only where the

defendant "refuses to perform the contract" or breaches the contract "in such a way as to

terminate it entirely."  Opp. at 23:13, 23:20.  This alleged factual distinction provides no aid to

BART.  BART claims that GETS did repudiate the contract.  TAC ¶ 59, 61.  Its complaint alleges

that GETS anticipatorily repudiated, by answering the "requests for adequate assurances" as it

did, and by taking the contractual positions that it did (e.g., in BART's view, "contend[ing] that

most of its remaining Phase 2 development work was 'out of the scope of the Contract,' and at

BART's expense.").  *See* Opp. at 5:19-21; *id.* at 6:26-28 (same, for period August 2003 to late

2005); *id.* at 7:1-11 (GETS took position on contract terms concerning safety that BART viewed

as "bottom line and a no compromise matter"); 12:5-6 (GETS did not, in response to BART's

"request for adequate assurances," "provide BART with the requested safety responsibility

assurance and return to work.").  If the key element of the *Pecarovich/Martin* cases is that the

party "refuses to perform the contract," then it's unclear why BART thinks that element isn't

present here, given its theory of the case.[16]

---

[16]     BART's factual position appears to be based in some way on its own dismissal of its
Fourth Count – which claimed that GETS had exercised its voluntary termination rights "through
conduct."  *See* Opp. at 23 n.14.  GETS always regarded the Fourth Count as meritless because the
voluntary termination rights, under the terms of SC8.3, were to be exercised by "sixty (60) days
written notice," *see* P8.4.1.  Indeed, GETS had secured an admission in discovery that would lead
to summary judgment on the claim.  Reply Exh. GG.  BART then offered to stipulate to its
dismissal, which was obviously just fine with GETS, and included the factual recital that "GETS
did not terminate the Phase 2 Work within the meaning of Articles SC8.3 and P8.4 of the contract
. . . ."  Stringer Decl. ¶ 14 and Exh. 6.  None of this meant that BART no longer contended that
GETS' conduct wasn't a repudiation of the contract, a "refusal to perform," or a termination-in-
fact.  It only took BART's claim that GETS had exercised SC8.3 out of the case.

1    But setting aside the difficulty BART has in making the factual distinction, the distinction

2    doesn't work as a legal principle either.  The core principle of *Martin*– that a party should not be

3    better off through damages than if the contract a party had exercised a voluntary termination

4    provision, applies with equal force to breaches that look like terminations and breaches that do

5    not.  BART's proposed distinction would be a strange rule indeed.  If GETS encounters a project

6    difficulty and decides not to finish the project, its liability is capped under *Martin* and *Pecarovich*

7    at the amount it pays under the voluntary termination clause; according to BART's expert this is

8    $70 million.  But if BART sees that GETS is encountering a project difficulty and might exercise

9    its right to terminate, it can run to the courthouse first claiming material breach of contract,

10   thereby terminating GETS and – if BART is right about the law – sue for the entire value of the

11   work that could have been completed (either $150 million or even $241-393 million, according to

12   BART's experts).  The strange result that BART advocates – that GETS' liability for breach of

13   contract varies depending on whether it breached by terminating, instead of breaching and then

14   being terminated for breach before it could itself terminate, and that the substantive outcome

15   should be controlled solely by a race to the courthouse – is contrary to California Civil Code

16   § 3358 "no person can recover a greater amount in damages for the breach of an obligation, than

17   he could have gained by the full performance thereof on both sides."  *See also Martin*, 204 Cal.

18   App. 3d at 410.  As *Martin* holds, because GETS could have "performed" by making the payment

19   set forth in P8.4.1.2, a refund is the most BART could ever reasonably expect, and can therefore

20   recover, under this contract.

21   BART tries to establish its "must look like termination" exception with three cases.  None

22   of them is persuasive.

23   First, BART cites a 1971 Ninth Circuit case apparently decided under Oregon law, *Ring*

24   *Bros. v. Martin Bros.*, 438 F.2d 420 (9th Cir. 1971).  The discussion in the case is bare-bones and

25   unanalyzed, especially in contrast to the five pages of California law analysis in *Martin*, 204 Cal.

26   App. 3d at 407-411; it cites only a 1925 Ninth Circuit case under Montana law, and then only to

27   distinguish it by concluding without citation to authority that the lack of a contractual termination

28   or an "open and obvious repudiation of the contract" meant that damages were not limited by the

REPLY ISO GETS' MOTION FOR PARTIAL                 - 23 -                        18972\2231100.1
SUMMARY JUDGMENT/SUMMARY ADJUDICATION
 - Case No. C-06-03749 JSW

termination clause.  *Ring Bros.* is contrary to the holdings of *Martin*, *Pecarovich*, and *Epis, Inc. v.*
*Fidelity and Guaranty Life Ins. Co.*, 156 F.Supp.2d 1116, 1127 (N.D.Cal. 2001) each of which
held, applying California law, that failure to exercise the termination option did not affect the
result:  either way, the non-defaulting party could not obtain more in damages than by full
performance of the contract, which could have included the alternative performance by an early
termination notice.

BART next cites *Kuffel v. Seaside Oil Co.*, 11 Cal. App. 3d 354 (1970).  *Kuffel* held that
plaintiff's damages were speculative, and reversed the verdict of a bench trial on that basis.  *Id.* at
361-367.  Then, in dicta to provide guidance on remand, the court rejected Seaside's argument
that damages for its *fraud* (not breach of contract) should be limited to a 15 day period based on a
termination provision that Seaside claimed *could have* shortened the contract's term.  Because the
case involved tort damage instead of contract damages, the *Pecarovich*/*Martin* principle – that
contract expectation damages are limited by the possibility of exercise of a voluntary termination
clause – was not at issue.  But even if the case had been under contract law, *Pecarovich* and
*Martin* would have been irrelevant, because as the court went on to explain, the contract's
termination clause could not be exercised at any time before expiration of the ten year term of the
contract.[17]  *Id.* at 368.  The dicta BART points to thus won't bear the weight BART places on it;
there wasn't a termination provision that could have shortened the contract.

BART's final citation is, as it knows, improper.  *See* N.D. Cal. Civil L. R. 3-4(e)
("Prohibition of Citation to Uncertified Opinion or Order").  This Court's task sitting in diversity
is to determine what the California Supreme Court would do; to do so, it looks to the published
appellate case-law and not unpublished decisions that cannot be cited within the California court

---

[17]      BART claims that *Kuffel* can be harmonized on its facts with *Pecarovich* and *Martin*, all
three standing for the principle that the defendant must either exercise a termination right or
indirectly terminate the contract through conduct that breaches the contract in such a way as to
terminate it.  *Kuffel* can't be reconciled on its facts:  the supplier's conduct consisted of
completely refusing to supply any more gasoline to the gas station owner the day after having
secured a termination document by fraud.  If it were in fact a *contract* damages case, and *had*
involved a termination provision that could have shortened the term, then *Kuffel* would be
contrary to *Pecarovich* and *Martin*.  In that case, GETS would point out simply that *Kuffel* lacks
any reasoning or discussion of prior California case-law (unlike *Pecarovich* and *Martin*, which
each have extensive discussion of California contract damages law standards and voluntary
termination cases).

1   system.  *See Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 722 n.2 (9th

2   Cir. 2009) ("While the question [in this case] has been addressed by us and the California Court

3   of Appeals, it has not been resolved in a published opinion on which we may rely.").  One

4   problem with unpublished decisions is that the court writes them believing the decision will never

5   be cited as law; dicta can therefore be used more casually, and vestiges of bench memos are

6   sometimes not excised with the care devoted to opinions designated for publication.  *Cf. Hart v.*

7   *Massanari*, 266 F.3d 1155, 1170-71 (9th Cir. 2001) ("[W]hen crafting binding authority, the

8   precise language employed is often crucial to the contours and scope of the rule announced."); *id.*

9   at 1177-79 (explaining why non-precedential opinions are less thoroughly crafted).  Here the

10  passage cited by BART is most decidedly dicta:  the holding was to reverse the jury's damage

11  award as unsupported by the evidence, so whether the damages should have been based on a sixty

12  day period or a nine month period had no effect.  *County of Los Angeles v. Baker*, 2005

13  WL1661986, at *17.  The distinction made from *Martin* is not based on any discussion of the

14  policy behind the rule or the case-law that created it, and had no effect on the outcome.  In a

15  published case, unreasoned dicta in a footnote would lack persuasive force; in an unpublished

16  one, it was intended by the court that authored it not to be used as authority for anything.

17                                 **<u>CONCLUSION</u>**

18          For the foregoing reasons, the Court should grant the motion for partial summary

19  judgment or summary adjudication.

20  Dated:  April 16, 2010                    FARELLA BRAUN + MARTEL LLP

21

22                                            By:    /s/
                                                 Thomas B. Mayhew
23

24                                            Attorneys for Defendant and Counterclaimant
                                              GE TRANSPORTATION SYSTEMS
25                                            GLOBAL SIGNALING, LLC

26

27

28